# STATE OF CONNECTICUT *v.* JOSHUA KOMISARJEVSKY
## (SC 18973)

Robinson, C. J., and Palmer, D'Auria, Mullins,
Ecker, Alvord and Keller, Js.*

### *Syllabus*

Convicted of numerous crimes, including six counts of capital felony, in connection with the invasion of the P family home in the town of Cheshire that resulted in a triple murder, sexual assaults, kidnappings, and arson, the defendant appealed to this court. The defendant, along with his accomplice, S, entered the home around 2 a.m. and proceeded to tie up the members of the P family, which consisted of J, her husband, W, and their daughters, H and M. Discovering that there was no money in the house, and concerned that his and the defendant's DNA would be found there, S drove J's car to a nearby gas station to buy gasoline and then, around 9 a.m., took J to a bank so she could withdraw a large sum of cash. While S was gone, the defendant sexually assaulted M and took sexually explicit photographs of her with his cell phone. After returning to the home, S sexually assaulted J and strangled her to death. Upon realizing that W was escaping and that the police, responding to a 911 call from the bank, were surrounding the house, S poured gasoline throughout the home, ignited it, and fled with the defendant in J's car. The defendant and S crashed the vehicle and were apprehended, while H and M perished in the ensuing fire. S was tried first and convicted.

---

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson, Justices Palmer, D'Auria, Mullins, Ecker, and Judges Alvord and Keller. Although Justice Mullins was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

338 Conn. 526     OCTOBER, 2021     527

State *v.* Komisarjevsky

Prior to the defendant's trial, the defendant filed a motion to change the venue from the judicial district of New Haven, arguing that the pretrial publicity surrounding his case, exacerbated by coverage of S's trial, would prevent him from empaneling an impartial jury. The trial court denied the motion. The jury returned a guilty verdict, and the trial court rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Held*:

1. The trial court did not violate the defendant's right to a fair trial by an impartial jury in denying his motion to change the venue from the judicial district of New Haven or in denying his challenges for cause to twelve prospective jurors:

a. There was no merit to the defendant's claim that the pretrial publicity surrounding his case created an irrebuttable presumption of prejudice that would have required moving the trial from New Haven, because, although certain factors relevant to determining whether prejudice should be presumed favored the defendant, namely, the nature of the media coverage and whether the passage of time had alleviated the impact of the prejudicial publicity, the extensive jury selection process employed by the trial court in this case, along with the characteristics of New Haven's population, strongly favored the state with respect to whether to presume prejudice: certain media coverage of the incident, particularly remarks from a state senator calling for the defendant to be hanged in the street by his genitalia and commentary from a bipartisan array of state politicians citing the home invasion in support of the death penalty, evoked the sort of community wide rush to judgment that can trigger a presumption of prejudice, and, because the defendant's case was tried only several months after S was convicted and sentenced, the passage of time between the home invasion and the defendant's trial did not mitigate the impact of that prejudicial publicity; nevertheless, when compared to other geographic regions that courts have considered sufficiently populous to permit the selection of an impartial jury, the size and diversity of New Haven, which had an urban and suburban population of 846,000 at the time of trial, greatly increased the feasibility of identifying an impartial jury, and the jury selection process in the present case, which allowed the attorneys for the state and the defendant to assess each prospective juror's familiarity with the case and ability to render an impartial verdict, which afforded each party forty peremptory challenges instead of the minimum thirty required in capital cases, and which left open the possibility of a change in venue in the event that individual voir dire did not result in the empaneling of an impartial jury in New Haven, outweighed the inflammatory nature of the publicity associated with the case such that the defendant failed to surmount the extremely high bar necessary to establish the existence of presumptive prejudice.

b. The extensive pretrial publicity surrounding the defendant's case did not result in actual prejudice that deprived the defendant of a fair trial, as

State *v.* Komisarjevsky

the voir dire process by which the jury was selected was constitutionally adequate: the individual voir dire process did not consist of the blind acceptance of prospective jurors' assurances of impartiality but involved a lengthy and thorough probing of their responses to questions by the state, the defendant, and the trial court, the defendant did not exhaust his peremptory challenges until the voir dire of the backup alternate jurors, after the regular and alternate jurors had been selected, or challenge for cause any juror who actually deliberated in his case, and the trial court implemented thorough measures to ensure the jury's continued impartiality through daily admonishments counseling the avoidance of any publicity; moreover, a detailed, juror by juror analysis of the jury selection record, which focused on the extent of each juror's exposure to pretrial publicity and its effect on his or her case knowledge and impartiality, revealed that each juror who deliberated at trial and sentencing repeatedly expressed his or her ability to be fair and impartial, to apply the appropriate burden of proof and the presumption of innocence, and not to be swayed by sympathy or to be affected emotionally after viewing disturbing evidence; furthermore, the fact that some of the jurors expressed sympathy for W and the P family did not indicate that they were so impartial that they could not set aside their impressions to return a verdict on the basis of the evidence, none of the jurors was personally affected by the events at issue, and the fact that several prospective jurors lost their composure and made inappropriate outbursts, including crying openly in court and making menacing comments about or toward the defendant, did not deprive the defendant of a fair trial because the trial court questioned the prospective jurors who had witnessed the outbursts to ensure that the outbursts would not affect the jurors' impartiality; accordingly, in light of the deference appellate courts afford to a trial court's assessment of the impact of pretrial publicity on juror impartiality, this court concluded that the trial court had correctly determined that the pretrial publicity did not result in actual jury prejudice.

c. The defendant could not prevail on his claim that the trial court had abused its discretion in denying his challenges for cause to twelve potential jurors because any error was harmless; an improper denial of a for cause challenge is not prejudicial unless the defendant shows that the ruling resulted in an identifiable, objectionable juror actually serving on the jury that decided the case, and none of the twelve jurors that the defendant challenged for cause actually deliberated on his case or decided his guilt.

2. The trial court did not abuse its discretion in denying the defendant's motions for a continuance, to reopen the evidence, and for a mistrial, which were all based on his contention that the state had improperly failed to disclose until after the close of evidence approximately 130 pages of letters written by S while S was incarcerated, as there was no miscarriage of justice or prejudice resulting from the late disclosure of

State *v.* Komisarjevsky

the letters: even if the letters, which, according to the defendant, contained S's admissions that he was the mastermind behind the home invasion and that he previously had raped, tortured, and murdered seventeen other women and girls, were admissible, nothing contained therein was exculpatory or directly supported the defendant's theory that he did not intend for anyone to be killed, as the letters indicated that the home invasion was a joint venture and contradicted certain theories of defense proffered at trial, namely, that the defendant did not engage in anal intercourse with M and that it was S who had poured the gasoline throughout the house; moreover, the trial court properly found that the letters likely would have reinforced the basis for a guilty verdict and would have served to establish certain aggravating factors needed to secure a death sentence during the penalty phase.

3. The defendant could not prevail on his claim that the state had violated his due process rights under *Brady* v. *Maryland* (373 U.S. 83) by failing to disclose recordings of certain communications made by various Cheshire police officers during and after the response to the home invasion:

a. The trial court correctly determined that it was the defendant's burden to prove, by a preponderance of the evidence, the existence of a police communications log, which J's sister, C, claimed to have received via e-mail several months after the home invasion and which purportedly established that police officers were present at the P home when S and J returned from the bank, the preponderance standard having been consistent with the one required by federal and sister state courts for a defendant to prove the existence of purported *Brady* evidence and with the standard used by Connecticut courts to make other preliminary determinations of fact involving a defendant's constitutional rights; moreover, the trial court did not commit clear error in finding that the defendant had failed to prove the existence of the e-mail or the communications log it contained by a preponderance of the evidence because, even though the trial court found that the testimony of C was credible and that she had no motive to help the defendant by fabricating evidence, C had deleted the e-mail and lost her only printout of it, making it impossible to determine its provenance, C did not know who sent the e-mail, a search of the Cheshire Police Department's records did not reveal a corresponding communication, despite C's belief that someone from the department had sent it, and the log had not been turned over to the defense; furthermore, any error on the part of the trial court in sustaining the state's objection, during an evidentiary hearing, to a question about whether the e-mail appeared to have been created by the police was harmless.

b. Certain undisclosed communications regarding the Cheshire Police Department's response to the bank's 911 call, which the parties agreed constituted impeachment evidence insofar as it supported the defendant's theory that the testifying officers' embarrassment over the alleg-

State *v.* Komisarjevsky

edly inadequate response colored their testimony, were not material, and, therefore, the state's failure to disclose them did not violate *Brady*; none of the communications would have impeached the veracity of the officers who testified with respect to the principal issues disputed during the guilt phase of the trial, namely, whether the defendant committed an anal sexual assault of M and his intent to kill J, H, and M, as DNA evidence recovered from M's body provided overwhelming support for the jury's verdict with respect to the defendant's sexual assault of M, any inadequacy in the police response bore no relation to the defendant's theory that the DNA had been contaminated by a laboratory technician, and none of the circumstantial evidence on which the state relied to prove the defendant's intent depended in any way on the observations or veracity of the officers who testified.

c. Statements made by certain police officers describing the defendant as "simple as they come" and "nobody home," and S as looking "evil," were not material for *Brady* purposes: the officer who described the defendant's demeanor observed the defendant only fleetingly in a police station hallway and took no part in the response to the home invasion, the investigation, or any interviews with the defendant, and it was not reasonably likely that the officer's testimony would have influenced the jury on the issue of the defendant's demeanor in light of more probative evidence in the record, namely, a detective's testimony that the defendant was emotionless following his arrest and the recording of the defendant's statement to the police; moreover, the statement describing S as looking evil was a casual observation that, in the absence of anything further, did nothing to inform the jury's assessment of what actually happened in the P residence or to support the defendant's theory that S was the mastermind behind the home invasion and that the defendant wanted no part in killing J, H, or M.

4. There was no merit to the defendant's claim that the state had violated his due process right to a fair trial by presenting evidence that it knew or should have known to be false or misleading, namely, the testimony of an expert witness, B, that an inflammatory photograph of female genitalia found on the defendant's cell phone depicted M, as that testimony was not material: even if B's testimony was false or substantially misleading, there was no reasonable probability that it would have affected the jury's verdict, it having been undisputed that the other five photographs in the exhibit containing the purportedly inflammatory photograph were in fact of M, which corroborated the defendant's statement to the police that he had taken photographs of M for his personal use, and the content of the image did not bear on the principally contested issues in the guilt phase, that is, whether the defendant had sexual assaulted M anally and whether he had the requisite intent to kill; moreover, if the person depicted in the photograph was not M, it necessarily had to have been H, which would have introduced an additional sexual assault victim to the case.

State *v.* Komisarjevsky

5. The defendant's challenge to the statute (§ 18-10b) imposing certain restrictive conditions of confinement on inmates, like the defendant, who have been convicted of capital felony or murder with special circumstances was not reviewable on direct appeal: the record was insufficient to resolve the defendant's claims that the conditions of confinement set forth in § 18-10b are unconstitutional on the grounds that they constitute an ex post facto law, violate equal protection, and are excessive and disproportionate, as there was no evidence beyond an averment of information and belief with respect to the claimed disparate treatment of defendants who had received life sentences after the abolition of the death penalty, as compared to capital defendants who previously had received life sentences, and there was no evidence as to the conditions of confinement actually imposed on the defendant, who was incarcerated in Pennsylvania; moreover, the proper vehicle by which the defendant may challenge his conditions of confinement is a petition for a writ of habeas corpus, and the defendant can present evidence that is relevant to his claim before the habeas court, which is empowered to make factual findings on the basis of that evidence.

Argued October 17, 2019—officially released April 12, 2021**

*Procedural History*

Information charging the defendant with six counts of the crime of capital felony, four counts of the crime of kidnapping in the first degree, three counts of the crime of murder, and one count each of the crimes of sexual assault in the first degree, burglary in the second degree, arson in the first degree and assault in the second degree, brought to the Superior Court in the judicial district of New Haven, where the court, *Blue, J.*, denied the defendant's motions for a change of venue, to sequester the jury, to continue jury selection, to strike the jury panel, for additional peremptory challenges and to excuse tainted jury panels; thereafter, the case was tried to the jury before *Blue, J.*; subsequently, the court denied the defendant's motions for a continuance, to open the evidence, and for a mistrial; verdict of guilty; thereafter, during the penalty phase of the proceedings, the jury found the existence of an aggravating factor or factors that outweighed any mitigating factors; sub-

** April 12, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Komisarjevsky

sequently, the court, *Blue, J.*, rendered judgment in accordance with the jury verdict and the jury's findings during the penalty phase, and imposed a sentence of death with respect to the six capital felony counts, and the defendant appealed to this court; thereafter, the court, *Blue, J.*, granted in part the defendant's motions for augmentation and rectification of the record; subsequently, the court, *Blue, J.*, granted the defendant's motion to correct an illegal sentence. *Affirmed.*

*John Holdridge*, with whom were *Erica Barber* and, on the brief, *Moira L. Buckley*, for the appellant (defendant).

*Marjorie Allen Dauster*, former special deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Michael Dearington*, former state's attorney, *Gary Nicholson*, former senior state's attorney, *Robert Scheinblum*, senior assistant state's attorney, and *Leonard C. Boyle*, former deputy chief state's attorney, for the appellee (state).

*Opinion*

ROBINSON, C. J. The principal issue in this appeal is whether Connecticut's individual voir dire process protected the right of the defendant, Joshua Komisarjevsky, to a fair trial by assessing and mitigating the prejudicial effects of pretrial publicity about this particularly notorious case involving a home invasion in Cheshire that resulted in multiple fatalities. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of, among other crimes, six counts of capital felony in violation of General Statutes (Rev. to 2007) § 53a-54b. On appeal, the defendant claims, inter alia, that the trial court improperly (1) denied his motions to change the venue of his trial from

_____

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (4).

State *v.* Komisarjevsky

the judicial district of New Haven (New Haven), (2)
denied his challenges for cause to twelve prospective
jurors, and (3) denied his motions to reopen the evi-
dence, for a mistrial, or for a continuance because of
the state's belated disclosure of certain letters written
by the defendant's accomplice, Steven Hayes. The
defendant also contends that the trial court unconstitu-
tionally applied the stringent conditions of confinement
set forth in General Statutes § 18-10b[2] to the defendant

_____

[2] General Statutes § 18-10b provides in relevant part: "(a) The Commis-
sioner of Correction shall place an inmate on special circumstances high
security status and house the inmate in administrative segregation until a
reclassification process is completed under subsection (b) of this section,
if . . . (2) the inmate is in the custody of the Commissioner of Correction
for a capital felony committed prior to April 25, 2012, under the provisions
of section 53a-54b in effect prior to April 25, 2012, for which a sentence of
death is imposed in accordance with section 53a-46a and such inmate's
sentence is (A) reduced to a sentence of life imprisonment without the
possibility of release by a court of competent jurisdiction, or (B) commuted
to a sentence of life imprisonment without the possibility of release.

"(b) The commissioner shall establish a reclassification process for the
purposes of this section. The reclassification process shall include an assess-
ment of the risk an inmate described in subsection (a) of this section poses
to staff and other inmates, and an assessment of whether such risk requires
the inmate's placement in administrative segregation or protective custody.
If the commissioner places such inmate in administrative segregation pursu-
ant to such assessment, the commissioner shall require the inmate to com-
plete the administrative segregation program operated by the commissioner.

"(c) (1) The commissioner shall place such inmate in a housing unit for
the maximum security population if, after completion of such reclassification
process, the commissioner determines such placement is appropriate, pro-
vided the commissioner (A) maintains the inmate on special circumstances
high security status, (B) houses the inmate separate from inmates who are
not on special circumstances high security status, and (C) imposes condi-
tions of confinement on such inmate which shall include, but not be limited
to, conditions that require (i) that the inmate's movements be escorted or
monitored, (ii) movement of the inmate to a new cell at least every ninety
days, (iii) at least two searches of the inmate's cell each week, (iv) that no
contact be permitted during the inmate's social visits, (v) that the inmate
be assigned to work assignments that are within the assigned housing unit,
and (vi) that the inmate be allowed no more than two hours of recreational
activity per day.

"(2) The commissioner shall conduct an annual review of such inmate's
conditions of confinement within such housing unit and the commissioner

State *v.* Komisarjevsky

when he was resentenced after his death sentence was vacated. Finally, the defendant contends that the state deprived him of his due process right to a fair trial by (1) failing to disclose certain communications among various Cheshire police officers during and after the response to the home invasion, in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and (2) failing to correct materially false expert testimony about a highly inflammatory photograph of female genitalia found on the defendant's cell phone in violation of *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). We disagree with all of these claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. In 2007, the P family, consisting of W, an endocrinologist, J, his wife, who was a nurse, and their two daughters, seventeen year old H, and eleven year old M, lived in a house at 300 Sorghum Mill Drive in Cheshire. In the early evening of July 22, 2007, the defendant went to the Stop and Shop supermarket at the Maplecroft Plaza in Cheshire to meet a contractor who owed him wages for construction work. While in the Stop and Shop parking lot, he saw J and M, who were there shopping for dinner. Intrigued by J's car, a Chrysler Pacifica, the defendant followed J and M to the P residence, and was further impressed by their apparent prosperity.

The defendant then contacted Hayes, with whom he had been communicating by text message about plans to make money in some way. After spending the evening caring for his daughter, the defendant returned to the

may, for compelling correctional management or safety reasons, modify any condition of confinement, subject to the requirements of subparagraphs (A) to (C), inclusive, of subdivision (1) of this subsection. . . .''

State *v.* Komisarjevsky

Stop and Shop parking lot at approximately 10 p.m., where he met Hayes. After driving around for a while in the defendant's van discussing ways to make money, including robbing people who were using ATMs or coming out of bars, the defendant remembered J and M from earlier in the evening and told Hayes about them. After some discussion, Hayes and the defendant came to believe that there might be a lot of money in the P family home.

After driving around for a while longer, the defendant and Hayes went to Sorghum Mill Drive in the defendant's van, parked around the corner from the P family residence, and donned rubber gloves and face masks improvised from cut up shirts and a hat. Hayes brought with him a pellet gun that he had purchased the day before at a nearby Wal-Mart while accompanied by the defendant; the pellet gun looked like a nine millimeter pistol.

At approximately 2 a.m. on July 23, 2007, the defendant and Hayes approached the P residence and walked around the house. They noticed that W was sleeping on a couch in the sunroom. The defendant then entered the house through an unlocked bulkhead door to the basement. The defendant found a baseball bat in the basement and carried it with him to the sunroom, where he repeatedly struck W in the head with the bat, causing W to make an "unearthly scream." After W, who was bleeding profusely and confused, backed into the corner of the couch and quieted down, the defendant let Hayes into the house through the back door.

After W stirred and sat up, Hayes pointed the pellet gun at him. The defendant then ordered W to lie down on the couch and covered his bleeding head with a towel; Hayes and the defendant bound W's wrists and ankles with a cotton rope clothesline that the defendant had found on the basement stairs. The defendant told

State *v.* Komisarjevsky

Hayes to "put a bullet in" W if he were to move, and said to W, "if we get the money, nobody will be hurt . . . ." In response to the defendant's questions about whether anyone else was in the house, W told him that J, H, and M were upstairs. Hayes and the defendant then tied up J and M, who were sleeping in the same bed in the master bedroom, and went into H's bedroom and tied her up, as well.

After talking with J and searching the house, the defendant and Hayes concluded around 4 a.m. that there was no money there, but they realized from the check register and receipts in J's purse that W and J had approximately $40,000 in their Bank of America accounts; they asked W and J about that money at various points during the encounter. The defendant and Hayes decided to wait until the bank opened at 9 a.m., at which point Hayes would take J there to withdraw $15,000, an amount that they believed would not raise a "red flag . . . ." The defendant and Hayes then went back upstairs and retied the ropes binding J, H, and M, making sure to secure them to their bedframes. The defendant and Hayes took all of the family's portable and cell phones that they could find and drove the Pacifica and the defendant's van to a nearby condominium complex on Mountain Road, where, to avoid triggering any of the neighbors' suspicions, they parked the defendant's van before returning to the house in the Pacifica.

At approximately 5 a.m., the defendant and Hayes moved W from the sunroom down to the basement in order to avoid the possibility that a neighbor might see him through the sunroom window. They tied W to a support pole in the basement with a rope, sat him on a pillow, and rebound his feet with a plastic zip tie. Shortly thereafter, J, acting at Hayes' direction, called W's medical office and asked a nurse to cancel his morning schedule because he was ill.

State *v.* Komisarjevsky

During the encounter, the defendant spoke to M several times about her summer plans and schooling; he also brought her water and provided her with bathroom breaks. In the meantime, tensions continued to rise between Hayes and the defendant because Hayes expressed concern to the defendant about having left traces of their DNA in the house; Hayes then proposed burning down the house and kidnapping the victims using the family's vehicles. A short time later, Hayes became angrier because he believed that the defendant had used his real name in front of the victims, and he proposed killing them instead. Hayes found several one gallon bottles of windshield washer fluid in the garage and emptied them into the kitchen sink. At approximately 8 a.m., Hayes drove the Pacifica to a nearby Citgo service station and filled four of the containers with gasoline, communicating with the defendant several times on his cell phone while he was out. Hayes then returned to the house and left those four containers in the garage.

Shortly before 9 a.m., Hayes and J drove in the Pacifica to the Bank of America branch located at the Maplecroft Plaza near the Stop and Shop. To emphasize the gravity of the situation to J, Hayes called the defendant on his cell phone while they were driving to the bank and asked about W, H, and M. When they arrived, J entered the bank by herself and told Kristin Makhzangi, a teller, that she needed to withdraw $15,000 because two men were holding her family hostage in their house. Because there was not enough money in the account that J desired to use, and J lacked the identification required to make withdrawals from her other accounts, Makhzangi relayed this information to Mary Lyons, the branch manager. Lyons then came out to speak with J, who told her that the two men had been polite and had promised to free the P family upon receiving the money. Lyons subsequently approved the

State *v.* Komisarjevsky

withdrawal of $15,000 from a home equity line of credit and notified the Cheshire police at approximately 9:21 a.m. of the ongoing hostage situation at the P family house; she provided the police with descriptions of J and Hayes, whom she had seen waiting in the Pacifica. In the meantime, Makhzangi gave J $15,000 in cash, packaged in three straps of $50 bills, from the vault. At 9:23 a.m., J exited the bank, where Hayes picked her up in the Pacifica, and drove back to the P family house.

While Hayes was out of the house purchasing gas and going to the bank with J, the defendant went to check on W and H, who were still tied up in the basement and on her bed, respectively. The defendant then went to M's bedroom and, after some additional conversation, cut her clothes off and sexually assaulted her anally.[3] The defendant also took several sexually explicit photographs of M using the camera on his cell phone. After committing the sexual assault, the defendant allowed M to shower and poured bleach on her shorts in an attempt to eliminate traces of his DNA.

When Hayes and J returned from the bank with the money, he and the defendant retied J's hands and feet and put her on the couch in the living room. Hayes and the defendant then moved into the dining room and argued again about whether it was necessary to kill the family to avoid detection. Hayes initially planned to

---

[3] Whether the defendant had sexually assaulted M anally was a disputed issue during the guilt phase of the trial. In his statement, the defendant admitted to sexually assaulting M by performing oral intercourse on her, stating that he believed she was between the ages of fourteen and sixteen years old. He denied performing other sexual acts with M. The jury, however, reasonably could have concluded that the defendant had anal intercourse with M on the basis of the testimony of H. Wayne Carver II, then the state's chief medical examiner, that semen containing the defendant's DNA was found in M's anus during her autopsy, with the lack of visible injuries to that area not inconsistent with penetration having occurred. The state's DNA testing eliminated Hayes, along with W, J, and H, as potential sources of the DNA found in M.

State *v.* Komisarjevsky

strangle the family using nylon stockings, and he paced around the house to "psyche himself up . . . ." Hayes then went into the living room where he was alone with J for approximately fifteen minutes, at which point he sexually assaulted her vaginally and strangled her to death.

Meanwhile, W's weight had caused the ropes binding him to loosen as he slumped over while drifting in and out of consciousness; when he awoke, he was able to free himself from the bindings. W heard numerous noises from his position in the basement, including loud thumps and the Pacifica leaving from the garage. Rather than confront the defendant and Hayes himself, W chose to escape the basement via the bulkhead door, and he crawled to the home of his next door neighbor, David Simcik, for help. When Simcik saw W, he told his wife to call 911 because of W's visible injuries. While Simcik's wife was on the phone with the police dispatcher, two Cheshire police officers, Dennis Boucher and Thomas Wright, appeared, having been dispatched in response to the call from the bank,[4] and asked whether there was anyone still in the house. W informed them that J, H, and M were still in the house. W was subsequently transported by ambulance to St. Mary's Hospital in Waterbury, where he was admitted for several days and treated for head injuries, including the loss of five to seven pints of blood.

In the meantime, the defendant, who had heard the basement bulkhead door opening, yelled to Hayes that

---

[4] The Cheshire Police Department initiated a radio broadcast alerting all units about the ongoing hostage situation at 9:26 a.m. Captain Robert Vignola, who was the incident commander, testified that responding police units acted to create a perimeter and surround the house, and to close the surrounding roadways; they had been ordered not to approach the house by Captain Ren Marchand, who was at the police station and had relied on information that J had relayed to Lyons that the defendant and Hayes had not mistreated them to that point but would kill them if the police were called.

State *v.* Komisarjevsky

W was escaping. Instead of chasing W, the defendant, who saw J's lifeless body on the living room floor, told Hayes that they had to leave immediately. Hayes took a bag that had the money from the bank, gave it to the defendant, and told him to start the car. While the defendant looked for the car keys, he saw Hayes pouring copious quantities of gasoline from the windshield washer fluid containers around the house, including in the living room, stairways, hallway, and master bedroom. At this time, H and M were still restrained in their bedrooms. Realizing that the police were starting to arrive and surround the house, the defendant started the Pacifica in the garage as Hayes flicked a lit match into the kitchen, igniting a pool of gasoline on the floor and causing flames to travel toward the front hallway of the house. The first responding police officers were unable to gain access to the interior portions of the house because of heat and flames from the rapidly spreading fire, in which H and M perished.[5]

After Hayes jumped into the passenger seat of the Pacifica, the defendant backed down the driveway at a high rate of speed, first striking the front passenger side of an unmarked police car driven by Captain Robert Vignola, a Cheshire police detective, which had pulled up to block the driveway, and then a small stone wall at the front of the lawn. Vignola and Boucher, along with another officer, Sergeant Philip Giampietro, drew their weapons and approached the passenger side of the Pacifica while commanding the defendant and Hayes to exit the vehicle with their hands up. The defendant, however, was able to recover control of the Pacifica and drove it at a high rate of speed down Sorghum Mill Drive, first at Sergeant Christopher Cote, who was

---

[5] Testimony from H. Wayne Carver II, then the state's chief medical examiner, and Malka Shah, an assistant medical examiner, established that H and M, who also sustained severe burns, were killed by asphyxiation from inhaling smoke containing toxic carbon monoxide.

State *v.* Komisarjevsky

standing in the road with a long rifle but was able to jump out of the way, and then toward a bend in the road where he crashed into a pair of police cruisers that had parked in a V formation to block the road, causing the airbags to deploy and the vehicle to stop. At that point, multiple police officers apprehended the defendant and Hayes. When questioned after being grabbed forcefully by Joseph Vitello, a Cheshire police detective, the defendant told the officers that there were no other accomplices, that he believed J was dead, and that there were "two girls in the upstairs . . . front facing bedrooms, and that they were still alive."[6] The officers placed the defendant and Hayes under arrest. After his arrest, the defendant waived his rights and gave a detailed statement to the investigating officers, including Vitello and Rafael Medina, a state police detective, which was admitted into evidence at trial.[7]

The state charged the defendant with six counts of capital felony in violation of General Statutes (Rev. to 2007) § 53a-54b, three counts of murder in violation of General Statutes § 53a-54a (a), four counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), one count of burglary in the second degree in

---

[6] The officers spoke to the defendant after Hayes did not answer any of their questions, stating only that "things just got out of control."

[7] The defendant moved to suppress this statement and an additional statement that he had made concerning two break-ins in the neighborhood that the state wished to offer as uncharged misconduct evidence. The defendant argued that he had not made a voluntary, knowing, and intelligent waiver of his privilege against self-incrimination pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct.1602, 16 L. Ed. 2d 694 (1966), because he had made those statements while sleep deprived and under the influence of injuries sustained in the vehicle crash while fleeing. Following an evidentiary hearing on August 23, 2011, the trial court denied the motion to suppress, concluding that the defendant's arguments were speculative and unsupported by the evidence. The defendant does not directly challenge the trial court's ruling on the motion to suppress in this appeal, although it is implicated by one of his *Brady* claims. See part III C 2 of this opinion.

State *v.* Komisarjevsky

violation of General Statutes § 53a-102, one count of arson in the first degree in violation of General Statutes § 53a-111 (a) (1), and one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2).

The defendant and Hayes were tried separately in New Haven. Hayes was tried first in the fall of 2010; he was found guilty by a jury of, inter alia, multiple counts of capital felony and sentenced to death. In mid-2011, following extensive pretrial motions practice, the defendant's case was tried to a jury, which returned a verdict of guilty on all counts. After a penalty phase trial with respect to the capital felony counts, the trial court sentenced the defendant in accordance with the jury's verdict to six consecutive death sentences, followed by a term of imprisonment of 140 years. This direct appeal followed. See footnote 1 of this opinion.

While this appeal was pending, this court held in *State* v. *Santiago*, 318 Conn. 1, 9–10, 122 A.3d 1 (2015), and reaffirmed in *State* v. *Peeler*, 321 Conn. 375, 377, 140 A.3d 811 (2016), that the imposition of the death penalty on offenders convicted of capital felonies prior to the prospective abolition of the death penalty by statute on April 25, 2012, would violate the Connecticut constitution's prohibition of cruel and unusual punishment. Accordingly, the trial court granted the defendant's motion to correct an illegal sentence and vacated his death sentences; the trial court resentenced him to a total effective sentence of six consecutive sentences of life imprisonment without the possibility of release, followed by a term of imprisonment of 140 years.[8]

On appeal, the defendant claims that (1) the trial court improperly denied his motion to change the venue

[8] In resentencing the defendant, for double jeopardy purposes, the trial court vacated three of the defendant's murder sentences and his sexual assault sentence pursuant to this court's decision in *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013).

State *v.* Komisarjevsky

of his trial from New Haven given the effects of prejudicial pretrial publicity, (2) the trial court improperly denied his challenges for cause to twelve prospective jurors, (3) the trial court improperly denied his motions for relief following the state's disclosure of certain letters written by Hayes while he was incarcerated, (4) the prosecutor deprived him of his due process right to a fair trial by failing to disclose certain communications among various Cheshire police officers in violation of *Brady*, (5) the prosecutor failed to correct materially false expert testimony in violation of *Napue* and *Giglio*, and (6) the trial court unconstitutionally applied the stringent conditions of confinement pursuant to § 18-10b to the defendant after his death sentences were vacated. Additional facts and procedural history will be set forth in the context of each claim on appeal.

I

PRETRIAL PUBLICITY AND JURY
SELECTION CLAIMS

We begin with the defendant's claims arising from adverse pretrial publicity about this case, which he contends sent the New Haven area into "paroxysms of inquisitional paranoia and communal hysteria." Specifically, the defendant argues, inter alia, that the trial court improperly denied (1) his motions for a change of venue and for a new trial, and (2) his challenges for cause to numerous jurors.[9]

A

Additional Relevant Facts and Procedural History

On February 4, 2011, the defendant filed a motion to change the venue of the trial from New Haven to the judicial district of Stamford-Norwalk (Stamford). In

[9] We note that the defendant suggests, but does not address in detail, additional claims of error arising from the pretrial publicity and jury selection, which we decline to review. See footnote 27 of this opinion.

State *v.* Komisarjevsky

that motion, the defendant argued that Stamford was "the most potentially neutral site" given the "unprecedented, prejudicial publicity surrounding this case, as exacerbated by the recent trial of . . . Hayes," during which Hayes attempted "to deflect responsibility for his crimes . . . ." In support of the motion, the defendant also filed an accompanying memorandum of law and a study that was undertaken by two psychology professors at the John Jay College of Criminal Justice of the City University of New York, Steven Penrod[10] and Margaret Bull Kovera,[11] who conducted a telephone survey to analyze the effect of pretrial publicity in this case on potential jurors in several judicial districts, namely, New Haven, Fairfield, Stamford, and Danbury.[12] The study was intended to determine the proportion of qualified jurors[13] who had heard about this case, the extent and sources of their knowledge about the case, and the degree to which they believed the defendant

---

[10] Penrod, who holds the position of distinguished professor, has focused his experimental research on jury decision making, including the effect on juries of exposure to pretrial publicity. He has administered surveys to assess the effects of pretrial publicity in approximately twenty-five civil and criminal cases over a twenty-five year period in connection with providing expert testimony on pretrial publicity and venue matters.

[11] Kovera consulted with Penrod in developing the study. She has conducted numerous studies on jury decision making and the effects of pretrial publicity, and has published two books and more than fifty scientific journal articles and book chapters. Like Penrod, she also has testified as an expert witness in numerous venues, including Iowa, New York, Maryland, and Canada.

[12] At the hearing on the motion to change venue, Penrod testified that the defendant's attorneys had selected the four judicial districts. Penrod was familiar with them because he had also performed a similar study in connection with Hayes' trial.

[13] Penrod stated that his researchers did not ask questions about case knowledge until after they had preliminarily established that the juror would be qualified to serve on a jury in Connecticut by verifying their age, United States citizenship, residence in the district being studied, and their qualification to serve on a death penalty jury under United States Supreme Court case law. The study excluded without further inquiry those survey respondents who reported knowing any person involved in the case, including attorneys and witnesses.

State *v.* Komisarjevsky

was guilty and had arrived at some judgment "about what the appropriate penalty would be for this case." The study concluded that New Haven was "resoundingly the least favorable judicial district in terms of juror taint, whereas [Stamford was] the most favorable relative to affording [the defendant] the best opportunity to empanel a fair and impartial jury."[14]

At a hearing on the motion to change venue, Penrod explained the study.[15] He described the pretrial publicity as "[o]verwhelmingly negative" with respect to the defendant, with guilt and death penalty judgments running approximately 20 percent higher than they had in a similar study he had performed slightly more than one year before in connection with Hayes' trial. Approximately 97 percent of qualified jurors in Stamford recognized the case, and approximately 98 percent of qualified jurors in New Haven recognized it, either immediately by name or after being prompted with one cue, namely, that it was a home invasion. The lowest recognition level was in Danbury, with approximately 94 percent recognition. The recognition of this case in all four districts studied was comparable to the state court prosecution of Terry Nichols, who had bombed the Alfred P. Murrah Federal Building in Oklahoma City, after his conviction in fed-

---

[14] The defendant suggested the judicial district of Fairfield as an alternative to Stamford.

[15] In addition to Penrod, Celia Lofink, a psychologist who had assisted the defendant's legal team by tracking media coverage of this case, testified at the hearing. Lofink testified that her research, conducted by capturing Google Alerts to news articles using the defendant's last name and W's name indicated that there were 1808 media reports about this case from the date of the offense through the date of the hearing. Lofink's results reflected worldwide coverage, although the majority of the articles were from Connecticut. Lofink then presented the court with a chronologically organized table identifying each article by title and source, along with a flash drive containing the text and any reader comments accompanying those articles, both of which were admitted into evidence as court exhibits. Lofink testified, however, that she was not aware of any technology that would allow her to determine how many people had actually read each article.

State *v.* Komisarjevsky

eral court, the Menendez brothers,[16] and John Walker
Lindh, the "American Taliban,"[17] in their respective
jurisdictions. Penrod opined that the "least prejudicial"
of the four studied judicial districts would be Stamford
because it is "generally the lowest across the board"
with respect to judgments about the defendant's guilt
and knowledge about the case. Penrod stated, however,
that this was a matter of "relative disadvantage," given
that this case reflected "the highest levels of prejudg-
ment of guilt" he had ever seen.

Turning to a district by district analysis of the respon-
dents' knowledge about the case,[18] Penrod noted that,

[16] The case of Lyle and Erik Menendez, two young men who killed their
wealthy parents in Beverly Hills, California, in 1989, involved a nationally
televised trial at which they claimed self-defense from physical and sexual
abuse. They were tried jointly, with a separate jury for each brother; the juries
hung at the first trial, but the brothers were convicted at their second trial
before a single jury. See Biography.com Editors, Erik Menendez Biography
(last modified November 17, 2020), available at https://www.biography.com/
crime-figure/erik-menendez (last visited April 8, 2021).

[17] John Walker Lindh is an American citizen who was captured in Afghani-
stan in 2001, where he had lent aid to Osama Bin Laden's terrorist organiza-
tion, Al Qaeda, and participated in a prison uprising that led to the death
of a Central Intelligence Agency officer. See, e.g., C. Rosenberg, " 'American
Taliban,' Held 17 Years, Nears Release," N.Y. Times, May 22, 2019, p. A1.

[18] Once a survey respondent established some knowledge of the case, the
survey progressed to open-ended questions to assess additional knowledge
of the incident, followed by specific inquiries about whether the respondent
(1) had read a book written about the case, (2) had seen a television interview
of W by Oprah Winfrey, (3) had heard about journals the defendant had
written in prison, (4) had learned of the Hayes trial and verdict, (5) had
followed the media coverage of this case, (6) could be fair and impartial
and render a verdict based only on the evidence presented at trial in this
case, and (7) believed that the defendant should be executed.

With respect to more granular knowledge of the case, the most prominent
answer among the 1284 people across the four judicial districts who recog-
nized the case was that 60 percent provided some information about the
victims, with 42 percent being aware that the victims were the wife and
daughters, and 25 percent, the next largest category, being aware that the
husband escaped. Fifty-five percent had some information about the perpe-
trators, with more than half remembering that there were multiple perpetra-
tors, 9 percent being aware of their status as parolees, and 10 percent being
aware of Hayes' conviction. With respect to the crime itself, 58 percent were

State *v.* Komisarjevsky

although there was a very similar reported rate of following the news media generally, approximately 70 percent of New Haven respondents followed this case "very closely" or "somewhat closely," as compared to approximately 49 percent in Stamford.[19] He determined that Stamford respondents had a much lower rate of case knowledge than those in New Haven, with 2.5 percent knowing the names of the defendant and Hayes spontaneously and 58 percent after receiving a cue, as compared to 22 percent and 89 percent in New Haven, respectively. In Stamford, 73 percent were aware of Hayes' conviction, in comparison to 88 percent in New Haven; with respect to Hayes' death sentence, the awareness rates were 39 and 66 percent, respectively. Forty-nine percent of the New Haven respondents had seen or heard about W's interview with Oprah Winfrey approximately one month before the survey took place, as compared to 31 percent in Stamford. Thirty-one percent of the respondents in New Haven had heard about the defendant's prison journals, in comparison to 11 percent in Stamford. Interestingly, more respondents in Stamford believed that the crimes were "disturbing/ graphic" than those in New Haven, 5.6 and 4.9 percent, respectively, which is a difference that Penrod did not believe was statistically significant.

Moving beyond general awareness to impartiality, in Stamford, 65 percent of the respondents had "very nega-

aware of some detail, with 30 percent being aware of the sexual assaults, robbery, or fire. Thirty-three percent categorized the crime as "horrible" or "heinous."

Turning to death qualification, Penrod stated that, across the four judicial districts, approximately two-thirds of those persons surveyed would not automatically vote for the death penalty, and approximately 75 percent would not allow their personal views on the death penalty to preclude them from rendering a guilty verdict.

[19] In New Haven, more respondents could offer greater detail about the case, with most able to offer an average of five or six details rather than the two or three provided by respondents in the other districts.

State *v.* Komisarjevsky

tive'' impressions of the defendant, as compared to 76 percent in New Haven; there were 6 and 5 percent reports of ''somewhat negative'' impressions, respectively, for each jurisdiction.[20] In Stamford, 50 percent of the respondents believed that the defendant was ''definitely guilty'' of murder, and 22 percent ''probably guilty,'' as compared to 60 and 25 percent, respectively, in New Haven.[21] In New Haven, 71 percent of those surveyed reported that they could decide the case based solely on the evidence, as compared to 80 percent in Stamford. Thirty-two percent said that they could ''definitely'' be ''fair and impartial'' in New Haven with respect to the defendant, and 18 percent ''probably'' so, as compared to 44 and 22 percent in Stamford, respectively. Penrod stated that the ''most significant'' difference between New Haven and Stamford was the number of respondents who believed that they could render a not guilty verdict, which was 15 percent in New Haven and 30 percent in Stamford. In Penrod's view, this suggested that there were ''twice as many people'' prepared not to convict in Stamford, with Stamford below New Haven with respect to virtually every measure of knowledge about the case.[22] Ultimately, Penrod described Stamford as ''a venue that is . . . less prejudice[d] against the defendant [and that] has a smaller fund of knowledge [on] which that prejudice is based.''

---

[20] Conversely, in New Haven, 2.5 percent of the population reported a ''positive'' impression of the defendant, as compared to 1.6 percent in Stamford. In New Haven, 27 percent of the respondents could not suggest the most compelling evidence against the defendant, as compared to 48 percent in Stamford.

[21] Fifteen percent of the respondents in Stamford did not know how to answer the question regarding their certainty as to the defendant's guilt, as compared to 6 percent in New Haven.

[22] Penrod stated in response to questions from the trial court that the margin of error was 5 or 6 percent depending on various underlying factors in the study. With that margin of error factored in, Penrod still believed that it was a significant enough difference to move the trial from New Haven to Stamford, particularly given the lower volume of coverage in the Stamford Advocate as compared to the New Haven Register.

State *v.* Komisarjevsky

During cross-examination, Penrod acknowledged that the publicity concerning this case was "extensive" across all four of the surveyed districts, with the lowest level of recognition being approximately 94 percent in Danbury and the highest being approximately 98 percent in New Haven. Penrod also acknowledged that, with respect to some specific factors, there was greater recognition in Stamford than in New Haven, and that approximately 70 percent of the respondents in New Haven reported that they could render a verdict based just on the evidence, with approximately 50 percent of the respondents in New Haven "definitely" or "probably" able to give the defendant a fair trial, despite that being a "somewhat lower" percentage answer than in Stamford.[23]

[23] Penrod explained that the intersection of those who believed that they could be fair and impartial, yet who had also prejudged the defendant's guilt, raised concerns of "conformity prejudice," in which jurors "worry about how they will be perceived in the broader community if they come back with a verdict that's at odds with community expectations about things." Penrod described conformity prejudice as a concept that is rooted in social norms about jury service as a civic responsibility, and as indicating that pretrial publicity has an "endur[ing]" effect that lasts through the presentation of trial evidence and into deliberations. The concept of conformity prejudice extends from guilt to the death penalty determination. Penrod believed that conformity prejudice was a "reasonable concern" in this case because there was "so much knowledge about the case" and a "clear sentiment toward guilt," with "part of that knowledge . . . about the nature of the case and the perception of it being a gruesome case." He explained that the concept of conformity prejudice drove the decision to move Timothy McVeigh's federal trial for the Oklahoma City bombing from Oklahoma City to Denver, given the concern that it would be difficult for jurors to return to the community having not returned its desired verdict—a concern that Penrod believed extended to this case.

With respect to conformity prejudice, Penrod noted that studies have shown a differing response rate to the question about whether the respondent can be fair and impartial, where people are significantly—nearly 60 percent—more likely to admit difficulties remaining impartial during a survey than they would in response to a question from a judge during jury selection. Penrod also testified that studies indicate that people have difficulty recognizing their own biases, including those arising from the effects of pretrial publicity, and are attuned to give "socially desirable response[s]" to questions on this topic. Penrod observed that the very effect of the juror

State *v.* Komisarjevsky

Significantly, Penrod also acknowledged that studies indicated that more extensive voir dire processes were beneficial for the purpose of exploring a potential juror's knowledge and attitudes about the case, and that there has not been research exploring the effect of voir dire lasting more than one hour in counteracting the effects of pretrial publicity. He agreed that Connecticut's individual voir dire process is good—and "more than minimal" for counteracting adverse pretrial publicity—and would be "[u]nquestionably" more effective than the phone survey. Penrod also conceded that it was not "impossible" to select a fair and impartial jury from New Haven but simply that it would be "more likely" to occur in Stamford, which would also present "significant difficulties" in that respect. Penrod agreed with the trial court's observation that the difficulties of teasing out prejudices during voir dire would be present in either location.

After the hearing, the trial court denied the defendant's motion for a change of venue. In its memorandum of decision, the trial court emphasized that the cases had been widely reported on throughout the state— and, indeed, the world—observing that many of the media materials provided had been published on the Internet, as well as in print. The trial court noted that "at least 97 percent of Connecticut residents have at least heard" of the defendant and Hayes. Relying on *Skilling* v. *United States*, 561 U.S. 358, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010), *Rideau* v. *Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), and *State* v. *Reynolds*, 264 Conn. 1, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004), the trial court declined to presume the existence of prejudicial publicity prior to voir dire, emphasizing

oath administered by an authority figure, namely, the trial judge—even during voir dire—might be to reinforce, rather than to alleviate, the effect of conformity prejudice.

State *v.* Komisarjevsky

(1) that the large, diverse pool of jurors in New Haven, with a population of more than 846,000 people, rendered it distinct from the contaminated pool in the much smaller rural community at issue in *Rideau*, (2) that the survey respondents' perceptions of guilt did not arise from admissions of guilt, (3) the lapse of four years from the crime to the time of trial, and (4) the fact that the jury in Hayes' case, which had received similar publicity, had returned a verdict finding him not guilty of one count of arson, which suggested that jury impartiality was possible despite the extensive publicity. The trial court contrasted Connecticut's "particularly searching" individual voir dire process with the "vastly more truncated federal jury selection process found constitutionally adequate in *Skilling*" and emphasized that "the parties will have ample opportunity to inquire about the effects of pretrial publicity on the individuals involved." The court further stated that it would revisit its decision should voir dire not produce the requisite number of impartial jurors.

Jury selection began on March 16, 2011, and ended on June 14, 2011.[24] The court agreed with the parties' recommendation to seat twenty-one jurors, twelve regular, six alternate, and three backup alternates. The trial court allotted each party forty peremptory challenges, ten more than the thirty mandated in death penalty cases under General Statutes 54-82h (a).[25] The twelfth regular juror was selected on May 10, 2011; at that point, the state had used twenty-one peremptory challenges and the defendant twenty-eight. On June 8, 2011, after the six alternates had been chosen, the defendant had one peremptory challenge remaining. He requested

---

[24] We discuss the voir dire of individual jurors in detail in part I D of this opinion.

[25] The trial court had denied the defendant's request for a total of sixty peremptory challenges, which would be twice the number statutorily granted to the state.

State *v.* Komisarjevsky

forty more for the selection of the three backup alternates.[26] The trial court denied that motion. Once jury selection was concluded on June 14, 2011, with the three backup alternates selected, each party had exhausted its challenges. None of the alternates was ultimately required to deliberate, and the defendant did not challenge for cause any juror who actually decided his guilt.

On May 16, 2011, the defendant also filed a motion to continue the then pending jury selection in this case for approximately three months, arguing that Senator Edith Prague, a prominent state legislator and longtime opponent of the death penalty, had publicly announced her decision to withdraw her support for abolition of the death penalty after meeting with W. In announcing her decision, Senator Prague made comments, later reported in the Hartford Courant, the New Haven Register, and other print and broadcast media, that " '[t]hey should bypass the [defendant's] trial and take that second animal and hang him by his penis from a tree out in the middle of Main Street.' " Senator Prague reiterated her comments in television news interviews over the following days; she expressed no regret for having made them and emphasized her support for the P family, calling the defendant a " 'monster . . . .' " The defendant argued that this call for a "lynching" lent "legitimacy" to similar views expressed in reader comments in online news stories about this case and further infected the venire. The defendant argued that a three month continuance would reduce the prejudicial effect of Prague's call for a lynching by allowing it to "slip from the mind of potential jurors." The trial court denied that motion.

---

[26] The defendant argued that the additional challenges were necessary to preserve his right to an impartial jury in light of pretrial publicity that resulted in both overt and conformity prejudice. For a discussion of conformity prejudice, see footnote 23 of this opinion.

State *v.* Komisarjevsky

Over the monthslong jury selection process, the conduct of several prospective jurors—none who ultimately served as jurors—evidenced the emotional impact of this case. Questioning during voir dire revealed that some prospective jurors had discussed with each other their distaste for the defendant, including a belief that he should immediately receive the death penalty. Other prospective jurors became emotional, with some refusing to enter the courtroom and others berating the defendant and openly stating their beliefs, either in open court or to court staff, that the defendant should "fry," or offering to execute him personally. For example, one prospective juror, J.M.-M., after being peremptorily challenged by the defendant, screamed at him and called him a "[k]iller, asshole." Another, B.G., after being excused for hardship, offered to "take care of him right here." Similarly, two alternate jurors, D.V. and J.B., who had been selected based on their assurances that they could withstand pressure and decide the case impartially, were stricken from the panel after they returned to court to express concern about their impartiality after friends and coworkers had questioned them about the case and offered unsolicited opinions.

On September 12, 2011, the defendant renewed his motion for sequestration of the jury pursuant to Practice Book § 42-22, arguing that sequestration was necessary to preserve his right to an impartial jury in light of the pretrial publicity and the notorious nature of the case. The trial court denied this motion.

On September 15, 2011, the defendant again moved for a change of venue from New Haven to Stamford, and to strike the selected jury panel, arguing that the subjective assessment of juror impartiality via the voir dire process was insufficient to protect his rights to a fair trial, as was demonstrated by the previously described statements of prospective jurors J.M.-M. and B.G. and alternate jurors D.V. and J.B. The defendant

State *v.* Komisarjevsky

argued that the conduct of these individuals, along with the comments of others during voir dire, was indicative of the adverse effects of the pretrial publicity. The trial court denied this motion. After he was found guilty, the defendant renewed these pretrial publicity claims in his motion for a new trial, which the trial court also denied.

B

Review of the Defendant's Pretrial Publicity
Claims and General Governing Principles

On appeal, the defendant relies on, among other cases, the United States Supreme Court's decisions in *Skilling* v. *United States*, supra, 561 U.S. 358, and *Rideau* v. *Louisiana*, supra, 373 U.S. 723, and contends that, given the extensive, frenzied, and inaccurate media publicity in this "extreme" case, an irrebuttable presumption of prejudice mandated moving the trial from New Haven to Stamford, which was the Connecticut venue mostly likely to yield an impartial jury. Arguing that *Skilling* is distinguishable because it was a white collar case that took place in the much larger city of Houston, Texas, the defendant argues that emotional outbursts in open court by multiple prospective jurors, with some openly weeping or shouting at him, demonstrated the impact on the New Haven juror pool of the media coverage of this crime, including Hayes' earlier trial. The defendant contends that any presumption of prejudice cannot be rebutted because the voir dire in this case demonstrated that six of the eighteen seated jurors had preconceived notions that the defendant was guilty, "virtually all had substantial knowledge of the case," and many had been told by family, friends, and other people that the defendant was guilty and should be sentenced to death. Overall, the defendant argues that "the voir dire proceedings establish beyond dispute that the jury selection process did not produce a jury untainted by pretrial publicity and community animus,"

State *v.* Komisarjevsky

with the seated jurors' self-assessments that "they could
be fair . . . [being] far from conclusive proof of their
impartiality."[27] (Internal quotation marks omitted.)

In response, the state, citing, as an example, the Bos-
ton Marathon bombing case; see *In re Tsarnaev*, 780
F.3d 14 (1st Cir. 2015) (order denying petition for man-
damus); contends that the trial court properly applied
the factors articulated by the Supreme Court in *Skilling*
v. *United States*, supra, 561 U.S. 382–83, in denying the
motion for a change of venue, given the relatively large
and diverse jury pool in New Haven, the "porosity of
geographic boundaries due to the effects of the Internet"
on the media coverage of this case, Penrod's study
indicating that prospective jurors had greater aware-
ness of the crime in general, rather than of the defendant
personally, the fact that coverage of Hayes' preceding
trial and conviction would not disadvantage the defen-

_____

[27] The defendant also appears to raise, as independent claims of error,
arguments that the trial court improperly (1) declined to discontinue jury
selection after Senator Prague made her lynching comments, (2) denied his
motions to dismiss various panels of prospective jurors based on certain
outbursts in court by prospective jurors, (3) declined to award him additional
peremptory challenges, (4) denied his motions to sequester the jury, (5)
denied his request to use a jury questionnaire, (6) denied his motion to
preclude supporters of the P family from wearing pins from the P Family
Foundation in the courtroom, (7) denied his motion to remove newspaper
boxes located outside the courtroom, (8) failed sua sponte to require that
jurors inform the court of exposure to publicity or communications about
the case, or to staunch the flood of comments by the state or to permit the
defendant relief from the gag order to respond publicly, and (9) failed
sua sponte to instruct the venirepersons not to discuss the case among
themselves. To the extent that these nine arguments constitute independent
claims of error outside the purview of the constitutional claims regarding
actual or presumed prejudice, we decline to reach them because we agree
with the state's argument that they are inadequately briefed, with virtually
no independent legal analysis. See, e.g., *Lafferty* v. *Jones*, 336 Conn. 332,
375 n.30, 246 A.3d 429 (2020), cert. denied,      U.S.    , 141 S. Ct. 2467,
209 L. Ed. 2d 529 (2021); *State* v. *Buhl*, 321 Conn. 688, 725–26, 138 A.3d 868
(2016). We do, however, consider their factual predicates within the context
of the actual and presumptive prejudice claims, which we address in
great detail.

State *v.* Komisarjevsky

dant's apparent strategy of asserting that Hayes was the ringleader, and the fact that Hayes' jury had rendered a partial acquittal at his trial. The state also relies heavily on the "unique" protections provided by Connecticut's constitutionally mandated individual voir dire process; *Rozbicki* v. *Huybrechts*, 218 Conn. 386, 392 n.2, 589 A.2d 363 (1991); see Conn. Const., amend. IV; to demonstrate that any prejudice was rebuttable due to a lack of actual prejudice because the jury, as empaneled after a monthslong voir dire, was one that the defendant himself had "accepted" as "actually . . . impartial," and the trial court took precautions to protect that impartiality. The state posits that the jurors selected, although aware of the crimes generally, knew nothing about the primary contested issue in this case, namely, the role and relative culpability of each accused. We agree with the state and conclude that the trial court did not violate the defendant's right to a fair trial by an impartial jury when it denied his motions for a change of venue from New Haven to Stamford because there was neither presumptive nor actual prejudice resulting from the pretrial publicity.

We begin with the standard of review and background legal principles. "In requesting a change of venue, a defendant bears the burden of showing that he could not otherwise receive a fair and impartial trial. The trial court exercises its discretion in deciding whether to grant such a change of venue. . . . The trial court's discretion is governed by Practice Book [§ 41-23], which provides: Upon motion of the prosecuting authority or the defendant, or upon his own motion, the judicial authority may order that any pending criminal matter be transferred to any other court location: (1) If the judicial authority is satisfied that a fair and impartial trial cannot be had where the case is pending . . . . Despite the broad discretion vested in the trial court in considering such a motion, its denial has constitutional

State *v.* Komisarjevsky

implications and appellate review requires an independent evaluation of the circumstances upon which the claim of an unfair trial is based. . . .

"For an appellate court to reverse a conviction on the [ground] of prejudicial pretrial publicity, a defendant generally must prove actual juror prejudice. . . . A defendant need not, however, show actual prejudice in extreme circumstances whe[n] there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable. . . . A defendant cannot rely, however, on the mere fact of extensive pretrial news coverage to establish the existence of inherently prejudicial publicity. Prominence does not, in itself, prove prejudice. . . . Rather, [t]he defendant must demonstrate that the publicity was so inflammatory or inaccurate that it created a trial atmosphere utterly corrupted by press coverage." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 222–23; see *Skilling* v. *United States*, supra, 561 U.S. 380–81; *Murphy* v. *Florida*, 421 U.S. 794, 798–99, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); *Sheppard* v. *Maxwell*, 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *State* v. *Pelletier*, 209 Conn. 564, 569–71, 552 A.2d 805 (1989). Indeed, "[t]o place our analysis of the defendant's claim regarding the extensive publicity in context, we must recognize the first amendment right of a free press to observe and publicize criminal trials. . . . It follows naturally that the public will hear and read reports of such proceedings. Dissemination of such information and the accompanying publicity itself, therefore, [are] not constitutionally objectionable. Extensive publicity implicates the defendant's due process rights only if it rises to a level sufficient to preclude a fair trial for the accused." (Citation omitted; footnote omitted.) *State* v. *Crafts*, 226 Conn. 237, 257, 627 A.2d 877 (1993).

State *v.* Komisarjevsky

Before we turn to the record in this case, we find instructive a detailed review of *Skilling* v. *United States*, supra, 561 U.S. 358, which is the United States Supreme Court's most recent decision concerning pretrial publicity. In *Skilling*, the court considered whether Jeffrey K. Skilling, the chief executive officer of Enron Corporation (Enron), had received a fair trial on criminal charges arising from the collapse of that business in the federal district that included Houston, which had been its home. Id., 367–68. Given the extensive and negative pretrial publicity about the case because of the severe economic consequences Enron's collapse had on the Houston area; id., 368–70; Skilling argued "that his trial 'never should have proceeded in Houston.' . . . And even if it had been possible to select impartial jurors in Houston, '[t]he truncated voir dire . . . did almost nothing to weed out prejudices,' . . . so '[f]ar from rebutting the presumption of prejudice, the record below affirmatively confirmed it.' " (Citation omitted.) Id., 377. The Supreme Court observed that "Skilling's [fair trial] claim thus raise[d] two distinct questions. First, did the District Court err by failing to move the trial to a different venue based on a presumption of prejudice? Second, did actual prejudice contaminate Skilling's jury?" Id.

The court began its analysis in *Skilling* with the "foundation precedent" of *Rideau* v. *Louisiana*, supra, 373 U.S. 723, in which "Wilbert Rideau robbed a bank in a small Louisiana town, [kidnapped] three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession. Without informing Rideau, no less seeking his consent, the police filmed the interrogation. On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, arguing that he could not receive a

State *v.* Komisarjevsky

fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people.'' *Skilling* v. *United States*, supra, 561 U.S. 379. The Supreme Court held that Rideau could not receive a fair trial because ''[w]hat the people [in the community] saw on their television sets . . . was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder. . . . [T]o the tens of thousands of people who saw and heard it . . . the interrogation in a very real sense *was* Rideau's trial—at which he pleaded guilty. . . . [The court] therefore [did] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire, that [t]he kangaroo court proceedings trailing the televised confession violated due process.'' (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., quoting *Rideau* v. *Louisiana*, supra, 725–27.

The United States Supreme Court also considered in *Skilling* ''two later cases in which media coverage manifestly tainted a criminal prosecution,'' namely, *Estes* v. *Texas*, 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), and *Sheppard* v. *Maxwell*, supra, 384 U.S. 333, both of which featured media coverage and reporting to the extent that the reporters and television crews physically overran the courtroom itself, creating '' '[b]edlam' '' and a '' 'carnival atmosphere' '' around the trial. *Skilling* v. *United States*, supra, 561 U.S. 379–80. Relying on *Murphy* v. *Florida*, supra, 421 U.S. 798–99, however, the court emphasized in *Skilling* that its ''decisions . . . cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process. . . . Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*.''[28] (Citations omitted;

[28] For a review of other United States Supreme Court pretrial publicity decisions relied on in *Skilling*, compare *Patton* v. *Yount*, 467 U.S. 1025,

State *v.* Komisarjevsky

emphasis in original; footnotes omitted; internal quotation marks omitted.) *Skilling* v. *United States*, supra, 380–81. Accordingly, the court emphasized in *Skilling* that a ''presumption of prejudice . . . attends only the extreme case.'' Id., 381.

The Supreme Court rejected Skilling's argument ''that [it] need not pause to examine the screening questionnaires or the voir dire before declaring his jury's verdict void.'' Id. The court emphasized that ''[i]mportant differences separate Skilling's prosecution from those in which [the court has] presumed juror prejudice,'' contrasting Houston's population of more than 4.5 million with the smaller communities at issue in its other cases, particularly *Rideau*. Id., 381–82; see also footnote 28 of this opinion. The court observed that, with Houston's ''large, diverse pool of potential jurors, the suggestion that [twelve] impartial individuals could not be empan-

1032–34, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (deferring to trial court's decision to credit jurors' statements of impartiality in retrial of defendant accused of murdering high school student in case of local notoriety, given passage of 4 years from time of crime to trial and 1.5 years from reversal of initial conviction to trial, despite fact that all but 2 of 163 panel members questioned had heard of case, and 8 of 14 seated jurors and alternates had at one time believed defendant to be guilty), and *Murphy* v. *Florida*, supra, 421 U.S. 800–801 (''The voir dire indicates no such hostility to [the] petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside. Some of the jurors had a vague recollection of the robbery with which [the] petitioner was charged and each had some knowledge of [the] petitioner's past crimes, but none betrayed any belief in the relevance of [the] petitioner's past to the present case. Indeed, four of the six jurors volunteered their views of its irrelevance, and one suggested that people who have been in trouble before are too often singled out for suspicion of each new crime—a predisposition that could . . . operate [only] in [the] petitioner's favor.'' (Footnotes omitted.)), with *Irvin* v. *Dowd*, 366 U.S. 717, 719, 727–28, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (pretrial publicity was prejudicial in case involving detailed reporting of defendant's extensive criminal history, details of his confession to murder and robbery spree, and his offer to plead guilty to avoid death penalty in newspaper that was circulated to 95 percent of small, rural community of only 30,000 people, with 8 of 12 seated jurors believing he was guilty, despite assurances of impartiality).

State *v.* Komisarjevsky

eled is hard to sustain.'' *Skilling* v. *United States*, supra, 561 U.S. 382.

The Supreme Court also considered the nature of the media coverage, observing that, ''although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau's dramatically staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it.'' Id., 382–83. The court also observed that, ''unlike cases in which trial swiftly followed a widely reported crime . . . over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered [Enron related] news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse.'' (Citation omitted.) Id., 383. The court further determined that Skilling was not prejudiced by the ''[well publicized] decision'' of a codefendant Enron executive to plead guilty because the District Court ''took appropriate steps to reduce that risk,'' such as delaying jury selection proceedings by two weeks and expanding voir dire inquiries to address recent publicity, including any news about the codefendant. (Internal quotation marks omitted.) Id., 384–85. ''Finally, and of prime significance,'' the court emphasized that the jury's verdict in *Skilling* demonstrated the jurors' impartiality, insofar as they found him not guilty ''of nine [insider trading] counts. Similarly, earlier instituted [Enron related] prosecutions yielded no overwhelming victory for the [g]overnment.'' Id., 383. Thus, the court concluded that ''Skilling's trial, in short, share[d] little in common with those in which [the court] approved a presumption of juror prejudice,'' emphasizing that ''pretrial publicity— even pervasive, adverse publicity—does not inevitably lead to an unfair trial. . . . In this case . . . news sto-

State *v.* Komisarjevsky

ries about Enron did not present the kind of vivid, unforgettable information [the court has] recognized as particularly likely to produce prejudice, and Houston's size and diversity diluted the media's impact.'' (Citation omitted; internal quotation marks omitted.) Id., 384.

The Supreme Court next turned to the actual prejudice claims and examined the voir dire in *Skilling* to consider whether an impartial jury had in fact been selected. Id., 385. Emphasizing the customary deference given by appellate courts to trial courts' assessments of juror impartiality; see id., 386–87; the court engaged in a detailed examination of the juror selection process, including the use of individual voir dire in conjunction with a ''comprehensive questionnaire drafted in large part by Skilling,'' which was used as an initial screening tool ''to identify prospective jurors excusable for cause and served as a springboard for further questions put to remaining members of the array. Voir dire thus was . . . the culmination of a lengthy process.'' (Internal quotation marks omitted.) Id., 388; see id., 389 (''[i]nspection of the questionnaires and voir dire of the individuals who actually served as jurors satisfie[d] [the court] that . . . the selection process successfully secured jurors who were largely untouched by Enron's collapse''); id., 395 (The court emphasized the role of the individual voir dire process ''to uncover concealed bias. This face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service.''). The court further rejected Skilling's claims that several specific jurors who sat at his trial were biased, noting that he had challenged only one of them for cause. See id., 395–99.

In the wake of *Skilling*, it has become axiomatic that, although ''any [high profile] case will receive significant media attention'' and ''people in general, and especially

State *v.* Komisarjevsky

the well-informed, will be aware of it . . . [k]nowledge . . . does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process.'' *In re Tsarnaev*, supra, 780 F.3d 15; see also *State* v. *Reynolds*, supra, 264 Conn. 224 (''[j]urors need not be totally ignorant of the facts and issues involved in a criminal trial and the fact that some jurors have some prior knowledge about the case does not itself constitute identifiable jury prejudice'' (internal quotation marks omitted)). With these principles in mind, we now examine the record in this case to determine whether it is one in which the ''community's knowledge . . . has . . . crossed from familiarity . . . to . . . prejudice''; *In re Tsarnaev*, supra, 23; mindful that ''the prospect of seating an unbiased jury'' is the key to the presumed prejudice inquiry, with the actual prejudice inquiry ''turn[ing] on [the] perception of the adequacy of the [jury selection] process'' itself. (Internal quotation marks omitted.) *Skilling* v. *United States*, supra, 561 U.S. 385 n.19.

C

Presumed Prejudice

In determining whether prejudice should be presumed, we consider the following factors articulated by the United States Supreme Court in *Skilling*, namely, (1) ''the size and characteristics of the community in which the crime occurred,'' (2) the nature of the media coverage, (3) whether the passage of time has alleviated the impact of any prejudicial publicity, and (4) whether the jury's actions and verdict, along with the jury selection procedures utilized, were consistent with imposing a presumption of prejudice. *Skilling* v. *United States*, supra, 561 U.S. 382–83.

Courts applying the *Skilling* factors have deemed the size and characteristics of the community to be of paramount importance. ''The larger the community, the

State *v.* Komisarjevsky

more likely that impartial jurors can be found within
it. . . . And [i]t is well recognized that in a small rural
community in contrast to a large metropolitan area, a
major crime is likely to be embedded in the public
consciousness with greater effect and for a longer time.
. . . Thus both the size and the character of the coun-
ty's population, while not determinative, are factors to
be considered.'' (Citation omitted; internal quotation
marks omitted.) *State* v. *Sowell*, 148 Ohio St. 3d 554,
565, 71 N.E.3d 1034 (2016), cert. denied, U.S. ,
138 S. Ct. 101, 199 L. Ed. 2d 63 (2017). Although smaller
than the Houston and Boston metropolitan areas con-
sidered in *Skilling* v. *United States*, supra, 561 U.S. 382,
and *In re Tsarnaev*, supra, 780 F.3d 21, New Haven,
with an urban and suburban population of 846,000, is
significantly larger than other regions that courts have
deemed sufficiently populous to permit the selection
of an impartial jury, even in cases of local, and often
national, notoriety, particularly when expanded voir
dire procedures are employed. See, e.g., *United States*
v. *Philpot*, 733 F.3d 734, 738, 741 (7th Cir. 2013) (North-
west Indiana, with jury pool drawn from two counties
with population of about 600,000, was not "a small
town" that would support presumption of prejudice in
political corruption case); *United States* v. *Jacques*,
Docket No. 2:08-cr-117, 2011 WL 1706770, *1, *6, *9 (D.
Vt. May 4, 2011) (declining to move venue of trial for
widely known rape and murder of twelve year old girl
from Vermont to New York given federal district divi-
sion's population of 500,000 and court's intention to
enlarge jury pool and use expanded voir dire process
to assess effect of pretrial publicity); *Luong* v. *State*,
199 So. 3d 139, 144, 147–50 (Ala. 2014) (Mobile County,
Alabama, had diverse pool of more than 400,000 citizens
that functioned to mitigate against extensive pretrial
publicity in death penalty case of defendant accused
of throwing his four young children from bridge); *People*

State *v.* Komisarjevsky

v. *Peterson*, 10 Cal. 5th 409, 416, 441, 472 P.3d 382, 268 Cal. Rptr. 3d 56 (2020) (concluding that 700,000 residents of San Mateo County constituted sufficiently large pool from which to draw jury in high profile death penalty case concerning husband who killed his pregnant wife and unborn child), cert. denied, U.S. , 141 S. Ct. 1440, 209 L. Ed. 2d 159 (2021); *State* v. *Robinson*, 303 Kan. 11, 54–55, 74–77, 363 P.3d 875 (2015) (no presumed prejudice in county of nearly 500,000 residents, despite survey indicating 94 percent awareness and overwhelming belief in defendant's guilt in case involving sexually motivated serial killings of multiple women), cert. denied, U.S. , 137 S. Ct. 164, 196 L. Ed. 2d 138 (2016); *State* v. *Kaarma*, 386 Mont. 243, 251–52, 254–55, 390 P.3d 609 (no presumed prejudice in Missoula County, Montana, with population of approximately 110,000 and six major media outlets, despite 90 percent juror awareness of homicide case, given availability of questionnaire and individual voir dire), cert. denied, U.S. , 138 S. Ct. 167, 199 L. Ed. 2d 40 (2017); *State* v. *Gribble*, 165 N.H. 1, 5, 19–20, 66 A.3d 1194 (2013) (size of Hillsborough County, New Hampshire, which has population of more than 400,000 and includes city of Manchester, mitigated effects of pretrial publicity in home invasion case involving murder of woman and attempted murder of her daughter, even after trial and sentence of coconspirator). But cf. *Commonwealth* v. *Toolan*, 460 Mass. 452, 464, 951 N.E.2d 903 (2011) (observing that "[t]he small size of the Nantucket community weighed in favor of finding local prejudice" in light of its "just over 10,000 permanent residents" and fact that "[t]he extensive links among the victim's family, members of the [overall] jury venire, and trial witnesses demonstrate[d] the network of social relations connecting this community, of which the victim was a valued member, and to which the defendant was an outsider"). The size and diversity of

State *v.* Komisarjevsky

New Haven, with its population of 846,000 at the time of trial, greatly increase the feasibility of identifying an impartial jury, meaning that this *Skilling* factor weighs very strongly in favor of the state, particularly given the much smaller populations that have been deemed adequate to mitigate the prejudicial effect of substantial and adverse pretrial publicity.[29]

With respect to media coverage and public awareness, as a general proposition, even a high volume of coverage about a sensational or particularly violent crime does not by itself tip this *Skilling* factor to favor

[29] This principle has, of course, also been applied in notorious cases in larger metropolitan areas. See *United States* v. *Warren*, 989 F. Supp. 2d 494, 499–500, 502–504 (E.D. La. 2013) (denying motion to transfer venue for New Orleans police officers' retrial in Danziger Bridge shooting case after Hurricane Katrina because district had population of 1.5 million, nearly three years had passed since first trial, and court would utilize questionnaires and individual voir dire to identify potential jury prejudice); *United States* v. *Mitchell*, 752 F. Supp. 2d 1216, 1220–27 (D. Utah 2010) (no presumed prejudice in Elizabeth Smart kidnapping case given district's population of 2.8 million, despite fact that 9000 to 10,000 residents participated in search for her); *State* v. *Sowell*, supra, 148 Ohio St. 3d 565–66 ("widespread" pretrial publicity of serial rapist/murder case did not deprive defendant of fair trial when jury was selected after extensive voir dire, which included individual questioning as to effect of pretrial publicity, from county that included city of Cleveland with population of more than 1.2 million).

We acknowledge, however, that even a relatively large population may not necessarily obviate the need to move a trial in a particularly notorious case. See *United States* v. *Casellas-Toro*, 807 F.3d 380, 386–88 (1st Cir. 2015) (size of District of Puerto Rico, with 3 million residents, was balanced by its " 'compact, insular' " population and media market, especially when federal trial held after conviction of reviled defendant in commonwealth court was "relatively unknown" outside of Puerto Rico); *People* v. *Boss*, 261 App. Div. 2d 1, 3–6, 701 N.Y.S.2d 342 (1999) (trial of police officer defendants charged with murder of Amadou Diallo should be moved from New York City given overwhelming and sensational pretrial publicity—including advertisements taken out by American Civil Liberties Union against defendants, commentary by public officials and opinion writers, and mass demonstrations—on point that "the two undisputed facts, namely that [forty-one] shots were fired and that . . . Diallo was unarmed, conclusively establish [the] defendants' guilt and are dispositive of all possible factual and legal issues," including "[routine] . . . assertions [by prospective jurors] that [the] defendants were motivated by racial prejudice").

State *v.* Komisarjevsky

a criminal defendant who is the subject of that publicity. See *State* v. *Carr*, 300 Kan. 1, 67, 69, 331 P.3d 544 (2014) ("[A] quadruple [execution style] homicide and an attempted [first degree] premeditated murder preceded by hours of coerced sex acts and robberies naturally [gave] rise to press coverage that some may fairly characterize as at least occasionally sensational [and led to increased purchases of home security systems]. It can hardly help but be so. . . . Yet, overall . . . the primarily factual tone of the press coverage . . . compensated for its sheer magnitude, and the second *Skilling* factor did not weigh in favor of presumed prejudice." (Citation omitted.)), rev'd on other grounds, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016); see also *State* v. *Reynolds*, supra, 264 Conn. 223 ("[o]ne who is reasonably suspected [of] murdering [a police officer in the line of duty] cannot expect to remain anonymous" (internal quotation marks omitted)). This is particularly so, given that the impact of media coverage has become increasingly difficult to assess. Unlike the relatively limited local television coverage considered by the United States Supreme Court in *Rideau* v. *Louisiana*, supra, 373 U.S. 725–27, in which the viewership was geographically confined and readily ascertainable, we must also consider the reality of life in the twenty-first century. "Simply because prospective jurors may have heard about a case through media reports does not render them incapable of jury service, since, in today's information age, [when] news of community events [is] disseminated virtually instantaneously by an ever multiplying array of delivery methods, it would be difficult to find [twelve] jurors who do not at least have some knowledge of the facts of an important and tragic incident like this one." (Internal quotation marks omitted.) *State* v. *Addison*, 165 N.H. 381, 431, 87 A.3d 1 (2013); see *State* v. *Gribble*, supra, 165 N.H. 20 (describing difficulty of estimating exposure to pretrial publicity given publi-

State *v.* Komisarjevsky

cation of news on Internet, which could be read nation-wide, as compared to local print media or local television); cf. *United States* v. *Casellas-Toro*, 807 F.3d 380, 386–88 (1st Cir. 2015) (considering ''[the] compact, insular community'' in Puerto Rico in presuming preju-dice in notorious murder case, especially when defen-dant was ''relatively unknown outside Puerto Rico'' (internal quotation marks omitted)); *United States* v. *Keleher*, Docket No. 20-019 (FAB), 2020 WL 4784749, *10 (D.P.R. August 17, 2020) (The court questioned whether the First Circuit's description in 1987 of Puerto Rico as '' 'a compact, insular community' '' that is '' 'highly susceptible to the impact of local media' '' remains accu-rate given ''[t]he advent of the [I]nternet and social media (and other developments) . . . . Like the resi-dents of Boston, it is possible that Puerto Ricans now 'obtain their news from a vast array of sources.' ''). Thus, caution about changing venue is appropriate ''in any case that draws significant national attention'' because, ''[i]f exposure to a certain level of pretrial publicity renders a community presumptively unable to convene an impartial jury, then no venue will be acceptable, and no trial will be possible . . . .'' (Inter-nal quotation marks omitted.) *Luong* v. *State*, supra, 199 So. 3d 147.

That having been said, we acknowledge that at least some of the coverage in the media in the present case went beyond the reporting of even the most disturbing facts and, instead, was at times evocative of the ''lynch mob mentality'' or ''[community wide] rush to judg-ment'' identified by the United States Supreme Court as being sufficiently prejudicial to trigger a presumption of prejudice. (Internal quotation marks omitted.) *State* v. *Gribble*, supra, 165 N.H. 27. Commentary from a bipar-tisan array of prominent political figures made clear the extent to which this case affected the debate about criminal justice public policy and, particularly, the

State *v.* Komisarjevsky

death penalty. Most graphic were the widely reported comments of Senator Prague, who, as we previously noted, was a formerly ardent death penalty opponent who changed her position on the issue after meeting with W, and then stated for the public record—while jury selection was ongoing in this case—her widely reported view that the defendant should be hanged in a public street by his genitalia. Indeed, then Governor M. Jodi Rell specifically cited this case in vetoing legislation repealing the death penalty. See Connecticut Executive Branch, Press Release, Governor Rell Vetoes HB 6578, An Act Concerning the Penalty for a Capital Felony (June 5, 2009), available at https://www.ct.gov/governorrell/cwp/view.asp?A=3675&Q=441204 (last visited April 8, 2021). Similarly, former Governor Dannel Malloy stated in his 2010 campaign for office that he would support legislation prospectively repealing the death penalty, with a prospective only repeal aimed specifically at ensuring the executions of the defendant and Hayes. In our view, targeted public commentary of this ilk— above the line from the comments section and made by prominent public officials—is sufficient to tip the press coverage *Skilling* factor in the defendant's favor, even accounting for the twenty-first century reality of the omnipresent media coverage of notorious criminal cases.

Turning to the remaining *Skilling* factors, we agree with the defendant that the passage of several years from when the home invasion occurred did not, by itself, blunt the potentially prejudicial impact of the coverage, insofar as this case was tried several months after Hayes' conviction and death sentence, the media coverage of which operated to revive any dissipation that had taken place. Cf. *Skilling* v. *United States*, supra, 561 U.S. 383–85 (passage of four years between Enron bankruptcy and trial minimized prejudice to Skilling, although another Enron executive's ''[well publi-

State *v.* Komisarjevsky

cized] decision to plead guilty shortly before [Skilling's] trial created a danger of juror prejudice'' that was addressed by continuances and enhanced voir dire (internal quotation marks omitted)); *State* v. *Gribble*, supra, 165 N.H. 22–23 (effect of media coverage on home invasion case tried approximately four months after verdict in coconspirator's trial, which had "received substantial publicity," was mitigated because defendant pleaded not guilty by reason of insanity and, therefore, did not contest most factual allegations).

Most significant, however, the jury selection process used in this case very strongly favors the state with respect to whether to presume prejudice. Having denied the motion to change venue without prejudice, the trial court properly relied on the prospect of Connecticut's attorney led, individual voir dire process to give the parties and the court a comprehensive opportunity to assess each prospective juror's familiarity with the case and ability to render an impartial verdict; that process far exceeded the more truncated process deemed constitutionally adequate in *Skilling*.[30] See, e.g., *Skilling*

[30] Although not directly relevant to whether the defendant could get a fair trial in New Haven, we also find it significant that Penrod's study reflected extremely high levels of case awareness among potential jurors in Stamford. This means that an exercise of discretion to transfer this case to Stamford would not have obviated the need for a searching and lengthy voir dire process like that employed in New Haven to identify twelve suitable jurors plus alternates. That suggests, of course, that transferring the case to Stamford would not have dramatically reduced obstacles to picking an impartial jury or have reduced the need for a searching voir dire process to reach that end. See *United States* v. *Tsarnaev*, 968 F.3d 24, 55 (1st Cir. 2020) (District Court did not abuse discretion in denying motion to change venue of Boston Marathon bombing trial from Boston, Massachusetts, because polling data showed "public awareness and attitudes were not materially different in, for example, Springfield or New York City," rendering it "not a case where almost everybody locally knows something and very few elsewhere know of it"), petition for cert. granted (U.S. March 22, 2021) (No. 20-443); *State* v. *Robinson*, supra, 303 Kan. 71 (noting high case recognition in counties outside venue of origin in upholding denial of motion to transfer venue on statutory grounds); cf. *United States* v. *Casellas-Toro*, supra, 807 F.3d 386–88 (prejudicial publicity warranted transfer when defendant was

State *v.* Komisarjevsky

v. *United States*, supra, 561 U.S. 387–89 (court led, individual voir dire over five hour period following submission of questionnaires). Indeed, the trial court prudently enhanced the utility of this extensive and searching individual voir dire process by awarding each of the parties forty peremptory challenges, which exceeded the minimum of thirty mandated in capital cases by § 54-82h (a). Coupled with the size and diversity of New Haven's population, this extensive process strongly supports a conclusion that there was no presumptive prejudice in this case.[31] See *In re Tsarnaev*,

son of federal judge in Puerto Rico, which had " 'insular' " population and media market, coverage of trial was massive and carried live on television, Internet, and radio, with entire baseball stadium erupting in cheers when he was convicted of related charges in commonwealth court, despite its size of three million residents, particularly given that case was "relatively unknown" outside of Puerto Rico); *United States* v. *Gordon*, 380 F. Supp. 2d 356, 365 (D. Del. 2005) (transferring political corruption case from Wilmington, Delaware, to Philadelphia, Pennsylvania, because of "the extensive publicity [the] case has received" in Delaware, including "hundreds of newspaper articles and editorials, which strongly support[ed] the view that a substantial percentage of Delawarians [were] likely to have concluded that the defendants [were] guilty as charged," almost everyone in county where alleged crimes occurred had heard about case and substantial majority already had formed opinions about it, and case could be tried in nearby Philadelphia, where it had "generated little or no publicity" without undue inconvenience), rev'd on other grounds, 183 Fed. Appx. 202 (3d Cir. 2006).

[31] In the present case, the jury found the defendant guilty on all counts, rather than having returned a split verdict, the latter of which has been deemed indicative of impartiality weighing against the presumption of prejudice. See, e.g., *Skilling* v. *United States*, supra, 561 U.S. 383–84; *State* v. *Carr*, supra, 300 Kan. 74. Nonetheless, our review of the record demonstrates that the evidence was overwhelming. Indeed, the defendant conceded the vast majority of the factual issues in the guilt phase—in particular, his participation in the home invasion—choosing to challenge only whether he had sexually assaulted M anally, rather than orally as he had confessed, and whether he had the requisite intent to kill. Accordingly, we conclude that the jury's verdict does not support a finding of presumptive prejudice. See *State* v. *Townsend*, 211 Conn. 215, 228–29, 558 A.2d 669 (1989) (noting that publicity about plea negotiations and defendant's offer to plead guilty to murder in exchange for five year sentence was "not as inherently prejudicial as in a case in which a defendant denies any involvement in a crime, but nonetheless has considered pleading guilty in exchange for a reduced sentence," because defendant did not "[dispute] the events leading up to

State *v.* Komisarjevsky

supra, 780 F.3d 24–26 (relying on likelihood of extensive voir dire process in Boston Marathon bombing case); *State* v. *Reynolds*, supra, 264 Conn. 223–24 (relying on individual voir dire process to mitigate effect of pretrial publicity in extensively publicized death penalty trial arising from killing of police officer); *People* v. *Avila*, 59 Cal. 4th 496, 499–500, 505–508, 327 P.3d 821, 173 Cal. Rptr. 3d 718 (2014) (upholding denial of change of venue prior to jury selection for death penalty trial arising from widely publicized rape and murder of five year old girl, which had been commented on by President George W. Bush and highlighted by local radio show encouraging execution of defendant, because county was one of California's most populous, and "prospective jurors would sympathize with [her] fate wherever the trial was held," two years and nine months had passed since the crime, and "it was reasonable for the trial court to conclude that actual voir dire—during which the court and parties could question the jurors [face-to-face]—was a more reliable way to measure the effect of pretrial publicity than a survey conducted by a person chosen by one of the parties"), cert. denied, 575 U.S. 940, 135 S. Ct. 1712, 191 L. Ed. 2d 685 (2015); *State* v. *Kaarma*, supra, 386 Mont. 251–52, 254–58 (trial court properly denied motion for change of venue from county with population of approximately 110,000, despite fact that there had been 500 articles about delib-

the victim's death" but, instead, appeared to challenge whether he had "the requisite intent for murder"); see also *Luong* v. *State*, supra, 199 So. 3d 148 (Given "[the defendant's] admission that he threw each of his children off the bridge, the fact that [the defendant] was not acquitted of any of the charged offenses does not either support or rebut a presumption of jury bias or impartiality. The evidence in [the] case simply did not create any inference from which the jury could conclude that he killed some, but not all, of his children."); *State* v. *Gribble*, supra, 165 N.H. 23 (defendant's admission to participation in crimes and plea of not guilty by reason of insanity reduced prejudice from media reporting on coconspirator's trial that "described the defendant's involvement in the crime" because he "admitted as much when he pleaded not guilty by reason of insanity").

State *v.* Komisarjevsky

erate homicide case with sympathy to victim and cover-
age of defendant's prior bad acts, and 90 percent of
polled potential jurors had heard of case, because trial
court properly used detailed questionnaires and individ-
ual voir dire to assess impact of pretrial publicity); *State*
v. *Addison*, supra, 165 N.H. 430–31 (no presumptive
prejudice requiring transfer from Manchester, New
Hampshire, for death penalty trial for murder of city
police officer, despite fact that 98 percent of prospec-
tive jurors knew about case, because individual voir dire
enhanced with questionnaire and increased number of
peremptory challenges could be used to ensure impar-
tial panel); *State* v. *Clinton*, 153 Ohio St. 3d 422, 433–35,
108 N.E.3d 1 (2017) (no presumptive prejudice, despite
extensive publicity about prosecution for aggravated
murder and sexual assault of victim and her two minor
children, because, although most jurors knew some-
thing about facts of case, trial court took steps to
address impact of pretrial publicity, including having
potential jurors complete extensive publicity question-
naire, and using individual voir dire to weed out pro-
spective jurors with excessive knowledge of case or
apparent belief in defendant's guilt), cert. denied,
U.S.    , 139 S. Ct. 259, 202 L. Ed. 2d 173 (2018). Finally,
the trial court also prudently left open the possibility
of changing the venue should the individual voir dire
process indicate that an impartial jury could not be
empaneled in New Haven. See *State* v. *Reynolds*, supra,
224.

As the California Supreme Court recently observed
in upholding the denial of a second change of venue in
the Scott Peterson death penalty trial,[32] which was a
case of similar national notoriety arising from a hus-
band's murder of his pregnant wife, the "publicity . . .

[32] The Peterson trial originally was moved from the rural jurisdiction in
which the murder happened to San Mateo County, which had a larger
population. See *People* v. *Peterson*, supra, 10 Cal. 5th 438.

State *v.* Komisarjevsky

generated" in this case, "like the trials of O.J. Simpson, the Manson family, and any number of other so-called trials of the century before them, was intrinsic to the *case*, not the *place*," particularly given "the explosion of cable television and the Internet as sources of information, facilitating nationwide coverage of the case," meaning it was "speculation to suppose [the] results of jury selection would be any different anywhere else." (Emphasis in original; internal quotation marks omitted.) *People* v. *Peterson*, supra, 10 Cal. 5th 440. Put differently, the endless and instant flow of information—and in some cases disinformation—enabled by twenty-first century media, does not stop at the political boundaries of our judicial districts. "Instead, in a [high profile] case such as this one, provided a sufficiently large pool is available . . . the better answer is not to change venue . . . but to rigorously vet potential jurors to screen out those tainted and irrevocably biased by pretrial publicity, to find [twelve], plus alternates, who can decide only on the evidence admitted at trial." Id., 441. We conclude, therefore, that the defendant has not surmounted the "extremely high" bar; (internal quotation marks omitted) *State* v. *Robinson*, supra, 303 Kan. 76; see also *Skilling* v. *United States*, supra, 561 U.S. 381; necessary to establish the existence of presumptive prejudice in this case, insofar as the other *Skilling* factors function to outweigh the inflammatory nature of the publicity that attended this case with respect to the possibility of empaneling an impartial jury.

D

Actual Prejudice

We next consider whether pretrial publicity resulted in actual prejudice in this case.[33] This requires us to

___

[33] Having concluded that no presumption of prejudice arose on the record in this case, we need not directly consider the question of whether any such presumption is rebuttable, an issue not resolved by the United States Supreme Court in *Skilling*; see *Skilling* v. *United States*, supra, 561 U.S.

338 Conn. 526 OCTOBER, 2021 575

State *v.* Komisarjevsky

examine the record of jury selection to determine whether it "adequately detect[ed] and defuse[d] juror bias." *Skilling* v. *United States*, supra, 561 U.S. 385. Particularly in cases with extensive pretrial publicity and notoriety, individual voir dire, which is mandated by article four of the amendments to the Connecticut constitution; see, e.g., *Rozbicki* v. *Huybrechts*, supra, 218 Conn. 392 and n.2; is critical to ensure the selection of jurors who are sufficiently impartial to serve. See *Commonwealth* v. *Toolan*, supra, 460 Mass. 468 (failure to conduct individual voir dire regarding exposure to pretrial publicity denied defendant his right to fair trial given risk of prejudice occasioned by "small, socially interconnected community" in Nantucket and extensive pretrial publicity).

As a matter of both well established Connecticut and federal constitutional law, "[n]o [hard and fast] formula dictates the necessary depth or breadth of voir dire. . . . Jury selection . . . is particularly within the province of the trial judge. . . .

"When pretrial publicity is at issue, primary reliance on the judgment of the trial court makes [especially] good sense because the judge sits in the locale where the publicity is said to have had its effect and may base her evaluation on her own perception of the depth and extent of news stories that might influence a juror. . . .

385 n.18; and not clearly addressed by that court's earlier precedents, which were inconsistent with respect to whether to examine the transcript of voir dire after determining that prejudice existed. See, e.g., *United States* v. *Casellas-Toro*, supra, 807 F.3d 388–89. Those few courts that have directly considered this issue have, however, concluded that the presumption is in fact rebuttable, both before and after *Skilling* was decided, in a process akin to the actual prejudice inquiry. See *United States* v. *Wilcox*, 631 F.3d 740, 749 (5th Cir.), cert. denied, 563 U.S. 1015, 131 S. Ct. 2921, 179 L. Ed. 2d 1260 (2011); *United States* v. *Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006); *United States* v. *Chagra*, 669 F.2d 241, 250 (5th Cir.), cert. denied, 459 U.S. 846, 103 S. Ct. 102, 74 L. Ed. 2d 92 (1982); *Luong* v. *State*, supra, 199 So. 3d 167 (Parker, J., dissenting).

State *v.* Komisarjevsky

Appellate courts making after-the-fact assessments of the media's impact on jurors should be mindful that their judgments lack the [on the spot] comprehension of the situation possessed by trial judges.

"Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty. . . . In contrast to the cold transcript received by the appellate court, the [in the moment] voir dire affords the trial court a more intimate and immediate basis for assessing a venire member's fitness for jury service." (Citations omitted; internal quotation marks omitted.) *Skilling* v. *United States*, supra, 561 U.S. 386–87; see also *State* v. *Griffin*, 251 Conn. 671, 710, 741 A.2d 913 (1999) ("[t]he trial court is vested with wide discretion in determining the competency of jurors to serve"); *State* v. *Pelletier*, supra, 209 Conn. 572 (describing trial court's "broad discretion" with respect to "determining the credibility of prospective jurors and their ability to be impartial").

In assessing for actual prejudice, we are cognizant that a lengthy voir dire process is frequently necessary to seat a sufficient number of impartial jurors and that a lengthy duration is not, by itself, indicative of "pervasive prejudice permeating through the jury pool," insofar as "a jury selection process of several weeks in length is not unusual in either contemporary or historical terms. [M]ajor cases have been known to require six weeks or more before the jury is seated." (Footnote omitted; internal quotation marks omitted.) *In re Tsarnaev*, supra, 780 F.3d 25–26; see id., 26 ("it defies logic to count the efforts the [D]istrict [C]ourt has taken to carefully explore, and eliminate, any prejudice as *show-*

State *v.* Komisarjevsky

*ing* the existence of the same'' (emphasis in original)). This is particularly so in death penalty cases, which add significant lines of questioning to the juror qualification process.[34] See id., 26 and n.15.

Accordingly, we now turn to a detailed analysis of the jury selection process in the present case. Our juror by juror[35] analysis to determine whether the trial court empaneled an impartial jury focuses on the jurors who actually deliberated at trial and sentencing. See, e.g., *State* v. *Gould*, 322 Conn. 519, 531, 142 A.3d 253 (2016) (''[p]rejudice is assessed with reference to the jurors who [found] the defendant [guilty] because [t]he constitutional standard of fairness requires [only] that a defendant have a panel of impartial, indifferent jurors'' (internal quotation marks omitted)).

For the sake of relative brevity, our review does not extensively consider the jurors' personal background histories, focusing instead on the portions of voir dire relevant to the major issues in this appeal, namely, the extent of their exposure to pretrial publicity and the effect of that exposure on their case knowledge and impartiality. Although the death penalty is no longer at issue in this case, we include in footnotes a review of each juror's views on that topic, insofar as that subject would have strongly informed the parties' decision

---

[34] We note that the First Circuit recently concluded that the Boston Marathon bomber, Dzokhar Tsarnaev, was entitled to a new penalty phase trial. *United States* v. *Tsarnaev*, 968 F.3d 24, 56 (1st Cir. 2020), petition for cert. granted (U.S. March 22, 2021) (No. 20-443). Although the court held that the District Court had not abused its discretion in declining to move the trial out of Boston, Massachusetts; id., 55–56; it also concluded that the extent of the voir dire conducted—the presumed adequacy of which had been a key to its earlier mandamus decision in *In re Tsarnaev*, supra, 780 F.3d 25–26, not to move the trial from Boston—was in fact inadequate to ensure the impartiality of the jurors. See id., 58–59.

[35] ''In accordance with our usual practice, we identify jurors by initial[s] in order to protect their privacy interests.'' (Internal quotation marks omitted.) *State* v. *Holmes*, 334 Conn. 202, 207 n.6, 221 A.3d 407 (2019).

State *v.* Komisarjevsky

whether to accept a particular juror.[36] Finally, we note that each selected juror repeatedly expressed his or her ability (1) to be fair and impartial, (2) to understand and apply the reasonable doubt burden of proof as to each element of each charged offense, along with the presumption of innocence, and (3) not to be swayed by sympathy for the P family or to be affected emotionally after viewing disturbing crime scene or autopsy photographic evidence. None of the jurors who were asked whether they had participated in the P family memorial or charitable activities responded in the affirmative. None of the jurors who were asked had changed their home security habits as a result of this case. Finally, the trial court instructed each selected juror not to talk about the case with anyone or to do independent research, and to avoid media coverage of the case during the time between jury selection and the start of trial. We now turn to an examination of each juror's individual voir dire.[37]

---

[36] With respect to the death penalty, all of the jurors testified that they (1) understood the jury's exclusive role in the sentencing decision, (2) would keep an open mind during a sentencing phase despite evidence heard during the guilt phase supporting convictions of intentional murder and the sexual assault of an eleven year old girl, and (3) would keep an open mind with respect to the claimed mitigating factors, including relatively minor involvement in the crime, reduced mental capacity, and a troubled childhood.

[37] Out of an abundance of caution, and to give the most expansive consideration possible to the defendant's actual prejudice claims, we also reviewed the voir dire of the six alternate jurors, along with the three backup alternate jurors. See, e.g., *State* v. *Crafts*, supra, 226 Conn. 260. We do not discuss them in detail, insofar as "[p]rejudice is assessed with reference to the jurors who [found] the defendant [guilty] because [t]he constitutional standard of fairness requires [only] that a defendant have a panel of impartial, indifferent jurors." (Internal quotation marks omitted.) *State* v. *Gould*, supra, 322 Conn. 531. None of the six alternates who sat at trial, G.B., C.T., C.H., Ch.G., C.J., and R.D., was needed to deliberate in this case. Similarly, the three backup alternate jurors, I.L., M.S., and M.M., were dismissed prior to the start of the trial and did not sit with the jury for any part of this case. Our review of their voir dire testimony indicates that, consistent with the regular jurors, each of the alternates and backup alternates expressed relatively modest levels of knowledge about this case and the defendant's background in particular, did not know anything about the defendant's background, stated

State *v.* Komisarjevsky

1

Review of Jurors

a

M.N.

The first regular juror selected was M.N., a physician.[38] When the trial court asked M.N. whether he could be fair and impartial with respect to both the guilt and penalty determinations, he stated: "[C]learly, I've heard of this case, and, when it first happened, I read about it in the news and saw some stories on TV. Nonetheless, I realize that things may not always be the way they are represented in the media, and I understand that my charge would be to evaluate things based solely on the evidence, evidence that would be presented during court, and I will try my hardest to do that." M.N. had read about the case in the New York Times and on Google News, and had "occasionally" seen stories about it on television news. When asked about what he knew about the case, M.N. stated: "I think that the home was, I guess, the term has been used in the media, the home was invaded, three of the four individuals were raped and killed, and the fourth individual was beaten, and then the house was put to fire." M.N. was familiar with Cheshire, having lived in a nearby town, but did not know the area where the crime occurred. M.N.'s last exposure to information about the case was during Hayes' trial; he was aware that Hayes was convicted

limited support for the death penalty as a general matter, and had an open mind and understanding of the state's burden of proof with respect to both the guilt and penalty phases in this case. We acknowledge, however, that the defendant raised challenges for cause to several of these alternate and backup alternate jurors based on case knowledge, which the trial court rejected on the basis of its assessment of the jurors' understanding of and ability to apply the presumption of innocence; the defendant did not exercise peremptory challenges as to any of them. See part I E of this opinion.

[38] M.N. did not have any personal or professional contacts with W.

State *v.* Komisarjevsky

but did not know the sentence imposed. Both parties accepted M.N. without challenge.[39]

b

T.A.

The second regular juror chosen was T.A., a college student studying criminal justice and social work who interns with a program that assists sex offenders with transitioning from incarceration to the community. T.A. obtained most of his news, including knowledge about this case, from television and stated that none of that coverage would keep him from being fair and impartial, particularly because he viewed the media as having "a tendency of twisting and turning things . . . ." When asked to rate how frequently he had heard about this case on a scale of one to ten, he rated it between five and seven. T.A. did not make a point of following the coverage and had not read any of the books written about the case. When questioned about his case knowledge, T.A. stated that "a murder occurred in Cheshire, and it was pertaining to the family members that, you know, one person or two people, you know, were the culprits of a murder." T.A. believed that "three or four" people were killed in the incident and that two perpetrators had been arrested. T.A. also knew that the other person who was arrested had been convicted and sentenced to death. T.A. was familiar with Cheshire but not the street where the crime took place. T.A. stated

[39] With respect to the death penalty, M.N. believed that "it's something that should be reserved only for heinous crimes that were done . . . intentionally and thought out beforehand." He quantified his support for it as a three on a scale of one to ten. When asked hypothetically about whether the death penalty was "the only appropriate penalty" for a premeditated murder, M.N. stated that his view would "depend on additional details," such as whether the victim in the hypothetical had suffered "additional pain and torture . . . ." When asked about this case, he stated: "The accused's crimes are horrible, and those are the kind of crimes that I think are the ones where the death penalty is appropriate, but I would consider mitigating circumstances if I was instructed to do so."

State *v.* Komisarjevsky

that none of that knowledge would keep him from being fair and impartial because being a juror "pertains to evidence and the law, so you can't really manipulate evidence or the law"; he informed defense counsel that he would consider this case on its own facts because he did not "know [Hayes'] case. I don't know what . . . evidence . . . was presented to the jury to make [it] decide that . . . ." He had not had "big" discussions about the case with other people, having talked about it once with his brother; T.A. did not remember his brother's opinion, which he emphasized would not affect his decision making as a juror in any event. Both parties accepted T.A. as a juror.[40]

c

T.M.

The third regular juror selected was T.M., an investigator for a state agency working on "family issues," whose responsibilities required her to testify in court regularly.[41] T.M. testified that she followed local television news, along with some Internet news, but did not read the New Haven Register "much." T.M. had not followed the news about this case "consistently" and had no impressions about it other than that "innocent people" had "suffered . . . ." She had not read any

[40] T.A. had "no qualms with" the death penalty because it was provided by law, and he quantified his support for it as a five on a scale of one to ten. His moderate support for the death penalty was dependent on the circumstances of the case. When asked about his ideal world, T.A. stated he would not have the death penalty because it is inconsistent with his ideals as a social worker to help people after understanding their actions. T.A. also acknowledged the need for proof of aggravating and mitigating factors, stating that, before making the death penalty decision, he would want to know "what caused that person to do that type of crime or . . . his history"; he believed a person's past could "definitely" shape his or her life.

[41] T.M. had previous personal experience with homicide trials, having testified as an alibi witness at the murder trial of a close friend one decade before, at which her friend was convicted.

State *v.* Komisarjevsky

books written about this case. When asked what she
knew about the case, T.M. stated that, from what she
had "been subjected to probably in the news and then
hearing it at work or wherever," her impression was
that "the woman was followed from Stop and Shop to
her residence. I guess they waited outside and, at some
point . . . they kind of scoped out the neighborhood,
the area. Later that night, they broke into a basement
where [W] was, beat him up, tied him up, went upstairs
or proceeded upstairs and raped the young girls, [J],
beat them up, killed them, murdered them, and set the
house on fire, tried to escape. Or, excuse me, missing
the part where I guess she went to the bank to take
out 'x' amount of dollars or, you know, she was being
robbed." T.M. emphasized, however, that she did not
have any preconceived ideas about the defendant's guilt
or innocence and that she could put her knowledge
aside and keep an open mind because she has "to hear
both sides." T.M. was aware that the defendant had
been caught at the scene, which indicated to her that
he was at the very least "a suspect at this point,"
although he "may" or "may not" have committed the
crimes. T.M. did not see W's appearance on The Oprah
Winfrey Show, although she had seen him on the news.
Her impression was that W was "suffering from a great
loss" but that she could still assess his credibility objec-
tively.[42] T.M. had heard some discussions about Hayes'
trial and death sentence but did not believe that should
affect the defendant's trial because he is a "[d]ifferent
individual," and she did not "know the facts," including
"what part" the defendant had played, or even "if he
played a part." T.M. had no preconceived notion as

_____

[42] T.M. also stated candidly that W's presence during the proceedings
"might" influence her by "putting [herself] in his shoes . . . . I would feel
bad. I would be hurting for him and with him." The trial court, however,
credited T.M.'s statement that, although her "heart goes out to him and his
family," that sympathy "wouldn't influence [her] decision based on what
happened with the trial . . . ."

State *v.* Komisarjevsky

to the sentence that the defendant should receive if convicted of a capital offense, and she did not know anything about him personally.

T.M. also testified that, prior to voir dire, two or three of the other prospective jurors had discussed the case, opining that "the police should have been there . . . right away or should have done something that day. That the two men [who] participated and that they're evil, things like that." Those jurors thought that the defendant and Hayes were "caught red-handed, so [they were] guilty," with one stating that the defendant should receive life imprisonment. None of those prospective jurors personally knew the P family or any of their friends or colleagues. T.M. testified that these discussions would not keep her from being fair and impartial and deciding the case on the evidence heard in court.

T.M. also had discussed the case with family and friends because it was a "hot topic" in the New Haven area; although none of them had expressed a desire to have the defendant executed, neither had any expressed a belief that he was innocent. T.M. had never expressed an opinion personally to anyone about the defendant's guilt or potential sentence. Her impression was that "[t]here's different opinions" within the community, acknowledging that many people believed that the defendant should be executed. T.M. emphasized that none of the community members' views would influence her decision in any way and that she could withstand any pressure that she might feel because, "at trial, you can't listen to someone who's not, you know, involved in the issue or, you know, here every day, so, no. I would have to go based on the facts that . . . I learn during the trial. It wouldn't have anything to do with it." T.M. said that she routinely pushes other people's opinions aside to reach decisions in both her professional and personal lives. T.M. expressed confidence in her ability to stand her ground and to consider other

State *v.* Komisarjevsky

people's opinions during a difficult deliberation. Both
sides accepted T.M. as a juror.[43]

d

K.A.

The fourth regular juror selected was K.A., a physi-
cian.[44] When asked about her familiarity with the case,
K.A. replied that she "under[stood] a family was lost
that day" and that "a family, a woman and her daughters
were murdered in their own homes," as well as that "I
don't remember the details, but I know that there was
also sexual abuse to some of them, including the daugh-
ters." K.A. had not followed the case closely or read
anything about it recently.

K.A. had not discussed the case recently, although
her husband "ha[d] brought it up" to her "[i]ntermit-
tently," in the context of his own religious "struggle[s]"
with the death penalty and his sympathy for the P family.
K.A. further stated that this conversation had taken
place in the context of the Hayes verdict and that her
husband was "a bit disappointed with himself" for being
"comfortable" with Hayes' death sentence. K.A. did not
know enough about Hayes' case to take a position dur-
ing that conversation. K.A. stated that her husband
believed that the defendant was guilty, as well, but that
his opinion had "[n]ot much" effect on her—and he
would "back [her] up on that," as she listens to him
"[c]onstructively" and will make up her own mind.
When questioned by defense counsel, K.A. stated that

_____

[43] With respect to the death penalty, T.M. knew from a college research
project that it is "expensive." T.M. did not "feel strongly either . . . way"
and was "in between" on the death penalty, although she "would rather not
see anybody [get] the death penalty." She characterized her support as a
three or four on a scale of one to ten, with it being potentially appropriate
depending on the circumstances of the case.

[44] K.A. did not know W personally or professionally and could not think
of any mutual acquaintances.

338 Conn. 526 OCTOBER, 2021 585

State *v.* Komisarjevsky

the fact that she was a mother to two young children would not keep her from being fair and impartial.

K.A. averred that she was proud of the criminal justice system because "it's part of what's so great about this country altogether," as "it is pretty noble that we try to give everybody the opportunity to . . . make their case . . . for what's happened rather than just assuming . . . these are [the] facts or this is how the facts are presented and . . . clearly this person must be guilty. I think it's ambitious and noble that we go beyond that and try to make it a systematic presentation of what the facts truly were rather than the circumstantial evidence." Both the state and the defendant accepted K.A. as a juror.[45]

e

V.K.

The fifth regular juror selected was V.K., a mental health counselor who works primarily with children and adolescents.[46] V.K. testified several times that she would not have any problem being fair and impartial to both sides, despite the fact that her sister is a victim's advocate who works with sexual assault victims. V.K. testified that she was living in Spain when the murders happened, and she had not heard anything about the

[45] When asked about the death penalty, K.A. stated her "ethical" opinion that "it is not a good solution to [crime] in our country or anywhere." She placed her support of it at a five on a scale of one to ten. Nevertheless, K.A. stated she did not know it was "a legal issue" and, consistent with her desire to be "fairly objective in [her] day-to-day activities," emphasized that she could follow the instructions of the court because "I believe in our system."

[46] We note that V.K. was the last prospective juror of the day on April 7, 2011, but that the transcript of her voir dire is apparently incomplete, proceeding directly to adjournment from the defendant's questioning of her. There is no transcript of V.K.'s being accepted as a juror or the trial court's instructions to her. Neither party has claimed, however, that this omission has rendered the record inadequate for review or that there was a challenge to the qualification of V.K.—or any other regular juror—to serve.

State *v.* Komisarjevsky

case at that time. When asked what she knew about
the case, V.K. stated that "it happened in Cheshire,"
"[t]wo daughters and . . . the mother were murdered,"
and "the father I guess was there, but he survived. Um,
and their house was burnt down. And I guess there
[were] two suspects." V.K. was aware that the first
suspect had been tried and convicted, and she
believed—but did not "know"—that he had been sen-
tenced to death. V.K. had not followed Hayes' trial or
other local news, choosing to follow only "important
national news" and "international news . . . ." V.K. did
not know anything about the defendant, favorable or
otherwise, including what his involvement was in the
crime. V.K. was not aware that books had been written
about this case.

V.K. had not discussed the case with friends, family,
or coworkers, although she perceived that everyone in
the community believed that the defendant was guilty.
She would, however, be able to "make a sound judgment
based on the evidence that was presented to me" and
to "stand by what I chose," despite the beliefs of other
community members. V.K. would not let the communi-
ty's apparent wishes factor into her decision making,
believing that her professional background left her
suited to resist peer pressure. She would make her
decision based solely on the evidence in the courtroom,
"[m]ostly because I don't know anything of the case
. . . so I really would need to hear all of the evidence
to make a sound judgment." V.K. would be "honored
if [she were] asked" to serve on the jury because she
believed it to be an "important" civic obligation for her
to "do my part as a citizen." She acknowledged that,
while waiting, she had discussed the case with some
of the other prospective jurors, who had made "[m]ostly
negative" comments about it, opining that they "could
never be . . . unbiased [toward] it and that they felt
[the defendant] was guilty." V.K., however, did not

express any opinion about this case in those discussions. V.K. was accepted as a juror.[47] See footnote 46 of this opinion.

f

M.B.

The sixth regular juror selected was M.B., a retired municipal social services employee. M.B. learned about this case by reading the newspaper. When asked what she knew about it, M.B. stated: "What I read is that there were two people who broke into a home and assaulted [J] and [W] and set the house on fire, and the people who were in the home at the time, only one person escaped, and the other three perished. . . . [W]hat I know about it is what I've read. . . . I don't know exactly what I think about it . . . ." M.B. was aware that the defendant had been arrested "directly after he . . . left the house" and knew from reading the newspaper that he had an accomplice named Hayes who had already been tried, convicted and, she thought, sentenced to death. Both parties accepted M.B. as a regular juror.[48]

[47] With respect to the death penalty, V.K. had not "really . . . thought about it," but she described her support for it as "in the middle," quantified as a five on a scale of one to ten. When asked whether she believed that the death penalty could be appropriate in some cases, V.K. stated that "it would really matter on what the case . . . was . . . ." When asked whether she could think of a situation herself in which the death penalty would be appropriate, V.K. stated that "I really . . . can't answer that. I really don't know." When asked to consider whether she would impose the death penalty in the case of a horrendous crime, she replied in the negative "because I don't really believe in killing somebody like for an eye for an eye kind of . . . philosophy . . . ." Nevertheless, V.K. also stated that she could imagine a situation in which the evidence would support a vote for the death penalty and that she would follow the instructions of the court and apply them to the evidence.

[48] M.B. testified that she had "mixed feelings" about the death penalty, describing it as a "weighty" and "very difficult" decision. She quantified her support for the death penalty as a five or six on a scale of one to ten but stated that she would not have it in a country where she made the law. Although M.B.'s husband favored the death penalty, including for the defen-

State *v.* Komisarjevsky

g

L.C.

The seventh regular juror selected was L.C., an architect employed by a university. L.C. had heard about this case but did not watch television news and typically just skimmed local newspapers for stories about her employer. When asked what she knew about the case, L.C. stated that "there was a murder in Cheshire," but she could not "exactly remember the date . . . and I know the name of the family from seeing it, you know, hearing it." L.C. had not read any books about the case. L.C. knew that there was another trial related to the case because she passed the courthouse each day on her way to work, and she was "racking my brains at lunchtime" to remember that "there was a conviction, but I don't remember the sentence." She had flipped past, but had not read, stories about the Hayes trial; she contrasted her lack of awareness of this case to that of another homicide that she had followed more closely because it had happened at the university where she worked and had "affected us so much." When questioned by defense counsel, L.C. explained that she could be impartial because "I haven't followed [the case] that much . . . compared to most people in Connecticut I'm probably not very knowledgeable about it. And . . . it's what our legal system is. I mean, that is what one is supposed to do, and . . . I am a very ethical person." She presumed that the defendant was innocent, and she was "embarrassed to admit" that she did not recognize him, had not heard his name before, and could not "remember the name of the first guy . . . ."

L.C. had briefly discussed the case with her husband in July, 2007, because they were "horrified . . . that these deaths had happened, but, other than that . . .

dant, she testified that his belief would not influence her because "I have a strong sense of myself."

State *v.* Komisarjevsky

we really haven't talked about it,'' including the verdict
or penalty in Hayes' case. She did not have any conver-
sations with other coworkers, friends, or family mem-
bers about the case. L.C. assumed that the community
"want[ed] some sort of retribution for the deaths of
. . . a woman and her two children,'' but believed it
was her "professional duty'' to withstand any pressure
during or after the trial.

L.C. stated that the other prospective jurors did not
discuss the case while they were waiting, other than
complaining about logistics and the inconvenience of
waiting. Both parties accepted L.C. as a juror.[49]

h

R.F.

The eighth regular juror selected was R.F., a munici-
pal employee with a college degree in public health.
R.F. had been exposed to "bits and pieces over the
course of . . . several months and years'' about the
case from television coverage. R.F. had "heard'' about
the case and "read [about it in] the newspaper'' and
very briefly while looking at books at Barnes & Noble
bookstore; he had been aware of it from the day of the
incident when it was discussed in the breakroom at
his job, as well as in subsequent discussions with his
coworkers and his family about current events. When
asked whether he had a "preconceived idea'' about the
defendant's guilt from that coverage, he acknowledged

_____

[49] With respect to the death penalty, L.C. stated that, "in the past, I was
not in favor of it'' because she questioned whether it was "morally right
for us as a society to put someone to death,'' but she had become more
"ambivalent'' about the issue over time. She quantified her current support
for the death penalty as a five on a scale of one to ten, acknowledging that
there might be some extreme situations in which the death penalty could
be appropriate, but emphasized her "hope that I could be very sure that
. . . it was beyond any reasonable doubt.'' When asked by defense counsel,
L.C. stated that her change in opinion about the death penalty had nothing
to do with this case.

State *v.* Komisarjevsky

that "[p]robably, I would think he was guilty from what
I've read in the paper and what I've seen on TV," but
he also had no "preconceived idea" of an appropriate
punishment. R.F.'s last reading about the case con-
cerned Hayes' trial and subsequent suicide attempt.

When asked to provide a narrative of what he knew
about the case, R.F. stated that "the victims were at
. . . a food store of some sort and they were followed
home and then they broke in [at] some point later on,"
and "tied them up. . . . I think they raped the wife
. . . and then they took her to the bank, I believe, to
try and withdraw money. They came back. He tried to
start a fire or did start a fire. They killed three of them,
and then they tried to drive away. The police stopped
them." R.F. did not know which perpetrator had started
the fire or purchased the gasoline, and he could not
remember what was said in the newspaper about it; he
did not "know the details" of which parts were perpe-
trated by the defendant. R.F. was aware of Hayes' name
and trial and the fact that he was found guilty and
sentenced to death, as well as that the defendant and
Hayes were arrested together, but, when questioned
about whether that would affect his impartiality or deci-
sion in this case, emphasized repeatedly that he "would
just ignore that" and that it "wouldn't affect" him.

R.F. stated that, despite previous discussions with
family and coworkers about the "gruesome" nature of
the case, he did not "really remember" any opinions
about what should be done to the defendant or Hayes,
and he emphasized that he personally would "come in
with an open mind" and continue to presume that the
defendant was innocent. R.F. also understood that his
decision had to be based on the evidence presented in
court rather than "[p]ast history" such as newspapers
or conversations, describing himself as "pretty open-
minded," despite his exposure to coverage of the case
in newspapers and on television, and conversations

State *v.* Komisarjevsky

with his parents, who thought it was "a pretty much open and shut case . . . ."

R.F. believed that the community was "angry" about the case, and he indicated that some of his coworkers had expressed opinions about it. R.F. had never posted anything on social media about the case. Acknowledging that it would be "difficult," R.F. stated that he could reach a verdict independently, having made "unpopular decisions" in the past that had made people "very angry with me," and believing that his friends and family would not hold his decision against him. R.F. had not heard other waiting, prospective jurors talk about the case, other than complaining about how long the voir dire process was taking. It did not bother him that two potential jurors had left crying in his presence because he could "understand them getting emotional about it, but it didn't really affect me." Both the state and the defendant accepted R.F. as a juror.[50]

i

L.K.

The ninth juror selected was L.K., a university employee with a masters degree in psychology. L.K. had not "read about the trial . . . or the case or anything in a while." When asked to provide a narrative of what she knew about the case, which was a product of reading newspapers, CNN's website, and watching local television news, L.K. stated: "[F]rom what I've heard, there were two men who went into a house, and I believe the—the father, who is [W], was, I think, asleep in

_____

[50] R.F. believed that the death penalty "should be used on . . . a case-by-case basis," for serious cases such as those involving "several murders, maybe like Ted Bundy," with his support for the death penalty being "a five or a six" on a scale of one to ten. R.F. had not given a lot of "serious thought" to the legality or morality of the death penalty or the pending public policy debate. He personally believed that the death penalty did not serve a "legitimate purpose" because he viewed life in prison as potentially worse, based on what he had seen of prisons on television.

State *v.* Komisarjevsky

another room, and they came in, and I'm not sure if they had, you know, hit him or something happened, but then they ended up—the—the mother—I don't know if the girls woke up, too, but they ended, like, at—that was, like, in the evening, I think.

"And then the next day I know that . . . the wife and mom went to the bank to withdraw a sum of money, and I think that she told the tellers there that—I don't know if she told them details or that she was being held captive or whatever, but she indicated something to them, and they did report that to the police.

"And then I know that there are charges—I think there were charges of sexual assault as well, and then I know that the house was burned down and [W] did manage to escape, but that the other three died in the fire." L.K. testified that she was "sketchy" about the details of the arrests of Hayes and the defendant. She did not "recall" who had performed specific acts in the house. The last thing she read about the case was that Hayes had been tried and convicted, and she "believe[d] he was sentenced to death." L.K. had not seen W's appearance on The Oprah Winfrey Show; she had seen him elsewhere on television and only had the "general impression" that he "was a man who lost his family."

When asked whether she could decide the case based solely on the evidence presented in court, given that some of it might be consistent with what she knew and some might be different, L.K. replied that she could do that, along with affording the defendant his presumption of innocence. She understood that "serving on a jury and being part of this is . . . just about what is presented here," and she would "come in with the understanding that [the] knowledge that I've heard and learned or opinions that I may have come or thought about are left . . . outside because I can only evaluate or think about what is shown to me in . . . this court-

State *v.* Komisarjevsky

room.'' When asked whether the Hayes' verdict would affect her thinking, L.K. observed that, ''in an ideal world, you know, we would have people who knew nothing and just walked in . . . but that's not the world we live in. And, so, you need to take knowledge and prior things that you know and realize that this trial is not for the person, that person was convicted, that was what happened with him, this is for someone else. It's an important thing to evaluate critically. . . . [M]y goal in coming in and being a juror would be to just listen to what I am told here.'' L.K. acknowledged that, based on the prior coverage and Hayes' verdict, before coming to court and hearing the instructions, she would have felt that the defendant ''probably was guilty but that, you know, he hasn't been tried.'' She was ''comfortable'' that she could put aside any ''preconceived ideas'' that she had about the case.

L.K. had spoken about the case over the last few years with friends, family, and coworkers because ''it's been a very big case'' and believed that ''the community wants justice . . . . [Y]ou know it was a horrific crime.'' She believed that the general feeling was that ''whoever did that should absolutely be punished for it.'' L.K.'s decision would not be influenced by what she thought the community would want, emphasizing: ''I don't want to be chosen, but . . . being a part of this jury . . . it's an important thing to do. I don't think that I could walk away or feel at rest with myself if . . . I didn't do it the way it was supposed to be done. . . . [T]hese are big decisions that have to be made and . . . this was a horrific crime, and this is someone's life that we're . . . sitting here discussing, and I think that it would be very important for me to do it in the way that is the law and that has to be done. I couldn't rest with myself if I didn't.'' Both the state and the defendant accepted L.K. without challenge.[51]

[51] With respect to the death penalty, L.K. stated that she could follow the law and make the ''right decision,'' but that she had ''always . . . felt'' that

State *v.* Komisarjevsky

## j

## S.H.

The tenth juror selected was S.H., a truck mechanic. S.H. read the New Haven Register and the Meriden Record-Journal daily but did not remember the last thing he had read or seen on television news about the case. S.H. did not regularly search the Internet for news or use it otherwise. He did not know that jury selection was going on in this case until he reported for jury duty. When asked what he knew about the case, S.H. stated that he had "read the early headlines and maybe a little bit of the follow-up on that" in July, 2007. S.H. "underst[ood] a couple of guys broke into a house . . . I guess they tried to make it look like a robbery, I believe, and they killed some people." He believed that three people had died and that two had been arrested. S.H. thought that "a mother and a daughter [were killed] but [was] not sure beyond that." He did not know how the victims died or the respective roles of the individuals arrested. S.H. did not know about the Hayes trial. S.H. did not know the defendant's name or background. He had not discussed the case with anyone and had no sense of what the community wanted done with the case. S.H. was familiar with Cheshire but had never been near the crime scene. Both parties accepted S.H. as a juror.[52]

she was not personally "a big supporter of it . . . ." L.K. quantified her support for the death penalty as a three or four on a scale of one to ten, observing that, although "there are certain crimes that it definitely fits," she was concerned about the imperfection of the criminal justice system and making sure that innocent people were not executed. She emphasized that she did not "think that death is the only appropriate punishment," deeming that decision dependent "on . . . the situation, based on mitigating factors," and stated that "I do not think that I would walk in and because . . . people had been murdered just say that the death penalty was the option."

[52] With respect to the death penalty, S.H. testified that "I guess debates [have] been going on for years with that. I don't feel on or off about it." He clarified that he did not "have an opinion to weigh either way" on the issue and lacked sufficient knowledge to quantify his support on a scale of one to ten. S.H. testified that he would be able to participate in a death penalty

State *v.* Komisarjevsky

k

J.H.

The eleventh juror selected was J.H., a corporate compliance officer and insurance fraud investigator. J.H. subscribed to the Meriden Record-Journal but did not read it every day—she received it primarily to help her parents keep up on the obituaries. When asked what she knew about the case, J.H. stated that she had "read somewhat about it in the newspaper" but "was not really following the case, and that it was a terrible tragedy." Providing an additional narrative, J.H. recalled that "two individuals broke into the home of [W], and subsequently his wife and two daughters were killed." When asked about whether she knew anything about a trip to the bank, J.H. remembered having "read something about going to the bank," but that was "unclear to [her]." She did not know how the deaths occurred but remembered reading "something" about allegations of sexual assault. J.H. did not know how the suspects were caught. She knew that the case of the other suspect was "settled recently" and that he was found guilty, but she did not "know any more than that," including the punishment he received. She also did not know anything about the different activities of the two men in connection with the crime. When asked whether she knew anything about the defendant's background, J.H. "recall[ed] something about a father, but . . . nothing really more than that." She had not seen W on television. J.H. did not read any books about the case or ever call into a radio talk show to discuss it. She was a "little bit" familiar with Cheshire but did not know the location of the crime scene.

J.H. had discussed the case with family members when it first happened, "not at length, but just to be

deliberation, including a vote to impose either it or a life sentence, but would have to "hear argument" about it.

State *v.* Komisarjevsky

very sympathetic.'' She did not discuss it with cowork-
ers. She thought the community wanted ''[j]ustice'' but
''couldn't presume to know'' what that meant in this
case. J.H. stated that she was ''used to controversy'' and
that the feelings of the community ''wouldn't change
my vote or my opinion'' because a juror hearing evi-
dence for several months is in a different position than
the general public. J.H. emphasized that she would con-
fine her decision to the evidence presented in court
and would not consider the ''fair amount of sympathy''
that she was sure she would feel. Both parties accepted
J.H. as a juror.[53]

*l*

C.A.

The twelfth regular juror selected was C.A., a tennis
coach. C.A. testified that he had heard ''[n]ot a lot, but
some'' about the case. He read the New York newspa-
pers ''[f]airly regularly,'' and the New Haven Register
''periodically,'' as well as watched local television news
and saw some news on the Internet. C.A. had seen news
stories about the case but had not followed the case
regularly or made a point of learning about it. C.A. knew
there was ''a lot of attention, a lot of media coverage,''
but did not ''remember . . . any specific details that
stood out because it was hard to piece kind of all of it
together . . . .'' When asked what he knew about the
events, C.A. recalled ''[o]nly that it was a . . . very,
very heinous crime'' and that ''[t]here was a home break-

_____

[53] J.H. described herself as ''on the fence'' about the death penalty because
of her Catholic faith; she acknowledged that, ''if a personal tragedy did
happen to me, I can't say how I would react in that circumstance.'' She
quantified her support for the death penalty as a five on a scale of one to
ten, calling it a ''difficult question'' that she never had to consider before.
If given a choice to create her own laws, J.H. said ''it would be hard for
me to enact the death penalty.'' J.H. further testified that she was ''really
undecided'' about the death penalty morally but could follow the law and
return a death verdict if ''that was the appropriate penalty,'' although she
recognized that ''it will be very difficult to be in this position.''

338 Conn. 526 OCTOBER, 2021 597

State *v.* Komisarjevsky

in, people were killed, a wife and daughters were killed, the house was set on fire, and [that] relatively, as far as I know, is it.'' He did not know how the house was set on fire or where the suspects were arrested. C.A. had heard the defendant's name before in the news but did not have any impression of him from that coverage. C.A. could not remember the last thing he had heard about the case. He was not familiar with the neighborhood in Cheshire where the crime occurred. C.A. was aware that there had been another trial but did not know the name of the other defendant or the result of his case.

In stating his ability to presume the defendant innocent and to decide the case based only on the evidence in court, C.A. recognized that ''the case itself hasn't come to trial,'' and ''everybody deserves a fair shot in the court, not necessarily in the court of opinion or in the court of television, newspaper, media, whatever.'' C.A. described himself as ''a facts person,'' stating that ''I want to hear everything before I make judgments.''

C.A. testified that the other prospective jurors had not discussed the case while they were waiting. He did not know what the community wanted to happen with the case and had not discussed it with his family or friends. C.A. suggested that, ''maybe, the people in Cheshire who are close to the situation and have knowledge of it would . . . want a certain verdict, but I don't know if I can answer that for the community at large, basically, you know, make a general statement like that.'' C.A. stated that, if he did come to learn of those opinions, they would not affect his decision in this case. Both parties accepted C.A. as a juror.[54]

_____

[54] With respect to the death penalty, C.A. had ''periodically'' engaged in discussions of it over the years, and he did ''not believe in the death penalty except for cases . . . with very extreme circumstances.'' He quantified his support for the death penalty as a five on a scale of one to ten, stating that he had become less supportive of the death penalty as he got older, perhaps because of his Catholic faith. C.A. believed that the state should have the power to kill a citizen only under ''certain circumstances,'' such as for crimes

State *v.* Komisarjevsky

2

Actual Prejudice Analysis

We conclude that the defendant suffered no actual prejudice from the extensive pretrial publicity about this case, as both the jury and the voir dire process by which it was selected compared very favorably to that which the United States Supreme Court deemed constitutionally acceptable in *Skilling* v. *United States*, supra, 561 U.S. 358. First, the individual voir dire process did not consist of blind acceptances of prospective jurors' assurances of impartiality but involved a lengthy and thorough probing of their responses to questions by the state, the defendant, and the trial court. The defendant did not exhaust his peremptory challenges until the voir dire of the backup alternate jurors—after the regular and alternate jurors had been selected—and did not challenge for cause any juror who actually deliberated in this case. We also "note that the trial court took unusually thorough measures to ensure the jury's continued impartiality through the use of extensive daily admonishments counseling the avoidance of any publicity." *State* v. *Crafts*, supra, 226 Conn. 261.

Although some of the jurors in this case expressed abstract sympathy for W and the P family based on what had happened to them—none of which was disputed at trial—these statements paled in contrast to those made by certain jurors deemed impartial in *Skilling*, several of whom had been *personally affected* by the Enron collapse. See *Skilling* v. *United States*, supra, 561 U.S. 396 (noting that District Court properly rejected challenge for cause in crediting juror's statement that

that are "[v]ery heinous in nature, and I think each case . . . or each situation is different . . . I think you have to listen to . . . the facts and then bear judgment on it, but to put a blanket statement over, you know, would you do it here and not there? I think that has to be handled very carefully . . . ."

State *v.* Komisarjevsky

he would have no trouble telling coworker who had lost 401 (k) funds in Enron collapse of not guilty verdict, despite fact that juror personally believed Enron's collapse was product of " 'greed' " and that "corporate executives, driven by avarice, 'walk a line that stretches sometimes the legality of something' "); id., 397 (District Court did not commit manifest error in seating juror who "said she was angry about Enron's collapse and that she, too, had been forced to forfeit [her] own 401 (k) funds to survive layoffs" because she "made clear during voir dire that she did not personally blame Skilling for the loss of her retirement account," thought she could be fair and impartial, and had "not [paid] much attention to [Enron related] news . . . [so] she quite honestly did not have enough information to know whether Skilling was probably guilty" (internal quotation marks omitted)); id. (District Court properly credited multiple assurances of impartiality from juror who "wrote on her questionnaire that [Skilling] probably knew [he] [was] breaking the law," after she stated that "she did not know what [she] was thinking when she completed the questionnaire" (internal quotation marks omitted)). As the United States Supreme Court observed, "[j]urors . . . need not enter the box with empty heads in order to determine the facts impartially. It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." (Internal quotation marks omitted.) Id., 398–99.

Consistent with the deference that we afford to the trial court's assessment of juror impartiality, pre-*Skilling* decisions from this court also support the conclusion that there was no actual prejudice in this case. For example, *State* v. *Pelletier*, supra, 209 Conn. 564, arose from the highly publicized Purolator Armored Car robbery in Waterbury, during which three guards were shot to death. See id., 567–68. In *Pelletier*, this court

State *v.* Komisarjevsky

concluded that the trial court did not deprive the defendant of a fair trial by declining to transfer his felony murder case out of Waterbury for a new trial after a successful appeal from the judgment of conviction rendered at his first trial. Id., 568–69. The court rejected the defendant's claim that "the best evidence of actual prejudice is found in the results of the voir dire examination of 381 venirepersons. Of those examined, the defendant claim[ed] that 199 were excused for cause because of prior knowledge of the case. [The court concluded, however, that this] fact alone . . . [did] not establish actual jury prejudice." Id., 570. The court emphasized that "[e]ach prospective juror was thoroughly and extensively examined. The parties fully explored the level and effects of each prospective juror's exposure to the publicity concerning the defendant. . . . While slightly more than 50 percent of the prospective jurors had prior knowledge of the case that would affect their ability to be impartial, *of the twelve jurors and two alternates actually selected*, none had substantial knowledge of the case or preconceived notions of the defendant's guilt. It is clear that [q]ualified jurors need not . . . be totally ignorant of the facts and issues involved. . . . Notably, none of the jurors or alternates selected knew of the defendant's prior conviction. . . . [T]here was no connection between the pretrial publicity and actual jury prejudice and, therefore . . . the trial court did not abuse its discretion in denying the defendant's motion to transfer the prosecution." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 570–71. In particular, the court deferred to the trial court's decision to credit the statements of "eight venirepersons . . . that their knowledge of the defendant's conviction [at his first trial] would not affect their ability to be impartial," particularly when "[t]hroughout the voir dire the trial court excused for cause those venirepersons it believed could not be impartial." Id., 572.

State *v.* Komisarjevsky

Similarly, in the infamous '' 'woodchipper murder case' ''; *State* v. *Crafts*, supra, 226 Conn. 258; this court held that there was no actual prejudice requiring a new trial because ''the voir dire . . . reveal[ed] that, although many prospective jurors were familiar with the fact of the defendant's arrest and of his first trial, most had only a vague recollection of any particular accounts of the crime.'' Id., 259. This court also observed that the defendant in *Crafts* had failed to exhaust his peremptory challenges after unsuccessful challenges for cause and had had the opportunity to explore fully each juror's exposure to pretrial publicity; id., 259–60; and that ''the trial court took unusually thorough measures to ensure the jury's continued impartiality through the use of extensive daily admonishments counseling the avoidance of any publicity.'' Id., 261.

Sister state case law similarly makes clear the deference appellate courts afford to trial courts' assessments of juror impartiality during voir dire during notorious trials. See, e.g., *People* v. *Avila*, supra, 59 Cal. 4th 508, 513 (local radio show broadcast during jury selection urging death verdict and recruitment of '' 'stealth juror' '' did not require change of venue because trial court properly used voir dire to determine whether prospective jurors had listened to program, and review of voir dire ''fully support[ed] the trial [court's] estimation of the jury's impartiality''); *State* v. *Carr*, supra, 300 Kan. 76 (The court held that there was no actual prejudice in a death penalty trial, which arose from a crime spree culminating in a home invasion with a quadruple homicide and sexual offenses, because, ''despite widespread pretrial publicity, an unbiased jury had been selected in Wichita [Kansas]. Eight of the [twelve] jurors eventually seated in the defendants' trial held no prior opinions on guilt. The four who admitted to forming such opinions ultimately said that they could

State *v.* Komisarjevsky

set their opinions aside.''); *State* v. *Gribble*, supra, 165 N.H. 26–28 (no actual prejudice from pretrial publicity in home invasion, double homicide case given that trial court credited jurors' assurances that they could decide case based solely on evidence, despite fact that ''almost all of the prospective jurors were aware of the crimes before jury selection,'' and all ''sixteen seated jurors reported knowing about the crimes prior to jury selection, and most acknowledged that they had seen or heard media accounts of the case,'' even when trial court had denied five challenges for cause to seated jurors with some having previously discussed case with others); *People* v. *Cahill*, 2 N.Y.3d 14, 36–37, 40–41, 809 N.E.2d 561, 777 N.Y.S.2d 332 (2003) (upholding denial of venue change in case of husband accused of poisoning his wife after she was comatose from beating he inflicted on her, despite facts that 86 percent of prospective jurors, including eight of twelve who sat, had heard of case and that 52 percent ''came to court with an opinion as to [the] defendant's guilt or innocence . . . [because] the voir dire successfully culled out jurors who may have been biased by pretrial publicity'').

As the defendant points out, the appropriately lengthy jury selection process in this case was not always the smoothest of sailing. A number of prospective jurors lost their composure at times, with some crying in open court or making menacing comments about or toward the defendant, with one, for example, calling him a ''[k]iller, asshole,'' after she was excused from jury service. These comments were a serious breach of the decorum expected in our state's courthouses. Nevertheless, these outbursts, although inappropriate and unfortunate, did not deprive the defendant of a fair trial because the trial court queried any prospective jurors who had witnessed them about any effect that the outbursts might have had on their impartiality. See *State* v. *Ziel*, 197 Conn. 60, 65–67, 495 A.2d 1050 (1985) (com-

State *v.* Komisarjevsky

mentary in jury room by venire members that defendant was guilty did not require excusal of entire panel, and trial court properly credited testimony of two jurors that they could remain impartial and decide case based solely on evidence in court, despite having heard those comments). Given the extensive voir dire conducted in this case, we defer to the trial court's assessment of the credibility of these jurors in light of their answers that they could remain fair and impartial, particularly insofar as only one of the prospective jurors who witnessed an outburst, R.F.—who saw two women leave crying—actually sat as a juror in this case, and the defendant did not challenge him—or any other regular juror—for cause. See part I C 1 h of this opinion. Accordingly, we conclude that the pretrial publicity did not result in actual jury prejudice that deprived the defendant of a fair trial.

E

Whether the Trial Court Improperly Denied the
Defendant's Challenges for Cause

The defendant next claims that the trial court abused its discretion by denying his challenges for cause to twelve potential jurors,[55] thus depriving him of a fair trial. He argues that they could not judge his case fairly and impartially, and the trial court improperly placed "undue reliance on [those jurors'] own assessments— expressed with varying degrees of certainty—that they could be fair and impartial." In response, the state cites, among other cases, *State* v. *Campbell*, 328 Conn. 444, 180 A.3d 882 (2018), and *State* v. *Esposito*, 223 Conn. 299, 613 A.2d 242 (1992), and contends, inter alia, that the defendant cannot prevail on these claims because

[55] Specifically, the defendant claims that the trial court improperly denied his challenges for cause to prospective jurors E.M., C.G., V.J., P.L., S.W., W.V., B.F.-S., M.C., S (no first name indicated), J.W., J.P., and C.P., thus requiring him to expend peremptory challenges on them.

State *v.* Komisarjevsky

he did not exhaust his forty peremptory challenges until *after* the twelve main and six alternate jurors had been seated, and, most important, no juror who decided his guilt was one whom he had challenged for cause. We agree with the state and conclude that any error with respect to challenges for cause was harmless because none of the challenged jurors actually decided his guilt.

"The Connecticut constitution guarantees a criminal defendant the right to exercise peremptory challenges in the selection of his jury. Conn. Const., [amend. IV]; see also General Statutes §§ 54-82g and 54-82h. . . . [W]e agree with numerous other courts throughout the nation that it is reversible error for a trial court to force an accused to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied."[56] (Internal quotation marks omitted.) *State* v. *Esposito*, supra, 223 Conn. 313; see *State* v. *Campbell*, supra, 328 Conn. 476; *State* v. *Kelly*, 256 Conn. 23, 31, 770 A.2d 908 (2001).

"[I]t is implicit in *Esposito* that, in determining whether the denial of a for cause challenge was poten-

---

[56] We note "the sources in our law of the defendant's right to an impartial jury and his correlative right to have a biased venireperson removed for cause. Both the federal and state constitutions guarantee to an accused the right to a public trial by an impartial jury. U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8. Furthermore, General Statutes § 54-82f provides in relevant part: 'If the judge before whom the [voir dire] examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines.' " *State* v. *Esposito*, supra, 223 Conn. 308–309; see also Practice Book § 42-12 (providing language substantially identical to § 54-82f). "[T]he trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion. . . . In exercising this discretion the trial court must zealously protect the rights of the accused." (Citation omitted; internal quotation marks omitted.) *State* v. *Esposito*, supra, 310.

State *v.* Komisarjevsky

tially harmful, this court considers whether an identifiable, objectionable juror actually served on the jury that decided the case, not whether the composition of the jury would have been different in the absence of the claimed error.'' *State* v. *Ross*, 269 Conn. 213, 232, 849 A.2d 648 (2004); see id., 233 (failure to seek and exercise additional peremptory challenge against specific juror after exhaustion of peremptory challenges rendered harmless any previous improper denial of for cause challenge because ''the defendant was not forced to accept an incompetent or objectionable juror after his peremptory challenges had been exhausted''). Put differently, ''the general rule is that an improper grant or denial of a for cause challenge is not prejudicial unless the defendant shows that the ruling resulted in an identifiable, objectionable juror actually serv[ing] on the jury that decided the case . . . .'' (Internal quotation marks omitted.) *State* v. *Gould*, supra, 322 Conn. 530. ''Prejudice is assessed with reference to the jurors who convicted the defendant because [t]he constitutional standard of fairness requires [only] that a defendant have a panel of impartial, indifferent jurors. . . . The right to challenge is the right to reject, not to select a juror of the defendant's preference.'' (Citations omitted; internal quotation marks omitted.) Id., 531. But cf id., 531–32 (violation under *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), is ''a limited exception'' to prejudice rule).

We conclude that the defendant cannot prevail on his for cause challenge claims because no challenged juror actually sat to deliberate in this case. It is undisputed that the defendant did not challenge for cause any of the twelve main jurors who actually deliberated on this case; see part I C of this opinion; and none of the alternates or backup alternates, some of whom had been challenged for cause, was required to participate. Accordingly, we need not reach the merits of these

State *v.* Komisarjevsky

claims because any error in the trial court's rulings on these identified challenges for cause was harmless due to the fact that none of those jurors deliberated with the jury that decided his guilt.[57]

## II

## CLAIMS ARISING FROM HAYES' LETTERS

The defendant next raises several claims arising from the state's disclosure, after the close of evidence, of approximately 130 pages of letters written by Hayes while he was incarcerated, which the Department of Correction (department) had intercepted before they reached their intended recipient, an unidentified woman in North Carolina. In addition to claiming that the state's disclosure of the letters after the close of evidence violated *Brady* v. *Maryland*, supra, 373 U.S. 83, the defendant also contends that the trial court improperly denied his motions (1) for a continuance to assess the information therein, and (2) to reopen the evidence because the trial court had found that the letters were not sufficiently trustworthy to render them admissible as statements against penal interest under § 8-6 (4) of the Connecticut Code of Evidence.[58] The

---

[57] To the extent that the defendant claims that he was prejudiced because he was required to exhaust his allotted peremptory challenges on these jurors prior to the conclusion of jury selection, thus depriving him of the opportunity to use those challenges on other jurors whom he also deemed objectionable, thereby affecting the composition of the panel as a whole, this claim is foreclosed by our decision in *State* v. *Ross*, supra, 269 Conn. 233–34. See also *State* v. *Pelletier*, supra, 209 Conn. 572–73 ("[T]he defendant did not accept any juror or alternate whom he requested to be removed for cause. Therefore, even if those prospective jurors were biased, the defendant was not harmed because those individuals never became members of the jury.").

[58] Section 8-6 of the Connecticut Code of Evidence provides: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . (4) Statement against penal interest. A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal

State *v.* Komisarjevsky

defendant argues that Hayes' letters would have supported his theory of the case, namely, that he did not intend for anyone to be killed, insofar as Hayes essentially admitted in the letters that he was the "mastermind" of the invasion of the P family home, and also confessed to raping, torturing, and murdering seventeen other women and girls. In response, the state contends that the trial court properly exercised its discretion to deny the various motions given its predicate determination that the letters were not admissible as statements against penal interest, which also rendered them immaterial for *Brady* purposes. The state further argues that any error was harmless because admitting the letters in their entirety into evidence would have been extremely prejudicial to the defendant because they contained graphic depictions of sexual assaults—including the assault of M that the defendant denied committing— and descriptions of joint efforts between the defendant and Hayes to plan and execute the crimes. We agree with the state and conclude that the trial court did not abuse its discretion in denying the defendant's motions for a continuance, mistrial, or to reopen the evidence on the basis of the disclosure of the letters after the close of evidence.

The record reveals the following additional relevant facts and procedural history. After the close of evidence, on October 7, 2011, the state provided the defendant with 132 pages of handwritten letters from Hayes to an unidentified woman who lived in North Carolina, which the department had intercepted and given to the prosecutor. On October 11, 2011, which was the day of closing arguments, the defendant moved for a continuance, claiming that he needed time to assess the letters

interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . .''

State *v.* Komisarjevsky

because they contained information that was exculpatory to him, as, in addition to vividly describing the details of what had transpired in the P residence, Hayes confirmed his leadership role when he stated: "The [P] home invasion was a dry run in the partnership between [the defendant] and myself. I do now realize had we gotten away, I would have killed [the defendant]. He was not even close to being worthy of my partnership. His sloppiness and lack of control would have been my downfall . . . ." The defendant also argued that the letters provided evidence of other crimes that established Hayes' modus operandi, given his claim therein that he had committed seventeen other murders by strangulation across the northeastern United States, each of which was preceded by a sexual assault. The trial court denied the motion for a continuance, stating that, although it would have granted one during a court trial, "we have the jury that's ready to go, and [its] time has to be considered, too, and it's a balancing act." The trial court further observed that the letters did not appear exculpatory to the defendant. The trial court did, however, agree to delay submitting the case to the jury for deliberations until the following day, in order to give the defendant and the court an additional opportunity to review the letters in more detail later that day.[59]

The next day, the defendant moved for permission to reopen the defense, initially proposing to offer Hayes' testimony to establish his lack of availability to testify as a predicate to the admissibility of the letters.[60] The

[59] After closing arguments, the trial court readdressed the parties with respect to the letters. The court stated that it would review the letters and then hear arguments the next day from the parties as to their admissibility, as well as any desired relief. Consistent with its directive from earlier in the day, the trial court then charged the jury, but it did not submit the case to the jury for deliberation at that time.

[60] When asked by the trial court, defense counsel indicated that he had not yet spoken with Hayes' attorneys, but he agreed with the trial court's observation that "[i]t's hard to imagine [Hayes] not taking the fifth amendment . . . ."

State *v.* Komisarjevsky

defendant also suggested that the postevidence disclo-
sure of the letters, which appeared to have been written
between August and September of 2011, could form the
basis for a motion for a mistrial, although he agreed
that the prosecutor had not been dilatory about provid-
ing the letters. Defense counsel reiterated his desire
for a continuance because he "had very little time to
actually go through [the letters] and figure out [their]
evidentiary potential," observing that Hayes' "depraved
letter . . . outlines details perceived by him and writ-
ten by him as to the events that occurred in the [P]
home; perhaps, more importantly, as he details other
crimes he's committed, he develops [a modus operandi]
that is similar to this crime." Defense counsel again
argued that the language describing the P home invasion
as a "dry run" and indicating that Hayes would have
killed the defendant had they escaped "clearly demon-
strates that Hayes was the mastermind and the leader,"
which was "exculpatory in rebutting the state's theory
that [the defendant] was the leader." Defense counsel
also argued that Hayes' claimed history of having raped
and strangled seventeen women "would indicate that,
unbeknownst to [the defendant] . . . when they
entered that house . . . Hayes had an agenda that he
[had not] exposed to [the defendant], which was to
further his [modus operandi] and to further his
depraved actions that he had done in the past."[61] Coun-
sel argued that it was "fundamentally unfair" that, given
the "clear . . . exculpatory information" in the letters,
he did not have time to investigate "information of this

_____
[61] The defendant emphasized that the police had found numerous pairs
of female sneakers when they searched Hayes' home and had found H's
sneakers in Hayes' vehicle, which was consistent with his "constantly"
talking in the letters about his sneaker fetish and the fact that he claimed
to have taken sneakers as trophies in connection with his past murders.
The defendant also contended that Hayes' descriptions of himself as a "great
hunter" and Hayes' statements of sadistic pleasure supported the defendant's
theory that he personally lacked intent to kill during the home invasion.

State *v.* Komisarjevsky

type,'' including the identity of the woman and any questions that might have been posed to Hayes in responsive letters, which might provide context for his statements. The state objected to the defendant's motion to reopen, arguing that the letters were hearsay that were ''unequivocally, undeniably . . . not reliable . . . .''

The trial court treated the defendant's motions as ones for both a continuance and to reopen, and denied both, relying on this court's decision in *Wood* v. *Bridgeport*, 216 Conn. 604, 583 A.2d 124 (1990). The court determined that there was nothing in the letters that would lead to a ''miscarriage of justice'' should the evidence not be reopened. Assuming that Hayes would assert the fifth amendment privilege and thus be unavailable as a witness, the trial court nevertheless determined that the letters were not admissible as statements against penal interest under § 8-6 (4) of the Connecticut Code of Evidence because the statements therein were unreliable, as Hayes' descriptions of the seventeen homicides were ''couched in terms that would be very difficult to allow corroboration because no dates are given, no times [are given], no locations are given, what he did with the bodies is not given.'' Most important, the trial court emphasized that the defendant ''cherry-picks'' certain portions of the letters, while ignoring others that were ''quite damning'' to him, with the letters in their entirety being ''the seal of [the defendant's] doom'' were they to be admitted into evidence.[62] Specifically, the trial court observed that the

---

[62] In its colloquy with defense counsel, the trial court described the letters as, ''at a minimum, a bare minimum, a mixed blessing for you because, if you view . . . Hayes as truthful, he is one of the great serial killers [in] modern American history. He claims to have killed seventeen people prior to this incident in pretty horrific ways, but he also says extremely, and I mean extremely, inculpatory things about [the defendant such] that it would be hard to imagine you wanting to put on. He says that [the defendant] had the proper evil intent, he says that [the defendant] poured gas on [the victims] and set the fire.'' The court further observed that Hayes had written

338 Conn. 526 OCTOBER, 2021 611

State *v.* Komisarjevsky

letters would not benefit the defendant, even if Hayes were to be deemed "the leader in this horrendous enterprise," given statements therein that the defendant himself had admitted prior killings, Hayes stated that they had planned to kill all of the occupants of the P house, Hayes vividly described watching the defendant sexually assault M anally, and Hayes said that it was the defendant who had poured the gasoline. The trial court further concluded that the probative value of the letters was outweighed by their prejudicial effect because leadership was not relevant to the elements of the crimes, with the content of the letters ultimately being harmful with respect to supporting the defendant's claim of lack of intent.[63] The trial court then denied the defendant's motion for a mistrial based on prejudice caused by the late production of the letters, concluding that the state had turned them over immediately upon receipt.

The defendant's various claims arising from the disclosure of the Hayes letters after the close of evidence

---

that the defendant "said, suppose we're going to kill everybody anyway, this is at an early stage, he says that [the defendant] announces that he is going to sexually assault the eleven year old girl which later on . . . Hayes purports to have personally witnessed. He says that . . . [the defendant] was the one who actually killed the girls. And he says that they went into this enterprise with the . . . joint plan of killing everybody. So, under these circumstances, I just don't see how, if it's true, that it helps you at all, and, of course, if it's not true, then I don't see how it could be relevant." Although defense counsel demurred, stating that "I don't believe it's appropriate for me to address trial tactics with the court in a public forum," the trial court emphasized that the information was "necessary for [it] to address this question because the evidence has closed" and could only "reopen . . . to avoid a miscarriage of justice." The trial court questioned how these "damning things" in the letters would mean that reopening "would avoid a miscarriage of justice . . . ." The trial court acknowledged that, if "hypothetically . . . Hayes had committed seventeen murders prior to this event, how you could argue from that that Hayes was the leader"; however, the letters also stated that *the defendant* himself had told Hayes that "he had killed before," making it "very hard for [the court] to term this as exculpatory."

[63] The trial court did, however, leave open the possibility that the letters could be admissible "in the penalty phase of the trial should we, hypothetically, get there," given the relaxed rules of evidence in that stage of the proceedings.

State *v.* Komisarjevsky

are evaluated under similar, well established legal standards, and we consider them together. With respect to the defendant's request to reopen the evidence, we note that, "[i]n any ordinary situation if a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is a serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided. . . . Whether . . . a trial court will permit further evidence to be offered after the close of testimony in a case is a matter resting in the sound discretion of the court. . . . Such a reopening should not be permitted if it would result in substantial prejudice to a party." (Citations omitted; internal quotation marks omitted.) *Wood* v. *Bridgeport*, supra, 216 Conn. 606; see, e.g., *State* v. *Carter*, 228 Conn. 412, 420–21, 636 A.2d 821 (1994); *State* v. *Dunbar*, 51 Conn. App. 313, 320, 721 A.2d 1229 (1998), cert. denied, 247 Conn. 962, 724 A.2d 1126 (1999), and cert. denied, 247 Conn. 962, 724 A.2d 1126 (1999). In considering "whether the trial court acted within its broad discretion in rejecting the defendant's request for permission to introduce [evidence] after the defendant had rested his case," we consider the admissibility of the proffered evidence, as well as "the specific circumstances of the defendant's request, including the state's interest in an orderly trial process, the potential for jurors to have placed undue emphasis on the evidence had it been admitted, and the nature of the evidence." *State* v. *Carter*, supra, 425; see id., 422.

It is likewise well established that the "determination of whether to grant a request for a continuance is similarly within the discretion of the trial court. . . . The court, in exercising its discretion, may weigh various factors in considering a request for a continuance, including the likely length of the delay . . . the impact

State *v.* Komisarjevsky

of delay on the litigants, witnesses, opposing counsel and the court . . . the perceived legitimacy of the reasons proffered in support of the request . . . [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . . In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, 334 Conn. 793, 811–12, 224 A.3d 886 (2020); see, e.g., *State* v. *Brown*, 242 Conn. 445, 459–61, 700 A.2d 1089 (1997) (The trial court did not abuse its discretion or deny the defendant due process in denying his midtrial motion for a continuance to perform DNA testing on the sexual assault victim's jeans given the lack of evidence of semen at the scene, the likely length of the delay for the testing, the lack of evidence that testing was possible given the age of the exhibit, and the fact that the defendant was not prejudiced because he could ''argue to the jury that the state, which bore the burden of proof, had presented no scientific evidence connecting him to the crime, and he specifically highlighted the lack of testing on the jeans. The defendant made that argument with the knowledge that, even if he was convicted, he probably would be granted a new trial if the test results proved exculpatory.'').

Finally, ''[a]lthough the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances [that] may arise during the

State *v.* Komisarjevsky

trial in which his function is to [ensure] a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 270–71, 49 A.3d 705 (2012).

"The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. . . . In order to prove a . . . violation [of *Brady* v. *Maryland*, supra, 373 U.S. 83], the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . .

"[E]vidence known to the defendant or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*. . . . Even if evidence is not deemed suppressed under *Brady* because it is disclosed during trial, however, the defendant nevertheless may be prejudiced if he is unable to use the evidence because of the late disclosure. . . . Under these circumstances, the defendant bears the burden of proving that he was prejudiced by the state's failure to make the information available to him at an earlier time." (Citations omitted; internal quotation marks omitted.) *State* v. *Guilbert*, supra, 306 Conn. 271–72; see id., 272–74 (belated disclosure of surveillance video recording did not deprive defendant of fair trial because, "even without the video recording, the defense was able to show inconsistencies between the eyewitness' descriptions of the defendant and the

State *v.* Komisarjevsky

shooter,'' defense was able to ask ''generally whether the police officers had provided [the] witnesses with information about the defendant's appearance,'' and ''a reasonable juror might have concluded that the video recording corroborated some of the eyewitness testimony'').

Having reviewed the letters in their entirety, we conclude that the defendant's various claims arising from Hayes' letters lack merit. Even if we assume, without deciding, that the letters would have been admissible as dual inculpatory statements against Hayes' penal interest; see Conn. Code Evid. § 8-6 (4);[64] there is nothing therein that is in any way exculpatory or directly supports the defendant's theory that Hayes was the ringleader and that the defendant's role was subservient to Hayes—even if that were relevant to the elements of the crimes charged. At most, the letters—including Hayes' statement that he would have killed the defendant had they gotten away—indicate that the invasion of the P home was a joint venture. Indeed, substantial portions of the letters directly undercut in graphic detail certain theories of defense proffered at trial, namely,

---

[64] We agree with the trial court's observation that, assuming that Hayes was unavailable to testify, the admissibility of his letters as declarations against penal interest was nevertheless highly doubtful, given that (1) they were written four years after the crimes to a woman whom Hayes understood to be simpatico in his passions for evil, and (2) there was no apparent corroboration of times, dates or places of his claimed prior seventeen homicides. See *State* v. *Bryant*, 202 Conn. 676, 699, 523 A.2d 451 (1987) (''the focus on time appears to arise from the belief that declarations made soon after the crime suggest more reliability than those made after a lapse of time [during which] a declarant has a more ample opportunity for reflection and contrivance''). Compare *State* v. *Snelgrove*, 288 Conn. 742, 769–70, 954 A.2d 165 (2008) (third party's statement to fellow inmate that he had killed victim was inadmissible when third party ''was suffering from psychiatric problems at the time that he made the statement,'' which lacked corroboration and was made two to three years after murder and defendant's arrest), with *State* v. *Rivera*, 268 Conn. 351, 369–71, 844 A.2d 191 (2004) (dual inculpatory statement was admissible when made to close family member in confidence, on his own initiative, and within five months of homicide).

State *v.* Komisarjevsky

that the defendant did *not* engage in anal intercourse with M and that it was Hayes who had poured the gasoline before setting the house on fire.[65] Thus, we agree with the trial court's observation that the Hayes letters likely would have been "the seal of [the defendant's] doom" by both reinforcing the basis for a guilty verdict and laying the groundwork for the existence of several aggravating factors that the state needed to prove to obtain a death verdict during the penalty phase. Accordingly, we conclude that there was no miscarriage of justice or prejudice as a result of the late disclosure of the letters, and the trial court did not abuse its discretion in denying the defendant's motions for a mistrial, to reopen the evidence, or for a continuance.

## III

## *BRADY* CLAIMS ARISING FROM VARIOUS CHESHIRE POLICE COMMUNICATIONS

The defendant next claims that the state violated his due process rights under *Brady* v. *Maryland*, supra, 373 U.S. 83, by failing to disclose to trial counsel recordings of numerous Cheshire Police Department communications. The claims arising from these communications fall into three categories: (1) six communications concerning the police response to the home invasion, (2) a police communications log contained in

---

[65] Although the defendant suggests that the prejudicial portions of the Hayes letters could have been redacted, the state accurately notes that the defendant did not raise the possibility of redaction before the trial court. This precludes us from considering the possibility of redaction in determining whether the trial court abused its discretion in denying the defendant's motions. In any event, as the state also points out, redaction of the portions that were prejudicial to the defendant might well have affected the context of the remaining statements in a manner inconsistent with our case law governing the admission of declarations against penal interest. See, e.g., *State* v. *Bryant*, 202 Conn. 676, 696–97, 523 A.2d 451 (1987) ("where the disserving parts of a statement are intertwined with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context").

State *v.* Komisarjevsky

an e-mail received in January, 2008, by C.H.-R., who is
J's sister, and (3) two communications relevant to the
state of mind and demeanor of both Hayes and the
defendant at the time of their arrests. The defendant
argues that the state's failure to disclose these commu-
nications deprived him of his right to a fair trial because
they would have (1) "strongly supported the defendant's
theory that, because of their woefully inadequate
response to the 911 call from the Bank of America, the
Cheshire police were motivated by guilt, anger, and
embarrassment to undermine the credibility of the
exculpatory parts of his police statements," (2) "strongly
supported the defense theory that . . . Hayes was the
mastermind of the murders and that the defendant,
stunned by Hayes' statements and actions during the
crime, was slow to process and react appropriately
to them," and (3) "constituted powerful exculpatory
evidence of the defendant's exhaustion and disorienta-
tion when arrested and when he waived his *Miranda*
rights and gave his police statements." We address each
*Brady* claim in turn.

A

Additional Relevant Facts and Procedural History

The record reveals the following additional facts and
procedural history relevant to the defendant's *Brady*
claims. Robert Sage, an inspector with the prosecutor's
office, coordinated the discovery in this case, including
collecting evidence from the police and bringing it to
the prosecutors. That material was later distributed by
the prosecutor to defense counsel as a discovery file,
the contents of which were memorialized in a letter
from the prosecutor. Shortly after the home invasion,
Sage contacted Vignola, Cheshire's detective captain,
and asked him to preserve any records relating to the
investigation, including audio recordings. Vignola
accommodated that request by directing Michael Win-

State *v.* Komisarjevsky

ters, the Cheshire Police Department's information technology coordinator, to capture all communications contained in the department's recording systems from the incident, starting with the initial call until the end of the incident.[66]

In August, 2011, shortly before trial, the defendant moved for disclosure and examination of the state's evidence, including exculpatory and impeachment evidence, pursuant to *Brady* and the rules of practice. The defendant filed an additional disclosure motion on August 18, 2011. After a hearing on August 22, 2011, the trial court granted both motions, with defense counsel acknowledging that the state had conducted this case as an open file case and given the defendant all requested material to that point. Subsequently, on August 25, 2011, defense counsel sent a letter to the prosecutor, which, inter alia, (1) observed that a compact disc (CD) that had been provided to the defendant of recorded Cheshire police communications "contains only select calls" and asked the state to provide all Cheshire and state

---

[66] Winters testified that he used software that allowed him to "mark" or "tag" recordings of various individual transmissions on the telephone and radio systems, and then to move them into another software application that would "recreate the incident." After reviewing the various telephone lines and radio channels, Winters moved the calls that he had tagged as relevant to the software application; he then created a compact disc (CD) for Vignola that contained those communications. Winters also created, at Vignola's request, a written log that summarized, but did not transcribe verbatim, the time and nature of the communications. This process depended on Winters' judgment to determine the relevance of each communication.

Winters testified that the system did not automatically back up the recordings, and he manually copied the sound files to CDs on a weekly basis as a backup. Several years later, the town replaced the Cheshire emergency communications system after it was severely damaged by a lightning strike in December, 2010. When he subsequently received a request for a review of additional communications in connection with the motions for augmentation in this case, Winters stated that the originals had been destroyed by the lighting strike, but he was able to review the backup drives that he had created, which were stored off-site at Cheshire's town hall. See footnote 67 of this opinion. He did not, however, remember the existence of those drives at the time that defense counsel had made the initial request for additional communications in 2011.

State *v.* Komisarjevsky

police communications recorded on July 23, 2007, from 9 a.m. through 1 p.m., and (2) sought "all documentation related" to any review of the police response on July 23, 2007, in light of the "questions and widespread criticism surrounding" it. The state subsequently advised the defendant that it had provided him with all preserved communications. In a letter dated September 19, 2011, defense counsel responded that his review of the CD that had been provided identified at least one call missing from the written log of communications; he also specifically requested "the action review" that department policy required following a response of the special response team. The record does not include the state's response to that letter. The case then proceeded to trial.

While this appeal was pending, the defendant's appellate counsel learned from reading a Hartford Courant article that certain Cheshire Police Department communications had not been turned over to trial counsel, or heard or publicly disclosed prior to trial.[67] On August 29, 2014, the defendant filed in this court a motion for augmentation and rectification of the record relating to those recordings. The defendant sought a hearing pursuant to *State* v. *Floyd*, 253 Conn. 700, 732, 756 A.2d 799 (2000) (*Floyd* hearing),[68] to establish that the state

_____

[67] Appellate counsel observed that the calls described in the Hartford Courant article were not identified in the call log and discovery memorandum that the state had produced prior to trial. She could not find any evidence of those communications after she searched the files of all three attorneys who had represented the defendant at trial and listened to the CDs that she found therein. She then contacted Neil Dryfe, the chief of the Cheshire police, who produced a flash drive of those calls, which had been found in a backup storage location in town hall. See footnote 66 of this opinion. Appellate counsel testified, however, that she subsequently learned that the recordings of the missing communications had in fact been produced to attorneys for Hayes, who was tried first.

[68] "Pursuant to *State* v. *Floyd*, supra, 253 Conn. 700, a trial court may conduct a posttrial evidentiary hearing to explore claims of potential *Brady* violations . . . when a defendant was precluded from perfecting the record due to new information obtained after judgment. . . . In order to warrant such a hearing, a defendant must produce prima facie evidence, direct or circumstantial, of a *Brady* violation unascertainable at trial. . . . The trial court's decision with respect to whether to hold a *Floyd* hearing is reviewable

State *v.* Komisarjevsky

had failed to disclose to the defendant's trial counsel recordings of these communications. The defendant argued that this failure to disclose violated *Brady* because those communications were evidence that supported a defense theory that the police response in this case was inadequate. Evidence of an inadequate police response would have supported his attempts to attack the credibility of various police witnesses who had challenged the veracity of the defendant's statement to the police, and also would have "front-loaded" a strategy for mitigation in the anticipated penalty phase of the trial.[69] We referred this motion to the trial court for action.

On September 24, 2014, the state notified the defendant's appellate counsel of the existence of additional recordings that had not been produced to counsel, which were discovered by Cheshire town employees after the defendant filed his first motion for augmentation and rectification of the record. On November 13, 2015, the defendant filed a second motion for augmentation and rectification of the record related to those additional calls.

The trial court held a three day *Floyd* hearing on the defendant's motions.[70] In advance of the hearing, the

by motion for review pursuant to Practice Book § 66-7 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 182 n.7, 989 A.2d 1048 (2010).

[69] In particular, the defendant claimed that the inadequacy of the police response was a relevant circumstance in this case for consideration by the jury in its capital sentencing determination. At the *Floyd* hearing, Todd Bussert, who was one of the attorneys who represented the defendant at trial, testified that he had reviewed the CD of dispatch calls found in his trial file in advance of cross-examining Vignola, the Cheshire police detective captain. The defense strategy, in connection with "front-load[ing]" mitigation for the anticipated penalty phase, was to raise the question of whether the tragedy might not have occurred if the Cheshire police had responded differently. Bussert's objective in cross-examining Vignola was to establish the sequence of the police response and to demonstrate that the Cheshire police "didn't actually engage anyone; they just kind of set up a perimeter."

[70] At the *Floyd* hearing, the trial court also considered a separate augmentation and rectification motion filed on November 13, 2015, that encom-

State *v.* Komisarjevsky

state and the defendant stipulated to the existence of
the recordings of numerous communications from July
or August of 2007 that had not been disclosed to the
defendant's trial counsel prior to trial in 2011 and had
been provided to appellate counsel for the first time
in November, 2014. The parties stipulated that those
recordings were true and accurate copies and should be
marked as exhibits at the *Floyd* hearing.[71] After hearing
testimony from Sage, counsel, and Winters; see footnote
66 of this opinion; the trial court found that the CDs
were not turned over as a result of an "error in transmis-
sion," which was likely attributable to the sheer volume
of evidence in this case. The trial court found that it

passed certain testimony and exhibits from Hayes' trial with respect to the
photographs that the defendant had taken of M. We address the defendant's
claims relating to those items in part IV of this opinion.

[71] As described in the stipulation, the relevant recordings are (1) "[a]
recording numbered 173251 (CH10 09001C58) [in] the call log provided by
the [s]tate to defense trial counsel and admitted at trial as [d]efendant's
[e]xhibit #A. Call from Cheshire Police Sergeant Chris Cote to Officer Robert
Regan, acting as dispatcher, in response to request of Officer Donald Miller
for a call," (2) "[a] recording numbered 173309 (CH1 000A724) [in] the call
log provided by the [s]tate to defense trial counsel and admitted at trial as
[d]efendant's [e]xhibit #A in which Cheshire Police Captain Robert Vignola
states he will do a drive-by of 300 Sorghum Mill Drive, Cheshire, and the
house is described by Officer Philip Giampietro," (3) "[a] recording desig-
nated CH10 09001CCB 669; in which Shawn Patterson, a Cheshire [p]olice
[o]fficer, speaks with Officer Brian Schechter," (4) "[a] recording designated
CH10 09001D4C 669; the relevant speakers are a Cheshire Detective Kerry
Nastri and . . . Connecticut State Trooper David Devito," (5) "[a] recording
designated CH11 0A00327B; the relevant speaker is Cheshire Police Captain
. . . Vignola; internal call from Captain Ren Marchand, shift commander.
The time of the call was 9:27:52 a.m. on July 23, 2007," (6) "[a] recording
designated CH17 10002AA5; the relevant speaker is Cheshire Police Officer
Jeff Sutherland. The time of the call was 9:33:26 a.m. on July 23, 2007. This
call was included on a dis[c] produced in discovery on or around September
13, 2007 (Item #87). It is included among other calls in Call #173292 [in] the
call log, [d]efense [e]xhibit A," (7) "[a] recording designated
CH17 10002AA7. The time of the call was 9:35:23 a.m. on July 23, 2007. This
call was included on a dis[c] produced in discovery on or about September
13, 2007 (Item #87). It is included among other calls in Call #173292 [in] the
call log, [d]efense [e]xhibit A," and (8) "[a] recording designated
CH10 09001C57 (Time: 9:23:12); the relevant speakers are [Officer Regan]
and Cheshire Police Lieutenant Joe Mazzini. The time of the call was 9:23:12
a.m. on July 23, 2007."

State *v.* Komisarjevsky

was uncontested that "the three police calls described in paragraph four on page nine of the August 19, 2014 motion . . . were not disclosed to the defense."[72] We address the content of these communications in detail in part III C of this opinion. See also footnotes 82 through 84 of this opinion.

The parties disputed, however, the existence of a communication that was described in paragraph one on page eight of the August 19, 2014 motion for augmentation, namely, the call log that C.H.-R. claimed to have received in an e-mail. After considering testimony from C.H.-R. and her husband, W.R., about this e-mail, the trial court found that its existence had not been proven by a fair preponderance of the evidence. Consistent with our previous denial of relief in a subsequent motion for review, we now turn to the merits of the defendant's *Brady* claims.

B

Claims Arising from the E-mail Described by C.H.-R.

We begin with the defendant's claim that the trial court improperly found that he had failed to prove the existence of a call log that established the presence of a police officer at the P residence when Hayes and J returned from the bank in the Pacifica, which had been relayed to C.H.-R., who is J's sister, in an e-mail that she received in January, 2008. The defendant first argues that the existence of the call log was established by the highly credible testimony of C.H.-R. and her husband, W.R., and corroborated by both the "consistent and highly suspicious pattern by the police of withholding or mischaracterizing critical police calls" and

[72] The defendant withdrew claims arising from the 9:33:26 a.m. broadcast by Cote indicating that he was approaching Sorghum Mill Drive and the 9:35:23 a.m. broadcast by an officer who sounded like Cote, indicating that he was on the rear side of the P family residence at that time.

State *v.* Komisarjevsky

"the improbability" that numerous Cheshire police officers had not "arrived at the P residence in time to observe the Pacifica returning there." The defendant also argues that the trial court improperly required him to prove the existence of the call log by a preponderance of the evidence, contending that, under § 9-1 (a) of the Connecticut Code of Evidence,[73] a party need only make a prima facie showing of the authenticity of an exhibit to the court for purposes of admissibility. Finally, the defendant argues that the trial court abused its discretion by sustaining the prosecution's objection under § 7-1 of the Connecticut Code of Evidence,[74] which governs the admission of lay opinion testimony, to defense counsel's question at the *Floyd* hearing to W.R. about whether the e-mail "appear[ed]" to him "to be a document that could have been created by a nonpolice or like a layperson who was not involved in the response . . . ."

In response, the state assumes the credibility of C.H.-R. and W.R. but contends that their testimony nevertheless does not establish the existence of the call log or the e-mail in which it was contained. The state also cites, among other cases, *State* v. *Thompson*, 305 Conn. 412, 45 A.3d 605 (2012), cert. denied, 568 U.S. 1146, 133 S. Ct. 988, 184 L. Ed. 2d 767 (2013), and argues that the trial court properly applied the preponderance of the evidence standard in determining whether the call log or e-mail existed as a predicate factual matter. Finally, the state contends that the trial court did not abuse its discretion in sustaining its objection to W.R.'s testimony

[73] Section 9-1 (a) of the Connecticut Code of Evidence provides: "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be."

[74] Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue."

State *v.* Komisarjevsky

about the appearance of the e-mail because it was not a proper subject for lay witness opinion testimony. We agree with the state and conclude that the trial court properly applied the preponderance of the evidence standard and concluded that the defendant had not established the existence of the communication at issue.

The record reveals the following additional relevant facts and procedural history. In his August 29, 2014 motion for augmentation and rectification of the record, the defendant claimed that the state had failed to produce a police communication that C.H.-R. had received by e-mail in January, 2008, and that she subsequently discussed during an appearance on Katie Couric's television show that aired on August 19, 2013. The defendant averred that that communication, as described by C.H.-R., "establishes that 'there actually was a police officer at [J's] home watching her come back to the house and pull into the driveway,' " describing " 'her car [as] a silver Chrysler Pacifica [that] is now entering the driveway and the garage door is going up and the car is pulling in . . . .' "

At the *Floyd* hearing, C.H.-R. testified that she and her parents had remained in contact with the Cheshire police because they had concerns about the police response to the home invasion and were angry when the Cheshire town manager publicly commended the police on television. C.H.-R. testified that, in early January, 2008, she received an e-mail that contained what appeared to be a log of communications between the officers before that information was ultimately released to the public. C.H.-R. stated that the call log contained the times and written descriptions of various communications between the responding officers. One particular item that distressed C.H.-R. was a notation in the log that Cheshire police officers were present and had witnessed the Pacifica returning to the P family residence,

State *v.* Komisarjevsky

leading her to conclude that officers were present at the house for approximately forty-five minutes before Hayes and the defendant fled the scene and that the officers could have prevented the deaths of J, H, and M. C.H.-R. testified that the log document in the e-mail did not have any logos or markings indicating that it had originated from either the Cheshire Police Department or the prosecutor's office. C.H.-R. did not know who sent the e-mail, but she assumed that "someone from the Cheshire police sent it to me."[75]

C.H.-R. testified that she did not presently have a copy of the e-mail printed out or saved electronically. C.H.-R. "was afraid to keep the e-mail" because it was labeled "for your eyes only or FYI only," and she was afraid to show it to anyone or tell anyone about it. She testified, however, that she had printed a copy of the e-mail and deleted the electronic file sometime in February or March of 2008. C.H.-R. showed a copy of the printout to her husband, W.R., and to a North Carolina news reporter who had come to their home. She did not give the news reporter a copy of the e-mail and asked her not to report about it given its confidential nature. She also showed the printed copy to her parents, who were upset by it and wrote letters to the Cheshire police; the police claimed they had never received those letters. She testified that W.R. had shown the printed copy to an attorney friend, and that they subsequently lost—and perhaps accidentally discarded—that printed copy. No evidence of the e-mail appeared after a search of her computer hard drive. C.H.-R. acknowledged that the communication described in the e-mail did not appear in the communications logs admitted into evidence at trial and that recordings provided to her for

---

[75] C.H.-R. testified that she originally thought that the e-mail had been created by the Cheshire police and forwarded to her by her brother-in-law, W. C.H.-R. later asked W about the e-mail around the time of trial, and W denied sending the e-mail to her or having any awareness of the information therein.

State *v.* Komisarjevsky

review by defense counsel did not include that communication.[76]

W.R. also testified at the hearing. He testified that C.H.-R. had shown him the e-mail when he came home one afternoon in January, 2008. He could not tell from the e-mail or the printout the origin of the message; he did not think that it had been forwarded by W but, perhaps, had come from the spouse of a Cheshire police officer. He did not think that it had come from the town of Cheshire itself and did not know where the sender of the e-mail had obtained the information therein. W.R. testified that, at that time, his family was frequently receiving e-mails from people whom they had not met— nearly twenty to thirty times per day—offering support and prayers. He recalled that it was about the case, and "that the Pacifica was returning, and the garage door . . . was going up." W.R. also observed that it had a list of numerous communications between police officers during the response. He showed a printout of the e-mail to an attorney friend and asked about "normal police protocol" in the home invasion/hostage situation. When he got home, he placed the printout on top of his computer to "save" or "keep it . . . ." The attorney did not keep a copy of the e-mail and did not ask for one. W.R. had never seen the police call log that was admitted into evidence at Hayes' and the defendant's trials. During W.R.'s testimony, the trial court sustained the state's objection to the question whether the log in the e-mail "appear[ed] to you to be a document that could have been created by a nonpolice or like a layperson who

---

[76] C.H.-R. testified that she had discussed the police response with Vitello, who stated that he could not speak to her about the evidence until after the trial; she had informed him of her concern that the police were present when the Pacifica returned. She also discussed her concerns about the police response with the prosecutor before the trial, although none of the reports that he had showed them included the initial police response time. Sage, an inspector with the prosecutor's office, counseled C.H.-R. not to discuss the information publicly until after the trial.

State *v.* Komisarjevsky

was not involved in the response . . . .'' With no argument by the defendant in response, the trial court ruled that the question ''call[ed] for an opinion [and] that [there was] no foundation that he has some expertise in this.''

As we noted previously, Winters, the information technology manager for the Cheshire Police Department, worked at the direction of Vignola to capture, log, and summarize the police department's radio and telephonic communications during the home invasion incident, from the initial 911 call until the defendant and Hayes were taken into custody. See footnote 66 of this opinion. In reviewing those communications in July, 2007, Winters denied hearing ''in words or in substance a communication by or among Cheshire police officers to the effect that someone [had] observed the Chrysler Pacifica entering the driveway at that residence and the garage door being elevated . . . .'' Had he heard such a communication, he would have moved it into the application and documented its existence in the log. Even if Winters had missed that communication during his manual review in 2007, it would have remained archived on the Cheshire police servers, as well as, presumably, the backup drives maintained at town hall. See footnote 66 of this opinion.

After hearing argument, the trial court first determined that it was the defendant's burden to prove the existence of the call log by a preponderance of the evidence, rejecting his reliance on *State* v. *Colon*, 272 Conn. 106, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005), for the proposition that his burden was merely to establish a prima facie showing of the call log's existence; the court deemed *Colon* to be limited to a showing of authenticity of an already existing document, whereas the inquiry in this case is whether the document existed at all. Observing that it was undisputed that the call log and

State *v.* Komisarjevsky

communication had never been turned over to the defense, the trial court stated that "the only question is whether the call [log] existed in the first place," and it concluded that it "cannot find on the basis of the evidence presented . . . that, by a preponderance of the evidence, such a call existed." Although the trial court agreed that C.H.-R. had "no incentive to fabricate testimony to help" the defendant, it nevertheless deemed evidence of the call log's existence unreliable given the lack of evidence as to the e-mail's origin and the fact that C.H.-R. and W.R. were "getting all sorts of information from people they didn't know." The trial court acknowledged that § 10-3 (1) of the Connecticut Code of Evidence[77] allows other evidence of the contents of a writing, if the original is lost or destroyed, to be established by secondary evidence, but ultimately determined that there simply was not a preponderance of "credible evidence" beyond "guesswork or speculation" to establish the existence of the call log or the e-mail in which it had been contained.

Having reviewed the defendant's various claims on this point, we first conclude that the trial court properly required the defendant to prove the existence of the e-mail and call log containing the communication described by C.H.-R. by a preponderance of the evidence. The existence of undisclosed evidence under

_____

[77] Section 10-3 of the Connecticut Code of Evidence provides: "The original of a writing, recording or photograph is not required, and other evidence of the contents of such writing, recording or photograph is admissible if:

"(1) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent destroyed or otherwise failed to produce the originals for the purpose of avoiding production of an original; or

"(2) Original not obtainable. No original can be obtained by any reasonably available judicial process or procedure; or

"(3) Original in possession of opponent. At a time when an original was under the control of the party against whom it is offered, that party was put on notice, by the pleadings or otherwise, that the contents would be a subject of proof at the proceeding, and that party does not produce the original at the proceeding; or

"(4) Collateral matters. The contents relate to a collateral matter."

State *v.* Komisarjevsky

*Brady* "is an issue of fact for the determination of the trial court. . . . Furthermore, the burden is on the defendant to prove the existence of undisclosed exculpatory evidence. . . . A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Citation omitted; internal quotation marks omitted.) *Greene* v. *Commissioner of Correction*, 330 Conn. 1, 29, 190 A.3d 851 (2018), cert. denied sub nom. *Greene* v. *Semple*, U.S. , 139 S. Ct. 1219, 203 L. Ed. 2d 238 (2019); see, e.g., *State* v. *Ouellette*, 295 Conn. 173, 187–89, 989 A.2d 1048 (2010); *State* v. *Floyd*, supra, 253 Conn. 737–38.

Although the quantum of proof necessary to establish the existence of undisclosed evidence is a question of first impression in Connecticut, our research reveals federal and sister state authority that requires the defendant to prove by a preponderance of the evidence the existence of evidence that is claimed to be *Brady* material, which is an inquiry that most often arises in the context of undisclosed cooperation agreements between prosecutors and witnesses. See, e.g., *United States* v. *Reese*, 745 F.3d 1075, 1083 (10th Cir.), cert. denied, 574 U.S. 894, 135 S. Ct. 235, 190 L. Ed. 2d 177 (2014); *Walker* v. *Kelly*, 589 F.3d 127, 141–42 (4th Cir. 2009), cert. denied, 560 U.S. 920, 130 S. Ct. 3318, 176 L. Ed. 2d 1215 (2010); *United States* v. *Thompson*, Docket No. 07-35-GFVT, 2011 WL 1327339, *13 (E.D. Ky. April 4, 2011), aff'd, 501 Fed. Appx. 347 (6th Cir. 2012); *People* v. *Giuca*, 33 N.Y.3d 462, 474, 128 N.E.3d

State *v.* Komisarjevsky

655, 104 N.Y.S.3d 577 (2019); *Commonwealth* v. *Spotz*, 616 Pa. 164, 201, 47 A.3d 63 (2012). The preponderance of the evidence standard is consistent with existing Connecticut case law governing factual proof of constitutional violations as a preliminary matter. See, e.g., *State* v. *Thompson*, supra, 305 Conn. 428 (applying preponderance standard in determining whether defendant procured absence of potential witness for purpose of hearsay exception under § 8-6 (8) of the Connecticut Code of Evidence because that "standard . . . is consistent with the standard used by courts in making other preliminary determinations of fact involving a defendant's constitutional rights, such as whether a confession was voluntary").

Application of the preponderance of the evidence standard is particularly apt in this case, in which the defendant sought to establish the existence of a lost or destroyed document or recording, the admissibility of which is governed by § 10-3 of the Connecticut Code of Evidence; authority applying similar rules of evidence generally requires such proof to be by at least a preponderance of the evidence.[78] See, e.g., *Bobcar Media, LLC* v. *Aardvark Event Logistics, Inc.*, 354 F. Supp. 3d 375, 382 (S.D.N.Y. 2018) (applying Federal Rules of Evidence to claimed loss of assignment of patents); *Kleenit, Inc.* v. *Sentry Ins. Co.*, 486 F. Supp. 2d 121, 125–26 (D. Mass.

---

[78] Accordingly, we agree with the trial court that the issue presented in this case, which concerned the existence of both the missing e-mail and the call log contained therein, is—contrary to the defendant's argument— distinct from the authentication inquiry governed by § 9-1 of the Connecticut Code of Evidence, under which the trial court exercises its discretion in determining whether there is a prima facie case showing that a specific item of evidence is what its proponent claims it to be. See, e.g., *State* v. *Carpenter*, 275 Conn. 785, 856–57, 882 A.2d 604 (2005) (authentication of identity of speaker on recording), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006); *State* v. *Colon*, supra, 272 Conn. 188–89 (authentication of written confession to police). This authentication inquiry would have arisen in the present case had, for example, the e-mail itself been presented to the trial court, thus requiring the trial court to consider the authenticity of both the e-mail and the call log contained therein.

State *v.* Komisarjevsky

2007) (applying Massachusetts law to lost insurance policy); *Coxwell* v. *Coxwell*, 296 Ga. 311, 312–13, 765 S.E.2d 320 (2014) (lost antenuptial agreement). But see *Estate of Bossio* v. *Bossio*, 237 W. Va. 130, 134–35, 785 S.E.2d 836 (2016) (requiring clear and convincing evidence to prove existence and contents of lost document). Accordingly, we conclude that the trial court properly required the defendant to prove the existence of the call log and C.H.-R.'s lost or deleted e-mail by a preponderance of the evidence.

We further conclude that the trial court did not commit clear error in finding that the defendant had not proven the existence of the call log described in C.H.-R.'s lost or deleted e-mail, or the e-mail itself, by a preponderance of the evidence. Although the trial court found C.H.-R. and W.R. to be credible, the fact that the e-mail had been deleted and the printout lost rendered it impossible to determine the provenance of the message or the call log contained therein. Neither C.H.-R. or W.R. knew who had sent the e-mail, and a search of Cheshire's communications server and records did not reveal a corresponding communication. Accordingly, we conclude that the trial court correctly concluded that the defendant had not established the existence of the call log claimed to have been contained in C.H.-R.'s e-mail.

Finally, we address the defendant's claim that the trial court abused its discretion in sustaining the state's objection under § 7-1 of the Connecticut Code of Evidence, governing lay opinion testimony, to a question posed to W.R., namely, whether the e-mail "appear[ed] to you to be a document that could have been created by a nonpolice or like a layperson who was not involved in the response . . . ." See, e.g., *State* v. *Holley*, 327 Conn. 576, 604–606, 175 A.3d 514 (2018) (setting forth background principles and abuse of discretion standard of review applicable to lay opinion evidence). The trial

State *v.* Komisarjevsky

court sustained the state's objection to this question, concluding that it "call[ed] for an opinion that [there was] no foundation that he has some expertise in this." We conclude that any error on this point is harmless, given that this issue turned on the lack of proof that the e-mail and the call log contained therein existed, as opposed to the authenticity of those documents.

C

Whether Certain Communications Not Disclosed
by the State Were Material for Purposes
of a *Brady* Violation

It is undisputed that the state failed to disclose six Cheshire police communications that form the basis of the defendant's *Brady* claim with respect to the police response, and two communications that concern the demeanor of the defendant and Hayes following their arrests. Before turning to those communications, we review the well established principles governing the defendant's claim under *Brady* v. *Maryland,* supra, 373 U.S. 83. "Due process principles [under the fourteenth amendment to the United States constitution] require the prosecution to disclose to the defense evidence that is favorable to the defendant and material to his guilt or punishment. . . . [Thus] [i]n order to obtain a new trial for improper suppression of evidence, the [defendant] must establish three essential components: (1) that the evidence was favorable to the accused; (2) that the evidence was suppressed by the state—either inadvertently or wilfully; and (3) that the evidence was material to the case, i.e., that the accused was prejudiced by the lack of disclosure." (Citations omitted.) *Marquez* v. *Commissioner of Correction,* 330 Conn. 575, 592, 198 A.3d 562 (2019).

"In *Brady,* the court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is

State *v.* Komisarjevsky

material either to guilt or to punishment, irrespective
of the good faith or bad faith of the [prosecutor]. . . .
The United States Supreme Court also has recognized
that [t]he jury's estimate of the truthfulness and reliabil-
ity of a . . . witness may well be determinative of guilt
or innocence, and it is upon such subtle factors as the
possible interest of the witness in testifying falsely that
a defendant's life or liberty may depend. . . . Accord-
ingly, the *Brady* rule applies not just to exculpatory
evidence, but also to impeachment evidence . . .
which, broadly defined, is evidence having the potential
to alter the jury's assessment of the credibility of a
significant prosecution witness. . . .

"Not every failure by the state to disclose favorable
evidence rises to the level of a *Brady* violation. Indeed,
a prosecutor's failure to disclose favorable evidence
will constitute a violation of *Brady* only if the evidence
is found to be material. The *Brady* rule is based on
the requirement of due process. Its purpose is not to
displace the adversary system as the primary means by
which truth is uncovered, but to ensure that a miscar-
riage of justice does not occur. Thus, the prosecutor is
not required to deliver his entire file to defense counsel,
but only to disclose evidence favorable to the accused
that, if suppressed, would deprive the defendant of a
fair trial . . . ." (Citations omitted; footnote omitted;
internal quotation marks omitted.) *Adams* v. *Commis-
sioner of Correction*, 309 Conn. 359, 369–70, 71 A.3d
512 (2013); see id., 370 (noting that "a classic *Brady*
case . . . involv[es] the state's inadvertent failure to
disclose favorable evidence").

In the present case, it is undisputed that the communi-
cations were not disclosed and constituted impeach-
ment evidence. The sole issue concerns whether they
were material under *Brady*, which "presents a question
of law subject to plenary review." *Marquez* v. *Commis-
sioner of Correction*, supra, 330 Conn. 593. "Evidence

State *v.* Komisarjevsky

is material when there would be a reasonable probability of a different result if it were disclosed. . . . A reasonable probability exists if the evidence could reasonably . . . put the whole case in such a different light as to undermine confidence in the verdict. . . . Materiality does not require, however, a demonstration . . . that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . Instead, the operative inquiry is whether, in the absence of the evidence, the defendant received a fair trial . . . resulting in a verdict worthy of confidence.'' (Citations omitted; internal quotation marks omitted.) Id., 593–94.

"This calls for a careful review of that [evidence] and its probable effect on the jury, weighed against the strength of the state's case and the extent to which [the defendant was] otherwise able to [discredit the evidence]. . . . [E]vidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can . . . be determined [only] by comparison to the rest." (Citation omitted; internal quotation marks omitted.) Id., 594; see *Kyles* v. *Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *United States* v. *Bagley*, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); see also *Henning* v. *Commissioner of Correction*, 334 Conn. 1, 24–26, 219 A.3d 334 (2019) (discussing more "stringent" and "strict" standard of materiality applicable when "a prosecutor obtains a conviction with evidence that he or she knows or should know to be false" (internal quotation marks omitted)). We now turn to the undisclosed communications.

State *v.* Komisarjevsky

1

Police Response Communications

The first communication at issue is a call from Cheshire police Sergeant Chris Cote to Officer Robert Regan, at 9:25:15 a.m. on July 23, 2007, discussing whether and where to attempt to intercept the Pacifica en route to the P family residence in response to a 911 call from the Bank of America.[79] The defendant argues that this first call supports the proposition that Cote was in a position to locate and to stop the Pacifica, yet failed to do so. The defendant argues that the other five calls suggest a failure by the Cheshire police to marshal necessary resources in a timely manner. Specifically, the second call is an internal communication at 9:27:52 a.m. between Vignola and Cheshire Police Captain Ren Marchand, who was the shift commander, indicating

_____

[79] The recording of the first communication provides in relevant part: "[A Male Voice]: Hey, what's up?

" [A Male Voice]: We're taking 911s from the bank. Apparently some family is tied up and being held hostage, and they're forcing the woman to go to the bank and withdraw a large amount of cash to pay the captors. Mazzini is here now. Don is getting basic information on it, but it sounds like we might be in this for a little bit.

"[A Male Voice]: All right. Where is it?

"[A Male Voice]: The lady is at Bank of America, Don? The lady just left, possibly with the captors in a Chrysler Pacifica heading out Vespucci's side of Maplecroft.

"[A Male Voice]: Do you want to put that on the air? Joe, what do you want to do? Do you want to try to find that car or what do you want to do? We're going to put that out on [indiscernible]. Just left Bank of America, the captors might be in the car with her, Chrysler Pacifica. . . . The bank manager is the one that called us. The lady doesn't even—didn't want to notify the police because they have her family tied up. [Indiscernible.]

* * *

"[A Male Voice]:  . . . Chrysler Pacifica, color gray, coming out of Maplecroft Plaza [indiscernible] West Main Street toward Sorghum Mill Road.

"[A Male Voice]: All right. What color is the Pacifica? . . .

"[A Male Voice]: . . . [Indiscernible] But—why don't you just head down toward that area and see if we can intercept this car.

"[A Male Voice]: I'm on Maple now. . . . [Indiscernible.] Turned onto West Main Street, the Pacifica [indiscernible] gray Pacifica. . . ."

State *v.* Komisarjevsky

that Vignola was "heading out" to the scene.[80] The third communication is one between 9:36:18 and 9:36:45 a.m., in which Vignola advises that he will "drive by" the P family house and receives a description of it from Officer Phillip Giampietro.[81] The fourth communication is one in which the caller, who is a hostage negotiator, is directed not to report to the station.[82] The fifth communication is one in which Cheshire special response team members are directed not to report to the station.[83] The sixth call is one in which an unidentified Cheshire police officer appears to have briefly questioned the account of the incident that J provided at Bank of America, which had been relayed to the police.[84]

The defendant argues that these undisclosed communications would have provided further impeachment evidence with respect to the veracity of the Cheshire police witnesses by providing support for the theory that their testimony was colored by their remorse for

[80] The recording of the second communication provides: "[A Male Voice]: 300 Sorghum Mills? . . . Is the lady still at the bank? . . . Chrysler Pacifica? . . . All right. We're heading out."

[81] The recording of the third communication provides in relevant part: "[A Male Voice]: [Indiscernible.] Going to do a drive-by [indiscernible] . . . .

"[A Male Voice]: Okay, as soon as you get past Hotchkiss Ridge, just look on your left, you'll see the house. Again, the front faces Hotchkiss Ridge, the driveway comes out onto Sorghum. The vehicle is in the driveway."

[82] The recording of the fourth communication provides in relevant part: "[A Male Voice]: I need to know whether you want me in or not. I'm the hostage negotiator, and I got paged. . . ."

"[A Male Voice]: Not at this time. . . ."

[83] The recording of the fifth communication provides in relevant part: "[A Male Voice]: We want to know, Brian and I are out on West Johnson . . . [indiscernible] if you want us to come in and start suiting up?

"[A Male Voice]: We'll call you if we need anything—if we need you."

[84] The recording of the sixth communication provides in relevant part: "[A Male Voice]: All right. Did you get that so far? . . . Apparently she came into the bank, she tried to get some money out. . . . One of the accounts was in the husband's name, and then she says, well, my kids are at home tied up, so we don't know if they really are or if she was just trying to get money out of the bank at this point. . . . The car is at the house from what I understand.

"The car is at the house. She got $15,000 in cash in three envelopes with $5000 a piece. They're all strapped. So $15,000 dollars in $50 bills."

State *v.* Komisarjevsky

an inadequate police response. As the defendant acknowledges in his brief, however, the principal issues of fact at the guilt phase of the trial were whether he had (1) committed an anal sexual assault of M, and (2) intended to kill J, H, and M. A review of the record, including the parties' closing arguments and the supporting evidence, confirms that none of the undisclosed material impeaches the veracity of the Cheshire police witnesses in a manner that undermines our confidence in the verdict as to the disputed fact issues. With respect to the sexual assault of M, the recovery of the defendant's DNA from her anus provides ample and overwhelming support for the jury's verdict on that count, with any inadequacy in the *police* response to the emergency bearing no relation to his theory, proffered during closing argument, that the rectal swab taken from M must have been cross-contaminated with the defendant's DNA by a technician in the Connecticut Forensic Science Laboratory (state lab), insofar as there was no other evidence of sexual assault such as physical injury to M's anal area or the presence of M's DNA on the defendant's penis.[85]

[85] We note that the defendant argued that the officers had watched him when he went into the bathroom at the police station to make sure that he did not wash himself, and that the swab had in fact detected the defendant's sperm on his penis, which was consistent with his account in his statement that he ejaculated after committing an oral sexual assault on M. Although the defense acknowledged Carver's testimony that the lack of physical injury was not inconsistent with sexual assault, the defense contended that it was unlikely given the size differences between M and the defendant, along with the lack of consent.

In rebuttal, the state emphasized that there was no support for the defense theory because it was Carver himself who had taken the swab from M and not a technician. The state also reemphasized Carver's testimony about the elasticity of the anus rendering the lack of injury to the area "not unusual . . . ." Finally, the state emphasized that there was no evidence that the police had supervised the defendant while he was in the bathroom at the police station, which would support the state's argument that he had the opportunity to wash his penis while in there, along with the fact that the swabs were not taken from the defendant until at least fifteen hours after his arrest. On this point, Vitello testified on cross-examination that the police had provided the defendant with a bathroom break during the interview; no one went in the bathroom with him, but they left the door partially ajar.

State *v.* Komisarjevsky

The state sought to prove the defendant's intent to kill by circumstantial evidence given the defendant's denials of such intent in his statement. The state relied on the defendant's motive of hiding the evidence of his sexual assault of M and his failure to walk out of the house and abort the crimes during the opportunities presented when Hayes was out of the house buying gasoline and taking J to the bank, along with his act of retying H and M to their beds after they had been permitted to use the bathroom and M had showered. The state also argued that the defendant had poured bleach on M's shorts in an attempt to eliminate DNA evidence. The state further relied on evidence that gasoline had been poured only in areas of the P home where people were present. The state also emphasized that gasoline was found on the defendant's clothes and debunked his explanation that the gasoline was the result of his work activities by using Stop and Shop surveillance video showing him wearing different clothes when he stalked J and M at the store after work than when he was arrested after perpetrating these crimes. None of the undisclosed evidence pertaining to the police response affected this evidence of intent in any way, as it did not depend on the observations or veracity of the Cheshire police witnesses. Accordingly, we conclude that the additional evidence that would raise the question of an inadequate police response was not material to the guilt issues at this trial, and the state's failure to disclose it did not, therefore, violate *Brady*.

2

Communications About the Defendant's
Appearance and Demeanor

The defendant next claims that two communications describing his demeanor and Hayes' appearance were

State *v.* Komisarjevsky

material for *Brady* purposes. The first communication is one in which Shawn Patterson, a Cheshire police officer, described the defendant to another officer as "nobody home" and "simple as they come."[86] The defendant argues that this communication was material to the voluntariness of his statements, which was an issue that he addressed in closing argument, and the waiver of his *Miranda* rights, and that the trial court would have granted his pretrial motion to suppress his statement on the ground that it was not voluntary because of sleep deprivation and injury from the collision between the Pacifica and the Cheshire police cruisers. In response, the state contends that Patterson's statement was not material because any information that could be drawn from it was amply duplicated firsthand at trial, including by Vitello's description of the defendant during the interview and the audio recording of the defendant's statement. We agree with the state and conclude that Patterson's description of the defendant was not material.

A review of the record satisfies us that Patterson's description of the defendant was not material for *Brady* purposes because its omission does not undermine our confidence in the fairness of the trial or the suppression hearing in this case. It is not reasonably likely that Patterson's testimony would have changed the fact finder's determination on this point, given the uncontro-

---

[86] In the first communication, the following exchange occurred between Patterson and Officer Brian Schechter: "[Patterson]: I was talking to the— I was with the detective when he was talking. That kid is like, there is nobody home, dude.

"[Schechter]: Which one? The older one or the younger one?

"[Patterson]: The younger one. The darker haired dude.

"[Schechter]: Really?

"[Patterson]: There is nobody . . . that dude is fucking simple as they come."

State *v.* Komisarjevsky

verted evidence at the *Floyd* hearing that Patterson's contact with the defendant was at most a fleeting observation in the hallway of the police station; he took no part in the response to the P home or the ensuing investigation and was not present for the interview.[87] Indeed, Patterson's testimony was at best cumulative of more probative evidence as to the defendant's demeanor, namely, Vitello's testimony that the defendant was emotionless during the period of time following his arrest, and the lengthy recording of the defendant's statement, which the trial court and the jury had the opportunity to hear for themselves. See, e.g., *State* v. *Wilcox*, 254 Conn. 441, 458, 758 A.2d 824 (2000); *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 298–99, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

We now turn to the second communication, which is a discussion between Cheshire Police Detective Kerry Nastri and Connecticut State Trooper David Devito, in which one of the two officers[88] describes Hayes as

[87] Specifically, Patterson testified at the *Floyd* hearing that he had been called to the station around noon on July 23, 2007, to help cover "routine calls" in Cheshire in the aftermath of the incident; he had no role in responding to the P home that morning. While standing in a hallway near a bulletin board, Patterson observed the defendant for several seconds being escorted by several detectives into the booking area. Patterson did not participate in any interviews of or have any conversations with the defendant at any time. He recalled making the comment to a fellow officer about the defendant that was captured on the recording, describing his observation that "no one was home" "and "simple as they come" as reflecting what he felt was a lack of emotion that was unusual for a person who had just been arrested.

[88] Neither Nastri nor Devito testified at the *Floyd* hearing, and the trial court did not make any finding as to which speaker made the "looked evil" comment. Although the defendant argues that Nastri made the "looked evil" comment, the state disagrees, observing that the flow of the conversation demonstrates that it was Devito who had made the observation, given that there was no evidence that Devito had responded to the scene, and Cheshire Police Lieutenant Jay Markella testified at trial that Nastri had responded to the scene and entered the house with him as part of the department's special response team.

State *v.* Komisarjevsky

"look[ing] evil."[89] The defendant argues that this state-
ment would have supported his argument that Hayes
was the mastermind in charge of the events at the house
and that the defendant wanted no part of killing the P
family, especially when considered in light of evidence
of the defendant's apparent slow reaction to the
unfolding events, such as Patterson's statement. The
state argues that this statement was not material
because it was "gossip" that did not necessarily reflect
what Hayes or the defendant looked like at the time of
the home invasion. We agree with the state and con-
clude that this casual observation of Hayes' appearance
as "evil" was not material. In the absence of any evi-
dence that the officers heard Hayes make any state-
ments that would support the defendant's theory, an
offhand impression of Hayes as "look[ing] evil"—with

[89] The second communication consisted of the following conversation:
"[A Male Voice]: Did the officers get hurt in the cars at all?

"[A Male Voice]: No, they were not in the cars.

"[A Male Voice]: The cars looked wrecked.

"[A Male Voice]: Oh they—they are.

"[A Male Voice]: They are totaled, right?

"[A Male Voice]: They are totaled. . . . They had placed the cars so that
no one would drive into the area, and there was a little gap between them,
and the guy tried to—

"[A Male Voice]: Oh, I see what he did . . . he tried to park [indiscernible].
. . . He hit them hard, huh?

"[A Male Voice]: Oh yeah. . . . And they—I'm sure their car, you know
the victim's car was—

"[A Male Voice]: I saw the troop. I saw the troop. . . . I saw the two
dirtbag cars. . . . There was a red pickup and there was like a minivan.

"[A Male Voice]: Yeah.

"[A Male Voice]: I think that those are the two scumbags.

"[A Male Voice]: Yup.

"[A Male Voice]: Wow, I mean that—the older guy just looked evil.

"[A Male Voice]: Yeah?

"[A Male Voice]: He just looked evil. I mean you got—you know what?
Your heart just breaks as an officer watching that stuff. You know—I mean
it's heartbreaking for all of us to investigate it. You know? Cuz we have
families and all that crap too you know.

"[A Male Voice]: Well we have—Out of all the guys that went in . . . I
think I was probably the only one who didn't have children . . . and we
have [employee assistance programming] coming in tomorrow. . . ."

State *v.* Komisarjevsky

no further elaboration—does nothing to inform the jury's assessment of what actually happened in the P residence, whether considered in isolation or cumulatively. Accordingly, we conclude that this undisclosed evidence was not material for purposes of *Brady*.

IV

*NAPUE* AND *GIGLIO* CLAIMS ARISING FROM
PHOTOGRAPH ON DEFENDANT'S
CELL PHONE

The defendant next claims that the state deprived him of his right to a fair trial under *Giglio* v. *United States*, supra, 405 U.S. 150, and *Napue* v. *Illinois*, supra, 360 U.S. 264, among other cases, by presenting evidence that it knew or should have known was false or highly misleading, namely, an inflammatory photograph taken from the defendant's cell phone that the state's expert witness, John Brunetti, testified was of M in a sexually explicit pose. In contrast to Brunetti's testimony at the defendant's trial, John Farnham, an analyst at the state lab, who also testified at the defendant's trial, testified as an expert witness at Hayes' trial that the same photograph was of a different female, and not M, who was prepubescent. The defendant contends that Brunetti's testimony was, therefore, misleading evidence that violated his right to a fair trial because the state capitalized on it during closing argument, insofar as it was "exponentially more inflammatory by the state's claim that it depicted an eleven year old child," and it undermined portions of his statement stating that he did not anally rape M, believed that she was between fourteen and sixteen years old, and did not intend anyone to be killed or pour gasoline at the scene. In response, the state contends, inter alia, that "there is no reasonable possibility that any falsity affected the outcome of the trial." We agree with the state and conclude that there is no reasonable likelihood that any falsity or substantially

State *v.* Komisarjevsky

misleading testimony by Brunetti on this point affected the outcome of the defendant's trial.

The record reveals the following additional relevant facts and procedural history. At the defendant's trial, H. Wayne Carver II, then the state's chief medical examiner, testified about his autopsy of M. He described her as ''a young adolescent female,'' stating that she was eleven years old ''*and the body looked like it*, and, at the time of the autopsy, she weighed 124 pounds.'' (Emphasis added.) In describing the various samples that he took from M's body, Carver stated that he had taken ''a sample of hairs, and *I don't think she had much more than head hair*, but, *if she had other hairs*, we would have taken them and labeled them.'' (Emphasis added.) Carver further stated that he performed various ''swabs and smears'' to retrieve material from M's oral, vaginal, and anal areas.

Farnham, a retired state police detective who worked in the computer crime unit at the state lab, had examined, pursuant to a search warrant, cell phones belonging to the defendant and Hayes; he retrieved text messages from both phones and photographs from the defendant's phone. Farnham retrieved eight photographs within the date and time period specified by the search warrant; he testified that two depicted the defendant and six ''showed a young white female on a bed . . . .'' The six images were admitted into evidence as state's exhibit 209.[90]

Brunetti, who worked in the multimedia and image enhancement section of the state lab, had reviewed the six images in state's exhibit 209, which were taken between 7:27 and 9:14 a.m. on July 23, 2007. The first five images depict a partially clothed young female,

[90] Defense counsel objected to state's exhibit 209 on the ground that its prejudicial effect outweighed its probative value. The trial court overruled that objection. The defendant does not challenge that ruling in this appeal.

State *v.* Komisarjevsky

whose head is covered; two of those images are a close-up photograph of the female's genital area, which is covered by underwear. The sixth image in state's exhibit 209 depicts an unclothed female lying on her back, with her legs raised at close to a ninety degree angle; the female's genitalia and anus are covered by a black bar that Brunetti had added to the original photograph for ''[d]iscretion.'' Brunetti opined that all six of the images were of the same person, namely, M.[91] The defendant cross-examined Brunetti briefly but did not question him about his conclusion that the six images all depicted M.

In contrast to Brunetti's testimony at the defendant's trial, the record, as augmented on appeal after the *Floyd* hearing,[92] reveals that Farnham testified at Hayes' trial that the sixth image was of ''a different female, apparently older than the first female picture that was taken,''

[91] Brunetti determined that all six of the photographs depicted the same person, despite the fact that ''the last image is more of an image that's a close-up photograph,'' which did not contain ''a lot of the surrounding area that you see in the previous five images . . . .'' Brunetti based his opinion on ''some telltale signs that . . . led [him] to the conclusion that it was the same person. And the last photograph, what's consistent about that photograph, as compared to two or three of the other images, is that the person in the last photograph has some type of a cloth over the upper face chest area that proceeds under the left arm, and the arm's bent back, apparently past the head, and you could see the cloth going out, and it's consistent [in] both of those photographs. In addition, the female that's in that photograph has pretty much a pronounced chest cavity when she's lying on her back, you could see the bones of her chest cavity and they are consistent in both those images also.''

[92] During the pendency of this appeal, on November 13, 2015, the defendant filed a motion to augment the record pursuant to, inter alia, *State* v. *Floyd*, supra, 253 Conn. 700, to add to the record in this case a transcript of Farnham's testimony at Hayes' trial, along with the unredacted counterpart to state's exhibit 209 at Hayes' trial under seal. The defendant argued that this augmentation was necessary to establish a violation of *Napue* v. *Illinois*, supra, 360 U.S. 264, and its progeny. After a hearing, the trial court granted the defendant's motion over the state's objection and added the transcript and a copy of the exhibit—the authenticity of which was stipulated by all counsel—to the record for purposes of this appeal. This court subsequently upheld that decision when it granted a motion for review filed by the state but denied the relief requested.

338 Conn. 526      OCTOBER, 2021      645

State *v.* Komisarjevsky

and that, "[b]ased on the size of the person, *it doesn't appear to be the same person; this person has reached puberty.*" (Emphasis added.) As the defendant observes in his brief, the sixth image that was admitted into evidence at Hayes' trial is unredacted and "shows that the female has reached puberty and has more than head hair," which is inconsistent with Carver's description of M.

"Whether a prosecutor knowingly presented false or misleading testimony [in violation of a defendant's due process rights] presents a mixed question of law and fact, with the [trial] court's factual findings subject to review for clear error and the legal conclusions that the court drew from those facts subject to de novo review. . . .

"[D]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears. . . . Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require the prosecutor to apprise the court when he or she knows that the witness is giving testimony that is substantially misleading. . . .

"To establish a *Napue/Giglio* violation, then, the [defendant] must demonstrate that the state's witnesses provided material, false or substantially misleading testimony that the prosecutor failed to correct." (Citations omitted; internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 175–76, 243 A.3d 1163 (2020); see also id., 182–83 (explaining relationship between prosecutor's obligations under *Napue/Giglio* and prosecutor's disclosure obligations under *Brady* v. *Maryland*, supra, 373 U.S. 83); *Greene* v. *Commissioner of Correction*, supra, 330 Conn. 24–25 (*Napue* and *Giglio* "do not apply to merely 'misleading' testimony in the first instance. Rather, those cases require the prosecutor to correct *only* testimony that

State *v.* Komisarjevsky

is substantially misleading or false.'' (Emphasis in original.)).

Whether the prosecutor's presentation of false or substantially misleading testimony constitutes a due process violation depends on whether the evidence at issue is material. In contrast to conventional *Brady* claims, ''[w]hen . . . a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt. . . . This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial [impropriety], but more importantly because they involve a corruption of the truth-seeking function of the trial process. . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is readily shown . . . such that reversal is virtually automatic . . . *unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury.* . . .

''In accordance with these principles, our determination of whether [the witness'] false testimony was material under *Brady* and its progeny requires a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case

State *v.* Komisarjevsky

and the extent to which [the defendant was] otherwise able to impeach [the witness].'' (Emphasis in original; internal quotation marks omitted.) *State* v. *Jordan*, 314 Conn. 354, 370–71, 102 A.3d 1 (2014); see also *Marquez* v. *Commissioner of Correction*, supra, 330 Conn. 593– 94. ''[D]etermining materiality presents a question of law subject to plenary review.'' *Marquez* v. *Commissioner of Correction*, supra, 593.

Assuming without deciding that Brunetti's testimony at the defendant's trial that the sixth image in state's exhibit 209 depicted M was false or substantially misleading, we conclude that it was not material and did not violate the defendant's due process rights under *Napue* and *Giglio*.[93] Specifically, our review of the record demonstrates that there is no reasonable likelihood that Brunetti's testimony identifying the sixth photograph as M would have affected the jury's verdict, despite its inconsistency with Farnham's testimony on this point at Hayes' trial. First, there is no dispute that the other five images in state's exhibit 209 were of M, which corroborates the defendant's statement to the police that he took photographs of M for his ''personal

---

[93] Accordingly, we need not consider the state's arguments that (1) the testimony at issue constituted a mere inconsistency in opinion that did not rise to the level of false or misleading testimony, and (2) there was no due process violation because the defendant was aware of the claimed falsity through his review of the Hayes' trial record during trial preparation, and was not precluded from responding to it. But see *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 189–90 (stating that, ''although the burden is one shared by defense counsel and the trial court, the onus ultimately is on the prosecutor to not knowingly seek a conviction on the basis of false testimony and, should a state's witness testify falsely, to take such remedial measures before the jury retires as are necessary to ensure that it is not deceived,'' and adopting case-by-case multifactor approach to whether case is ''[an] exceptional [one] in which disclosure to defense counsel, standing alone, is sufficient to satisfy a prosecutor's obligations and to vindicate a defendant's rights under *Napue*''). We also need not consider the state's request that we reconsider our decision on the motion for review upholding the trial court's decision to grant the defendant's request to make Farnham's testimony at Hayes' trial and the unredacted photograph part of the trial record in this case. See footnote 92 of this opinion.

State *v.* Komisarjevsky

use.'' Second, the content of the image does not bear on any of the contested issues in the guilt phase, and particularly whether the sexual assault that the defendant had committed was by anal intercourse rather than the claimed cunnilingus, or whether he had the requisite intent to kill.[94] Third, if the person in the image at issue was not M, based on the timing of the photograph, it had to have been H, which would have added the differently inflammatory specter of an additional sexual assault victim to the case. Indeed, the entirely tangential nature of this issue is borne out by the defendant's failure to cross-examine Brunetti on this point, despite having had access to Farnham's testimony at Hayes' trial and indications in the photographs—namely, different bedding as a backdrop—that suggest that the images were of different people. Accordingly, we conclude that any misleading testimony on this point was not material under *Napue* and *Giglio*, and did not deprive the defendant of a fair trial.

V

CONDITIONS OF CONFINEMENT

Finally, the defendant claims that the trial court unconstitutionally applied the stringent conditions of confinement set forth in § 18-10b after his death sentence was vacated and he was resentenced to life imprisonment without the possibility of release and subsequently transferred to a prison in Pennsylvania. Specifically, the defendant contends that the restrictive conditions of confinement set forth in § 18-10b, as

---

[94] We acknowledge, as the defendant argues, that his claim regarding his estimation of M's age was discussed at closing argument in the context of the state's attack on the credibility of his statements that he did not pour the gasoline, intend anyone to be killed, or sexually assault M anally. Although the state argued that these assertions, which included an attack on the defendant's claimed belief that M was fourteen to sixteen years old, lacked credibility, its argument was not based on the photographs but, instead, focused on the likely content of the conversation about summer plans and school that the defendant claimed to have had with M.

State *v.* Komisarjevsky

implemented by an administrative directive of the department, constitute an ex post facto law, violate equal protection, and are excessive and disproportionate, in violation of the eighth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution. In response, the state relies on *State* v. *Campbell*, supra, 328 Conn. 444, and argues that this claim is not ripe for review because the record lacks evidence or factual findings regarding the defendant's conditions of confinement or the procedures utilized by the department in determining those conditions. We agree with the state and conclude that this conditions claim, although ripe, is not reviewable in this direct appeal.

In *Campbell*, the defendant, Jessie Campbell III, argued that his penalty phase claims were not moot, despite the abolition of the death penalty, because he would suffer collateral consequences as a result of the previously imposed death sentence, namely, the imposition of restrictive conditions of confinement pursuant to § 18-10b. See *State* v. *Campbell*, supra, 328 Conn. 461. We agreed with the state's argument that Campbell's conditions of confinement claim was not yet ripe for review[95] because those conditions "have not yet been settled, as [Campbell] ha[d] not yet been resentenced.

___

[95] "The doctrines of mootness and ripeness both implicate justiciability. . . . Mootness implicates this court's subject matter jurisdiction, raising a question of law over which we exercise plenary review. . . . An issue is moot when the court can no longer grant any practical relief. . . . [T]he rationale behind the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . . Accordingly, in determining whether a case is ripe, a . . . court must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent [on] some event that has not and indeed may never transpire." (Citations omitted; internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 463.

State *v.* Komisarjevsky

Additionally, there ha[d] been no factual findings as to how, if at all, [Campbell's] confinement, after resentencing, would differ from those of any inmate who is similarly situated.'' Id., 462–63. We further concluded that, ''because [Campbell's] argument centers on a potential challenge to conditions of confinement, the proper vehicle for those claims is a petition for a writ of habeas corpus.'' Id., 463. Accordingly, we dismissed the appeal in *Campbell* ''with respect to his claims challenging the penalty phase and the sentence of death.'' Id., 466; see id., 463 n.5 (deeming penalty phase claims challenging death sentence moot).

Although the defendant in this case has been resentenced, in contrast to Campbell, whose resentencing was still hypothetical, rendering a challenge thereto not ripe; see id., 464; that is a distinction without a difference with respect to the reviewability of the merits of the defendant's claim in this appeal. With respect to the equal protection challenge in particular, which focuses on the claimed disparate treatment of defendants who had received life sentences after the abolition of the death penalty as compared to capital defendants who had previously received life sentences, there is no evidence in the record beyond an averment of information and belief in the defendant's brief as to the treatment of similarly situated inmates. Additionally, there is no evidence as to the conditions of confinement actually imposed on the defendant, who is presently incarcerated in Pennsylvania. Any merit with respect to the defendant's § 18-10b claims aside, they implicate his conditions of confinement. ''It is well established that the proper vehicle by which a defendant may challenge his conditions of confinement is a petition for a writ of habeas corpus. . . . The present case illustrates perfectly why a habeas petition is the proper vehicle. In the habeas court, the defendant will have the opportunity to present any and all evidence that is relevant to his

claim. That court is empowered to make factual findings on that evidence. This court is not." (Citation omitted.) Id., 465–66. Accordingly, we leave the merits of the defendant's conditions of confinement claim under § 18-10b to a subsequent habeas corpus proceeding.[96]

The judgment is affirmed.

In this opinion the other justices concurred.

———————————————